**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GULF RESTORATION NETWORK, et al., | Civil Action No. 18-01674-RBW |
| *Plaintiffs*, | Hon. Reggie B. Walton |
| v. | |
| DAVID BERNHARDT, et al., | |
| *Defendants*, | |
| and | |
| AMERICAN PETROLEUM INSTITUTE, et al., | |
| *Intervenor-Defendants*. | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR**
**SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... iv

INDEX OF EXHIBITS ................................................................................................x

INTRODUCTION ........................................................................................................1

STATUTORY AND REGULATORY FRAMEWORK ...............................................2

I. THE NATIONAL ENVIRONMENTAL POLICY ACT ...................................2

II. THE OUTER CONTINENTAL SHELF LANDS ACT....................................3

STATEMENT OF FACTS ...........................................................................................5

I. THE GULF OF MEXICO SUPPORTS RICH ECOSYSTEMS AND A ROBUST
ECONOMY THAT ARE THREATENED BY OIL AND GAS OPERATIONS. ............5

    A. The Gulf of Mexico's Ecosystems and Economy....................................5

    B. Environmental Risks from Oil and Gas Operations in the Gulf .............6

    C. The *Deepwater Horizon* Disaster...........................................................7

II. INTERIOR'S RESTRUCTURED LEASING PROGRAM EXPANDS OIL AND
GAS DEVELOPMENT IN THE GULF OF MEXICO.......................................8

III. INTERIOR'S REPEAL OF CRITICAL OFFSHORE DRILLING SAFETY
MEASURES INCREASES THE RISK OF A CATASTROPHIC OIL SPILL. ...............10

IV. LEASE SALES 250 AND 251 ARE BASED ON INACCURATE NEPA
ANALYSES AND A MISREPRESENTATION OF THE ENVIRONMENTAL
EFFECTS OF A LEASE SALE. ....................................................................13

    A. Irrational Assumption that Environmental Effects of a Lease Sale Would
Still Occur Under a No Action Alternative............................................14

    B. Incorrect Assumptions that Repealed Regulations and Nonexistent
Enforcement Would Reduce Risks ........................................................15

        1. Repealed safety regulations ......................................................16

        2. Lax enforcement .......................................................................18

    C. Inaccurate Assumptions Undermining Oil and Gas Activity Level
Forecasts Based on an Incorrect Royalty Rate ....................................20

STANDARD OF REVIEW .........................................................................................21

ARGUMENT ..................................................................................................................22

I.      BOEM IRRATIONALLY AND UNLAWFULLY ASSUMED THAT THE
        SAME ENVIRONMENTAL EFFECTS WOULD OCCUR EVEN IF IT DID
        NOT HOLD THE LEASE SALES ...................................................................23

        A.      BOEM Failed to Evaluate a True No Action Alternative By Assuming the
                Same Leases and Resulting Development Would Occur in the Future. ...............25

        B.      BOEM Irrationally Assumed that Future Leasing Would Result in the
                Same Effects Under the No Action Alternative. .....................................................27

II.     BOEM FAILED TO RATIONALLY ASSESS THE EFFECTS OF THE LEASE
        SALES ON THE ENVIRONMENT. ...............................................................32

        A.      BOEM Unreasonably Assumed Drilling Safety Would Be Ensured by
                Regulations Being Repealed. ................................................................................32

        B.      BOEM Disregarded that Safety Regulations Are Not Being Enforced
                When Assessing Drilling Safety. ..........................................................................39

        C.      BOEM Unreasonably Assumed that a Policy Intended to Increase
                Offshore Drilling Would Have No Meaningful Effect on Offshore
                Drilling. .................................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AEP Texas North Co. v. Surface Transportation Board.*
609 F.3d 432 (D.C. Cir. 2010) ...........................................................................44, 45

*Blue Mountains Biodiversity Project v. Blackwood,*
161 F.3d 1208 (9th Cir. 1998) ...................................................................................38

*BNSF Ry. Co. v. Surface Transp. Bd.,*
741 F.3d 163 (D.C. Cir. 2014) ..................................................................................39

*Bob Marshall All. v. Hodel,*
852 F.2d 1223 (9th Cir. 1988) ...................................................................................24

*Camp v. Pitts,*
411 U.S. 138 (1973)...................................................................................................22

*Camreta v. Greene,*
563 U.S. 692 (2011)...................................................................................................27

*Conservation Council for Hawaii v. National Marine Fisheries Service,*
97 F.3d 1210 (D. Haw. 2015) ....................................................................................26

*Conservation Nw. v. Sherman,*
715 F.3d 1181 (9th Cir. 2013) ...................................................................................24

*Ctr. for Biological Diversity v. U.S. Dept. of Interior,*
623 F.3d 633 (9th Cir. 2010) .............................................................24, 26, 27, 30

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA,*
785 F.3d 1 (D.C. Cir. 2015) .................................................................................36, 41

*Friends of Back Bay v. U.S. Army Corps of Eng'rs,*
681 F.3d 581 (4th Cir. 2012) ....................................................................................40

*Fund for Animals v. Babbitt,*
903 F. Supp. 96 (D.D.C. 1995) .................................................................................22

*Getty v. Fed. Sav. & Loan Ins. Corp.,*
805 F.2d 1050 (D.C. Cir. 1986)................................................................................43

*Gov't of the Province of Manitoba v. Salazar,*
691 F. Supp. 2d 37 (D.D.C. 2010) ...........................................................................36

*Grazing Fields Farm v. Goldschmidt,*
   626 F.2d 1068 (1st Cir. 1980) .................................................................38

*Hammond v. Norton,*
   370 F. Supp. 2d 226 (D.D.C. 2005) .........................................................38

*Haw. Longline Ass'n. v. Nat'l Marine Fisheries Serv.,*
   281 F. Supp. 2d 1 (D.D.C. 2003) .............................................................36

*High Country Conservation Advocates v. U.S. Forest Serv.,*
   52 F. Supp. 3d 1174 (D. Colo. 2014) .......................................................38

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) .................................................................................23

*Lewis v. Sec'y of Navy,*
   195 F. Supp. 3d 277 (D.D.C. 2016) .........................................................21

*Mercy Gen. Hosp. v. Azar,*
   No. CV 16-99 (RBW), 2018 WL 4680207 (D.D.C. Sept. 29, 2018)........22

*Metcalf v. Daley,*
   214 F.3d 1135 (9th Cir. 2000) .................................................................39

*Mo. Pub. Serv. Comm'n v. FERC,*
   337 F.3d 1066 (D.C. Cir. 2003) ....................................................33, 34, 42

*\*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.
Auto. Ins. Co.,*
   463 U.S. 29 (1983).................................................22, 32, 36, 39, 40, 41, 42

*Nat. Res. Def. Council v. Daley,*
   209 F.3d 747 (D.C. Cir. 2000) .................................................................22

*Nat. Res. Def. Council v. EPA,*
   489 F.3d 1364 (D.C. Cir. 2007) ...............................................................23

*Nat'l Wildlife Fed'n v. Marsh,*
   568 F. Supp. 985 (D.D.C. 1983) ..............................................................38

*\*Native Ecosystems Council v. U.S. Forest Serv.,*
   418 F.3d 953 (9th Cir. 2005) ......................................................... *passim*

*\*Native Vill. of Point Hope v. Jewell,*
   740 F.3d 489 ...........................................................................22, 23, 34, 42

*New York v. Nuclear Regulatory Comm'n,*
   681 F.3d 471 (D.C. Cir. 2012) ...................................................................2

*North Carolina Wildlife Federation v. North Carolina Dep't of Transp.*
  677 F.3d 596 (4th Cir. 2012) ...................................................................30

*Oceana v. Bureau of Ocean Energy Mgmt.,*
  37 F. Supp. 3d 147 (D.D.C. 2014) .........................................................27, 30, 31

*Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.,*
  625 F.3d 1092 (9th Cir. 2010) ................................................................43

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.,*
  494 F.3d 188 (D.C. Cir. 2007) ..............................................................43, 44

*Republic Airline Inc. v. U.S. Dep't of Transp.,*
  669 F.3d 296 (D.C. Cir. 2012) ................................................................41

*Shands Jacksonville Med. Ctr. v. Burwell,*
  139 F. Supp. 3d 240 (D.D.C. 2015) .........................................................44

*Sierra Club v. FERC,*
  867 F.3d 1357 (D.C. Cir. 2017) ..........................................................3, 21, 35

*Sierra Club v. Salazar,*
  177 F. Supp. 3d 512 (D.D.C. 2016) ...................................................22, 34, 38, 44

*Sierra Club v. Salazar,*
  177 F. Supp. 3d at 532–33 ...............................................................38, 42, 43

*Sierra Club v. U.S. Army Corps of Eng'rs,*
  701 F.2d 1011 (2d Cir. 1983) .................................................................35

*Taylor v. FDIC,*
  132 F.3d 753 (D.C. Cir. 1997) ................................................................22

*Vill. of False Pass v. Clark,*
  733 F.2d 605 (9th Cir. 1984) .................................................................4, 22

*Westlands Water Dist. v. U.S. Dept. of Interior,*
  376 F.3d 853 (9th Cir. 2004) .................................................................24

*\* Authorities upon which we chiefly rely are marked with an asterisk*

**Statutes**
5 U.S.C. § 706(2)(A).............................................................................21

42 U.S.C. § 4321...................................................................................2

42 U.S.C. § 4331...................................................................................2

42 U.S.C. § 4332(2)(C) .................................................................................................2, 22

43 U.S.C. § 1301(a) ................................................................................................................4

43 U.S.C. § 1331 ....................................................................................................................4

43 U.S.C. § 1337 ....................................................................................................................4

43 U.S.C. § 1340 .................................................................................................................4, 5

43 U.S.C. § 1344 ....................................................................................................................4

43 U.S.C. § 1344(a) ..............................................................................................................27

43 U.S.C. § 1346(a)(1) .........................................................................................................22

43 U.S.C. § 1351 .................................................................................................................4, 5

**Regulations**

30 C.F.R. § 250.101 ...............................................................................................................4

30 C.F.R. § 250.414 .............................................................................................................38

30 C.F.R. § 250.724 .............................................................................................................37

30 C.F.R. § 250.730 .........................................................................................................37, 38

30 C.F.R. § 250.731 .............................................................................................................37

30 C.F.R. § 250.732 .............................................................................................................37

30 C.F.R. § 250.734 .........................................................................................................37, 38

30 C.F.R. § 250.738 .............................................................................................................37

30 C.F.R. § 250.739 .............................................................................................................37

30 C.F.R. § 250.802(c)(1) .....................................................................................................12

30 C.F.R. § 550.101 ...............................................................................................................4

30 C.F.R. § 550.105 ...............................................................................................................4

30 C.F.R. § 550.201 ...............................................................................................................5

30 C.F.R. § 550.207 ...............................................................................................................4

30 C.F.R. § 550.208 ...............................................................................................................4

30 C.F.R. § 550.209 .................................................................................................................4

30 C.F.R. § 550.210 .................................................................................................................4

40 C.F.R. § 1500.1 ..........................................................................................................2, 3, 39

40 C.F.R. § 1500.3 .................................................................................................................2

40 C.F.R. § 1502.1 ..........................................................................................................2, 3, 39

40 C.F.R. § 1502.2(g) ...........................................................................................................39

40 C.F.R. § 1502.9(c) ...........................................................................................................13

40 C.F.R. § 1502.14 ....................................................................................................3, 24, 31

40 C.F.R. § 1502.20 .........................................................................................................13, 39

40 C.F.R. § 1502.24 .................................................................................................................3

40 C.F.R. § 1508.28 ...............................................................................................................13

Fed. R. Civ. P. 56(a) .............................................................................................................21

**Federal Register Notices**

46 Fed. Reg. 18,026, (Mar. 23, 1981) ...............................................................................24, 31

48 Fed. Reg. 10,605 (Mar. 10, 1983) .......................................................................................4

76 Fed. Reg. 64,432 (Oct. 18, 2011) ........................................................................................4

80 Fed. Reg. 21,504 (Apr. 17, 2015) ......................................................................................11

81 Fed. Reg. 25,888 (Apr. 29, 2016) ...........................................................................11, 12, 33

81 Fed. Reg. 61,834 (Sept. 7, 2016) ..................................................................................12, 33

81 Fed. Reg. 84,612 (Nov. 23, 2016) ........................................................................................9

82 Fed. Reg. 49,659 (Oct. 26, 2017) .......................................................................................13

82 Fed. Reg. 61,703 (Dec. 29, 2017) ................................................................................12, 37

82 Fed. Reg. 6643 (Jan. 19, 2017) ..........................................................................................13

83 Fed. Reg. 22,128 (May 11, 2018) ................................................................................11, 37

83 Fed. Reg. 49,216 (Sept. 28, 2018) ...............................................................................12, 13

83 Fed. Reg. 58,040 (Nov. 16, 2018)............................................................................................12

## INDEX OF EXHIBITS

Exhibit A:      Declaration of Christopher D. Eaton in Support of Plaintiffs' Motion for
                Summary Judgment

Exhibit B:      Declaration of Scott Eustis

Exhibit C:      Declaration of Peter Galvin

Exhibit D:      Declaration of Athan Manuel

Exhibit E:      Declaration of Kenneth Saxon

Exhibit F:      Declaration of Todd Steiner

## INTRODUCTION

The Bureau of Ocean Energy Management ("BOEM"), an agency within the Department of the Interior ("Interior"), held two offshore oil and gas lease sales in 2018—Offshore Lease Sales 250 and 251—offering essentially all unleased acreage in the Gulf of Mexico for sale to the oil and gas industry. The sales were part of a bigger effort by Interior to greatly increase the oil and gas production from offshore waters. In 2017, Interior began implementing several policies in the Gulf aimed at encouraging oil and gas development, including offering Gulf-wide lease sales to decrease competition and reducing federal royalty rates on those leases. At the same time, Interior began repealing offshore safety regulations enacted after the *Deepwater Horizon* disaster that are critical to preventing harmful accidental oil and gas spills.

BOEM completed a National Environmental Policy Act ("NEPA") analysis of the lease sales' environmental effects, but inexplicably assumed that repealed polices and regulations would reduce the sales' environmental risks and harms—i.e., that the safety regulations slated for repeal would limit the risks of accidents and catastrophic oil spills, and that leasing and development would occur under older policies without new development incentives. BOEM also irrationally assumed that the environmental effects of holding the lease sales would be approximately the same as not holding the sales because the same leases would be sold eventually, regardless whether either Lease Sale 250 or 251 were held. The effect of these erroneous assumptions is that BOEM vastly underestimated the overall effects of holding the lease sales on the vibrant and economically important environment in the Gulf of Mexico and understated the risks of major accidental events. In the wake of such catastrophic events as the *Deepwater Horizon* accident and ongoing Taylor Energy oil spill, Gulf wildlife and communities cannot afford additional harm from undisclosed risks that further threaten critical ecosystems.

NEPA requires each federal agency to take a "hard look" at the environmental effects of

its actions based on accurate information.  The agency may not rely on facts and assumptions it

knows are false, nor discount effects on the fictional basis that they would probably happen

regardless.  BOEM's heavy reliance on untrue notions unlawfully skewed its evaluation of the

lease sales' environmental effects, and misinformed the public and the decisionmaker about

those effects.  Plaintiffs Gulf Restoration Network, Sierra Club, and Center for Biological

Diversity ("Conservation Groups") therefore ask this Court to find that BOEM violated NEPA

and the Administrative Procedure Act ("APA"), and to vacate BOEM's decisions to hold Lease

Sales 250 and 251.

## STATUTORY AND REGULATORY FRAMEWORK

## I.      The National Environmental Policy Act

NEPA is this country's "basic national charter for protection of the environment."

40 C.F.R. § 1500.1; *see* 42 U.S.C. § 4331 *et seq.*[1]  Congress enacted NEPA to "promote efforts

which will prevent or eliminate damage to the environment" and to ensure that federal agencies

incorporate environmental concerns into the decisionmaking process.  42 U.S.C. §§ 4321,

4331(a)–(b); *see New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 476 (D.C. Cir. 2012).

To that end, NEPA requires all federal agencies to prepare a "detailed statement," called

an Environmental Impact Statement ("EIS"), for all "major federal actions significantly affecting

the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The EIS must provide a "full

and fair discussion of significant environmental impacts and . . . inform decisionmakers and the

public of the reasonable alternatives that would avoid or minimize adverse impacts or enhance

the quality of the human environment."  40 C.F.R. § 1502.1.

The EIS process "forces the agency to take a 'hard look' at the environmental

---

[1] The Council on Environmental Quality has promulgated regulations implementing NEPA, which are "binding on all federal agencies."  40 C.F.R. § 1500.3; *see id.* §§ 1500.1–1508.28.

consequences of its actions, including alternatives to its proposed course," and "ensures that these environmental consequences, and the agency's consideration of them, are disclosed to the public." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citations omitted). The agency must perform this duty using high-quality, accurate scientific information and must ensure the scientific integrity of its analyses. 40 C.F.R. §§ 1500.1(b), 1502.24; *see Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) ("To take the required 'hard look' at a proposed project's effects, an agency may not rely on incorrect assumptions or data in an EIS." (citing 40 C.F.R. § 1500.1(b))). NEPA also requires an agency to show its work: the agency must, in the EIS, "identify any methodologies used and . . . make explicit reference . . . to the scientific and other sources relied upon for conclusions." 40 C.F.R. § 1502.24.

Analysis of alternatives is "the heart of the environmental impact statement." *Id.* § 1502.14. In an EIS, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives," including "the alternative of no action." *Id.* § 1502.14(a), (d). The agency must "present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public." *Id.* § 1502.14.

NEPA requires agencies to incorporate their assessments of environmental effects into their decisionmaking processes. *Id.* § 1502.1. "NEPA's purpose is not to generate paperwork— even excellent paperwork—but to foster excellent action." *Id.* § 1500.1(c).

## II.      The Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act ("OCSLA") governs the leasing, exploration,

development, and production of oil and gas deposits on the Outer Continental Shelf.[2] 43 U.S.C.

§ 1331 *et seq.* Through OCSLA, Congress authorized Interior to lease portions of the Outer

Continental Shelf to qualified bidders. The Secretary of the Interior has made BOEM

responsible for managing the development of offshore resources, including offering lease sales

and conducting environmental analyses for the sales. 76 Fed. Reg. 64,432, 64,432 (Oct. 18,

2011); 30 C.F.R. § 550.101. The Secretary has made another agency within Interior, the Bureau

of Safety and Environmental Enforcement ("BSEE"), responsible for offshore safety and

environmental regulation and enforcement. 76 Fed. Reg. at 64,432; 30 C.F.R. § 250.101.

OCSLA prescribes four, tiered stages for the Secretary to manage offshore oil and gas

development: 1) five-year leasing programs; 2) lease sales; 3) exploration plans; and

4) development and production plans. 43 U.S.C. §§ 1344, 1337, 1340, 1351. At the five-year

program stage, the Secretary plans how and where to offer leases over the upcoming five-year

period. *Id.* § 1344(a). During the next three stages, BOEM authorizes oil and gas activities.

NEPA review applies to each stage in the OCLSA process, including the lease sale stage at issue

in this case. *See Vill. of False Pass v. Clark*, 733 F.2d 605, 609, 614 (9th Cir. 1984).

At the lease sale stage, BOEM offers for sale leases that "entitle the lessee to explore,

develop, and produce the oil and gas contained within the lease area," subject to certain

additional approvals. 43 U.S.C. § 1337(b)(4); *see* 30 C.F.R. §§ 550.105, .207–.210 (authorizing

"ancillary activities" on leases). Upon obtaining a lease, the lessee can conduct oil and gas-

related activities such as seismic surveying and geological exploration. 30 C.F.R. § 550.207.

Lessees can also seek BOEM approval of an exploration plan to conduct activities such as

---

[2] The Outer Continental Shelf extends from the outer boundary of state waters—which ranges from three to nine
nautical miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical
miles from shore. 43 U.S.C. §§ 1301(a), 1331(a); 48 Fed. Reg. 10,605 (Mar. 10, 1983).

exploratory drilling, and a development production plan to commence production or

development on a lease.  43 U.S.C. §§ 1340, 1351; *see* 30 C.F.R. § 550.201.

## STATEMENT OF FACTS

I.    **The Gulf of Mexico Supports Rich Ecosystems and a Robust Economy that Are Threatened by Oil and Gas Operations.**

The Gulf of Mexico is an ecologically rich area and is vitally important to coastal

communities all along the Gulf Coast.  Millions of people who live in the area depend on its

productive marine environment to support coastal fisheries, tourism, and recreation—the

backbones of the Gulf States' economies.  This environmentally important area is not pristine,

however.  A myriad of oil and gas operations currently permeate these vast, interconnected

ecological systems.  The development imposes huge environmental risks to the tourism, fishing,

and ecosystems on which the Gulf's coastal communities rely for their livelihoods.

A.    **The Gulf of Mexico's Ecosystems and Economy**

The Gulf of Mexico is an extraordinary aesthetic, economic, and environmental resource

to the nation, supporting some of the nation's most productive and biodiverse tropical and

temperate ecosystems.  AR0026754–58.  It is home to thousands of marine and coastal species,

including invertebrates, coral, fish, marine mammals, shore and coastal bird species, and five of

the world's seven species of sea turtles.  AR0014396–428, 0026772–76.  In addition, many of

the marine species living in the Gulf of Mexico are listed as endangered or threatened under the

Endangered Species Act.  AR0008778–79.  The Gulf's hard- and soft-bottom communities,

wetlands, seagrass beds, and mangroves provide the food, shelter, and spawning habitat

necessary to support this rich assemblage of marine life.  AR0026029, 0026767–72.

The Gulf of Mexico's abundant resources also support a robust economy.  The region

produces more than one-third of the nation's domestic seafood supply.  Nat'l Comm'n on the BP

Deepwater Horizon Oil Spill and Offshore Drilling, *Deep Water: The Gulf Oil Disaster and the Future of Offshore Drilling, Report to the President* 186–87 (2011).[3]  The area also supports a "highly popular and profitable recreational fishery."  AR0026758, 0026774.  Tourism and recreation are significant parts of the region's economy that are highly dependent on healthy natural resources.  AR0026758.  For example, the vast abundance of birds that live in or migrate through the area generate billions of dollars annually through hunting and bird-watching activities.  AR0026082.  The Gulf's commercial fisheries and coastal tourism alone generate more than $40 billion annually in economic activity.  Nat'l Comm'n, *supra*, at 187; AR0026048.

## B.      Environmental Risks from Oil and Gas Operations in the Gulf

In the midst of this vitally important assemblage of wildlife is an extensive landscape of oil and gas operations.  There were more than 2,600 active offshore oil and gas platforms in the Gulf as of 2013.  AR0008429.  Vast networks of oil and gas pipelines crisscrossing the seafloor, along with numerous transport vessels, storage facilities, and onshore terminals, support these operating platforms.  AR0008304–07, 0008348–59.  In addition, lessees conduct numerous, year-round activities that affect the environment.  For example, lessees: conduct surveys to locate oil and gas deposits beneath the seafloor using loud blasts of sound from airguns; drill wells; install pipelines and other structures on and under the seafloor and through coastal wetlands; pump oil and gas to the surface; conduct fracking of wells with associated toxic chemicals; and load and transport oil, gas, and cargo on ships.  AR0008273–368.

These activities cause numerous harmful environmental effects, including oil spills (both large and small), bottom habitat destruction, marine debris, water pollution, and noise (from

---

[3] This document and three other administrative record documents do not have Bates numbers, but are part of the administrative record.  *See* Eaton Decl., attached as Ex. A.

vessels, surveys, construction, and general operations).  *E.g.*, AR0008289–395.  Oil and gas activities also degrade air quality, erode coastal wetlands, impair commercial and recreational fishing opportunities, harm archaeological resources, degrade recreational and aesthetic experiences, and contribute significantly to climate change.  *E.g.*, AR0008522–9012.

Oil and gas operations in the Gulf of Mexico experience accidents, spill oil, and otherwise cause environmental harm on a daily basis.  Between 2002 and 2015, there were nearly 5,000 oil spill events just in the coastal waters of the Gulf.  AR0008373–76.  From 2007 through 2015, Interior's records show six losses of well control per year on average (48 total) in the Gulf.  AR0008396.  Loss of well control usually results in a release of pollutants like oil or gas into the environment and can lead to the uncontrolled flow of fluids from the well (known as a blowout) as a result of an equipment or human failure.  *Id.*  These spills and accidents are not easy to control.  Once a spill occurs, it can release oil and other fluids into the environment for months (*Deepwater Horizon*) or even decades.  For example, an oil well owned by Taylor Energy that was damaged by Hurricane Ivan in 2004 has continuously released thousands upon thousands of gallons of oil for the past fifteen years; Interior estimates that the oil discharge from that site "could continue for 100 years or more."  AR0008382–83.

Over time, the oil and gas industry in the Gulf has drilled in ever deeper waters.  AR0008298; Nat'l Comm'n, *supra*, at vii–ix, 39–53, 73.  Operations at deeper depths pose unique risks, exposing equipment to strong ocean currents, low water temperatures, and high water pressures.  AR0008397; Nat'l Comm'n, *supra*, at ix, 51–53.  In addition, experts still understand relatively little about the geology and effects of pressure in ultra-deepwater wells.  Nat'l Comm'n, *supra*, at 52.

## C.     The *Deepwater Horizon* Disaster

The environmental effects of offshore drilling can quickly become catastrophic, as when

the *Deepwater Horizon* rig exploded and sank on April 20, 2010, killing eleven people and causing the largest offshore oil spill in the history of the United States. AR0025300–23. The explosion caused 134 million gallons of oil and unquantified amounts of natural gas to gush continuously and uncontrollably from a well on the seabed, nearly 5,000 feet below the ocean's surface, over 87 days. AR0025307. In an effort to break apart large concentrations of oil, responders released nearly 2 million gallons of toxic dispersants into Gulf waters. AR0025301.

The spill marred coastal and marine habitats, causing severe damage to the ecosystems that support the Gulf's biodiversity, including the deaths of billions if not trillions of animals. *E.g.*, AR0021560–66, 0025324–960, 0026726–27, 0028408–25, 0028585–96; *see* AR0014371 ("[T]he injuries caused by the *Deepwater Horizon* oil spill affected a wide array of linked resources over an enormous area, and . . . must be described as an eco-system-level injury."). The spill also resulted in severe economic harm. AR0028636–37; Nat'l Comm'n, *supra*, at 185–91. Government officials responded to the spill by closing over 88,500 square miles (over one-third of the Gulf) to commercial and recreational fishing. AR0025317–18. Gulf tourism suffered similar harm. Nat'l Comm'n, *supra*, at 185.

In the aftermath of the spill, the Presidentially appointed National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling described BOEM's predecessor as an agency that was "unable to . . . [keep] pace with the changing risks and volume of offshore activity." *Id.* at 79. The Commission found that the spill was linked to the "culture of complacency with regard to NEPA [that] developed within [BOEM's predecessor]." *Id.* at 82.

## II.   Interior's Restructured Leasing Program Expands Oil and Gas Development in the Gulf of Mexico.

BOEM estimates that there is at least a 99% chance of another large oil spill occurring in the Gulf as a result of its OCSLA oil and gas program. AR0008391–92 (Table 3-20). Yet,

despite that disastrous likelihood, as well as the huge environmental and economic risks that oil

and gas operations already impose on the Gulf communities and wildlife, Interior recently has

begun pushing to expand oil and gas exploration and development to unprecedented levels in the

Gulf of Mexico through a series of incentives.

Interior first restructured the lease sale process to promote the sale of oil and gas leases.

Prior to 2016, Interior had never held a lease sale spanning the entire Gulf of Mexico.  Rather, it

held separate lease sales for the three discrete planning areas of the Gulf: the Western, Central,

and Eastern Planning Areas.[4]  AR0014291.  Interior changed its leasing approach in 2016 when

it adopted a five-year leasing program for 2017–2022 that offered essentially all unleased acres

in the Central and Western Planning Areas, as well as the portion of the Eastern Planning Area

not subject to a Congressional moratorium for lease in each of ten lease sales, two per year.  *See*

81 Fed. Reg. 84,612, 84,613 (Nov. 23, 2016).  Increasing the supply of available acreage in each

lease sale has the effect of reducing the competition among oil companies for the leases, which

consequently drives down bid prices and enables companies to acquire broader swaths of oil and

gas leases.  AR0015357.  Interior later stated that it adopted the "region-wide approach" to

provide "more frequent opportunity to bid on rejected, relinquished, or expired [Outer

Continental Shelf] lease blocks in all three [Gulf of Mexico] planning areas" and to "expedite

and increase the present value of leasing and tax revenues."  AR0001636.

Interior next acted to boost offshore oil and gas production on June 27, 2017, when it

reduced the royalty rate from 18.75% to 12.5% for leases in shallow waters (<200 meters).

---

[4] The Western Planning Area extends offshore from the Texas-Louisiana border to the Mexico border.  AR0014293.
The Central Planning Area extends offshore from the Texas-Louisiana border to the Alabama-Florida border.  *Id.*
The Eastern Planning Area covers Gulf waters offshore of Florida eastward of the state's border with Alabama.  *Id.*
Most of the Eastern Planning Area is presently subject to a Congressional moratorium on new leasing until 2022.
AR0014307.

AR0000006–09.  The royalty rate is the rate that companies pay the federal treasury for oil and gas extracted from leases.  *See id.*; Bureau of Ocean Energy Mgmt., *Lease Term Reassessment Report: GOM Lease Sales 251 (August 2018) and 252 (March 2019)*, at 43 (2018), *see* note 3, *supra*.  As Interior noted, "shallow water leasing, drilling, and production [had] declined precipitously in recent years."  AR0000006.  So Interior reduced the royalty rate because it would "lead to increases in the number of shallow water blocks sold" and "a slight increase in shallow water production."  AR0000007.  Interior expected the reduction to "encourage competition" and "increase activity resulting in positive employment benefits."  AR0000010.[5]

### III.    Interior's Repeal of Critical Offshore Drilling Safety Measures Increases the Risk of a Catastrophic Oil Spill.

At the same time that Interior has been moving to expand oil and gas development in the Gulf, it has been working to remove perceived regulatory barriers to development, rolling back two critical offshore safety regulations: (1) the Blowout Preventer Systems and Well Control Rule ("Well Control Rule") and (2) the Production Safety Systems Rule ("Production Safety Rule").  BSEE enacted these regulations in 2016 to implement lessons learned from the *Deepwater Horizon* disaster to ensure that the same mistakes are not made again.  Interior and offshore drilling experts had determined these regulations would improve drilling and production safety by a considerable degree.  Interior's repeal of some of the regulations' most critical measures significantly increases the risks of offshore accidents and oil spills.

Expert panels investigating the cause of the *Deepwater Horizon* disaster identified a number of human and technical failures that led to the loss of well control and blowout.  One "consistent element" in the investigations was that stricter federal requirements for blowout

---

[5] Indeed, BOEM later found that the royalty rate reduction likely led to "a meaningful increase in the number of shallow water blocks receiving bids" in Lease Sale 250.  AR0002555; *see* AR0002548 (noting increase of more than 200 percent in high bids for shallow water blocks after lowering royalty rate).

preventers[6] and well-control equipment and practices were necessary to ensure drilling safety.

80 Fed. Reg. 21,504, 21,508 (Apr. 17, 2015).  BSEE enacted many of the specific requirements

that the expert panels recommended in its Well Control Rule.  81 Fed. Reg. 25,888.  The Rule

prescribed a number of new technological and methodological measures drilling operators must

implement to reduce the likelihood of a catastrophic well blowout and spill when unforeseen or

unstable conditions are encountered in the well.  *Id.* at 26,013–38; *see also* 80 Fed. Reg. at

21,509–11.  BSEE concluded each of these measures would improve drilling safety and well

control, significantly reducing the risks of accidents and oil spills.  *E.g.*, 81 Fed. Reg. at 25,890–

91 (noting that ensuring the "integrity of the wellbore and maintaining control over the pressure

and fluids during well operations are critical aspects of protecting worker safety and the

environment"), 25,894, 25,986–87 & n.27.[7]

Just two years later, BSEE proposed extensive cuts to the Well Control Rule.  83 Fed.

Reg. 22,128 (May 11, 2018).[8]  Among the most consequential repeals BSEE proposed were:

(1) eliminating requirements to obtain regulator approval before taking certain higher-risk

drilling actions; (2) eliminating required improvements to blowout preventers; (3) removing

requirements to monitor wells in real-time to detect potential problems; (4) eliminating required

independent certifications that certain equipment will function properly; and (5) eliminating the

minimum "safe" level at which well pressures must be kept.  *Id.* at 22,132–42.  Repealing any

---

[6] Blowout preventers are mechanisms of last-resort that are intended to seal a well and prevent oil and gas from erupting from the seafloor if operators lose control of the well.  AR0008398.  The blowout preventer installed on the *Deepwater Horizon* lacked capacity to seal under the conditions, even though it met the regulatory standards at the time.  Nat'l Comm'n, *supra*, at 114–15; 81 Fed. Reg. 25,888, 25,956–57 (Apr. 29, 2016).

[7] BSEE also determined that despite costs to industry, the rule would result in *net* benefits to both industry and society from the avoided costs associated with worker injuries and fatalities, equipment testing, lost hydrocarbons, and oil spill response, cleanup, and damages.  81 Fed. Reg. at 25,985–87.

[8] Interior had directed BSEE to review, reconsider, and recommend revising or rescinding provisions of the Well Control Rule specifically to ensure that "exploration and development [of oil and gas on the Outer Continental Shelf] is promoted and not unnecessarily delayed or inhibited."  AR0004250.

one of these critical measures will significantly reduce safety and increase the risks of blowouts and catastrophic oil spills. *Cf., e.g.*, 81 Fed. Reg. at 25,990 ("BSEE considers this [Well Control Rule] *necessary* to reduce the likelihood of any oil or gas blowout. . . ." (emphasis added)); *id.* at 25,991 (stating that declining to enact Well Control Rule's provisions would create "the potential for another well control event with consequences similar to those of the *Deepwater Horizon* incident"). BSEE's issuance of the final cuts to the Well Control Rule is imminent. *See* 83 Fed. Reg. 58,040, 58,041 (Nov. 16, 2018) (planning "final action" on rollback in December 2018).

BSEE also issued the Production Safety Rule in 2016 to implement *Deepwater Horizon* panel recommendations to "reduce the number of production-related incidents resulting in oil spills, injuries, and fatalities." 81 Fed. Reg. 61,834, 61,838 (Sept. 7, 2016). The Production Safety Rule, among other things, "improved safety and pollution prevention equipment (SPPE) design, maintenance, and repair requirements," which BSEE concluded was "*necessary* to improve human safety, environmental protection, and regulatory oversight." *Id.* at 61,834 (emphasis added); *see also* AR007275 (BSEE stating rule would "reduce the number of production incidents resulting in oil spills, injuries and fatalities").

Yet BSEE also proposed to repeal many of the Production Safety Rule's most critical provisions a year later. BSEE proposed to revise the Rule to eliminate inspection requirements and minimum system design standards, deferring instead to industry to decide for itself what design and inspection protocols are safe enough. 82 Fed. Reg. 61,703, 61,704, 61,709, 61,715 (Dec. 29, 2017). The changes increase the risk of drilling safety system failures by removing requirements that ensure the systems will function effectively in all conditions that may be encountered. *See id.* at 61,709 (eliminating requirement in 30 C.F.R. § 250.802(c)(1) "that [each device] will function as designed, including under the most extreme conditions to which it may

be exposed").  BSEE finalized these changes in 2018.  83 Fed. Reg. 49,216 (Sept. 28, 2018).

**IV.    Lease Sales 250 and 251 Are Based on Inaccurate NEPA Analyses and a Misrepresentation of the Environmental Effects of a Lease Sale.**

On January 17, 2017, Interior approved the new 2017–2022 Oil and Gas Leasing

Program, providing for ten region-wide lease sales in the Central and Western Planning Areas in

the Gulf of Mexico over the five-year period.  82 Fed. Reg. 6643 (Jan. 19, 2017).  BOEM held

two region-wide lease sales in 2018 under that program: Offshore Lease Sales 250 and 251.

82 Fed. Reg. 49,659 (Oct. 26, 2017).  BOEM offered 77.3 million acres for sale in Lease Sale

250 and 78 million acres for sale in Lease Sale 251, making each the largest oil and gas lease

sale in U.S. history at the time.  AR0001636, 0004130.  BOEM expected that each of the two

lease sales would result in the development of between 0.211 and 1.118 billion barrels of oil and

between 0.5 and 4.424 trillion cubic feet of natural gas.  AR0001636, 0004130.

BOEM prepared a Supplemental EIS to analyze the environmental effects of a single

region-wide lease sale and inform its decisions for Lease Sales 250 and 251.[9]  AR0015471–

6365.  The Supplemental EIS tiered to, updated, and incorporated by reference two previous,

broader environmental analyses that BOEM had completed: (1) a Programmatic EIS ("Program

EIS") analyzing the effects of the five-year program "on national and regional scales," completed

in November 2016, AR0014278; *see* AR0014242–15179, and (2) a Programmatic Multisale EIS

("Multisale EIS") analyzing the "impacts of a single proposed lease sale" in the Gulf of Mexico

under the 2017–2022 program, completed in March 2017, AR0005502, *see* AR0005417–7274.

AR0015542.[10]  BOEM decided to produce the Supplemental EIS to "focus on new information

---

[9] An agency can prepare a supplemental EIS in a variety of circumstances.  40 C.F.R. §1502.9(c).

[10] An agency can tier to a prior, broader EIS (such as national program or policy statement) by "incorporating by reference the general discussion" from the broader EIS.  40 C.F.R. § 1508.28; *see also id*. § 1502.20.

released since" the completion of its last two analyses.  AR0016913.

The Supplemental EIS was the NEPA analysis directly "informing the decision on whether and how to proceed" with each of the two 2018 lease sales.  AR0001635, 0004129.  In particular, the Supplemental EIS informed BOEM as to whether or how to adjust the number or locations of acreage it offered for lease to avoid unacceptable environmental impacts; the lease sale stage is the last point at which BOEM can make such adjustments.  *See, e.g.*, AR0016913 ("During the pre-lease sale process, the size of any individual lease sale could be reduced, and a smaller area offered for leasing, should circumstances warrant.").  The Supplemental EIS assessed at a general level the effects of activities that could occur under leases issued pursuant to a single one of the proposed sales, including, most broadly, the effects of exploration, development, and production activities that are likely to occur as a result of the sales.  AR0015477–78.  BOEM made several incorrect, foundational assumptions in the Supplemental EIS for Lease Sales 250 and 251 that fatally undermine its analyses.

### A.    Irrational Assumption that Environmental Effects of a Lease Sale Would Still Occur Under a No Action Alternative

In the Supplemental EIS, BOEM described four action alternatives for offering leases for sale (Alternatives A–D), as well as a "no action" alternative of not holding a lease sale (Alternative E).  AR0015553–60.  BOEM forecast that holding a single lease sale would substantially increase the amount of oil and gas exploration, development, and production in the Gulf region over the next 50 years: resulting in as many as 1,700 new wells and 2,100 kilometers of new pipelines.  AR0015582–83.  Conversely, BOEM determined that the no action alternative would prevent the new oil and gas activities.  AR0015636.

Despite finding that activity levels would substantially differ between the no action and action alternatives, BOEM paradoxically concluded that, overall, the activity levels and the

environmental *effects* of such activities under all the alternatives would be the same.  *E.g.*, AR0015559–60 ("[T]he cancellation of a proposed lease sale would not significantly change the environmental impacts of overall [Outer Continental Shelf] oil- and gas-related activity."). BOEM attempted to justify this illogical conclusion by claiming that the same leases eventually would be sold even if the proposed lease sales were not held, asserting, "If a lease sale were to be cancelled, the resulting development of oil and gas would most likely be postponed to a future lease sale; therefore, the overall level of [Outer Continental Shelf] oil- and gas-related activity would only be reduced by a small percentage, if any."  AR0015488, *accord* AR0008228 (Multisale EIS).  The Assistant Secretary of the Interior for Land and Minerals Management officially adopted those conclusions—that not holding the lease sale would have essentially the same environmental outcomes as holding the lease sale—when he signed the final Records of Decision to hold Lease Sales 250 and 251.  AR0001640, 0004134.

At the same time, BOEM knew that a lease sale delayed into the future is unlikely to sell the same leases, and thus would result in different environmental effects, because conditions driving lease bidding change over time.  For instance, documents in the record demonstrate that advances in drilling technology and geologic information over time has pushed oil and gas production into deeper waters.  *See, e.g.*, AR0015346.  BOEM also knew that demand for oil and gas is highly volatile and can change significantly over time, decreasing (or increasing) industry interest in offshore oil and gas development.  *See, e.g.*, AR0015280–81, 0015632.  BOEM did not disclose or analyze these factors with respect to its no action alternative.

### B.   Incorrect Assumptions that Repealed Regulations and Nonexistent Enforcement Would Reduce Risks

In the Supplemental EIS, BOEM depended substantially on the existence, implementation, and enforcement of important safety regulations when it analyzed the effects

that a lease sale would have on the human and natural environment and, most importantly, the

risks of accidental events like blowouts and oil spills.  BOEM relied on these regulations even

though it was aware that Interior was in the process of repealing them.  Likewise, BOEM relied

on BSEE's supposedly rigorous enforcement of regulations despite being aware that the

Government Accountability Office found BSEE's enforcement inadequate.

1.   Repealed safety regulations

BOEM determined that the risks of well control losses, blowouts, and catastrophic oil

spills, which tend to cause the greatest harm to the environment, are rare and not reasonably

foreseeable under its preferred alternative to hold a lease sale.  BOEM concluded in both the

Supplemental EIS and Multisale EIS that losses of well control and blowouts "are rare events

and of short duration," AR0008551, 0015659, and that a catastrophic spill "is not reasonably

foreseeable and not part of the proposed action," *e.g.*, AR0008551, 0015508.  *But see*

AR0008528 ("The types of accidental events that could reasonably be expected as a result of

postlease activities include oil spills [and] losses of well control . . . as a result of a proposed

lease sale.").[11]  The Assistant Secretary accordingly relied on the proposition that a catastrophic

spill "is not reasonably expected to result from th[e] lease sale" in making the final decisions to

hold the sales.  AR0001638, 0004132.

In reaching the determination that the risk of an accident is low, BOEM relied heavily on

the assumption that the Production Safety Rule and the Well Control Rule would ensure safety.

In the Program EIS, BOEM explained the risk was low primarily due to the new safety

---

[11] BOEM defines a catastrophic spill (also termed a "catastrophic discharge event") as a "high-volume, extended duration oil spill . . . of national significance," such as the *Deepwater Horizon* spill.  Bureau of Ocean Energy Mgmt., *Catastrophic Spill Event Analysis: High-Volume, Extended-Duration Oil Spill Resulting from Loss of Well Control on the Gulf of Mexico Outer Continental Shelf; 1st Revision* 1–2 (2007), *see supra* n. 3.  Catastrophic spills typically result from equipment failure, such as a loss of well control or a blowout.  AR0014348.  Although such events are statistically rare, "the risk of such a [catastrophic spill] is not zero."  *Id.*

regulations enacted after the *Deepwater Horizon* disaster.  AR0014563; *see also* AR0014348

("Recently implemented safeguards, including additional subsea blowout preventer testing,

required downhole mechanical barriers, well containment systems, and additional regulatory

oversight make such an event less likely than in the past.").  BOEM similarly assumed in both

the Supplemental EIS and Multisale EIS that the two new regulations would significantly reduce

the risks of blowouts, catastrophic oil spills, and losses of well control.  *See, e.g.*, AR0009814–

15, 0016346, 0016350 (each citing U.S. Dep't of the Interior, Bureau of Safety & Envtl. Enf't,

*Reforms since the* Deepwater Horizon *tragedy, Fact sheet* (2016), *see* note 3, *supra*);

AR0009820 (referencing Well Control Rule); *see also* AR004133 (Record of Decision stating

"BOEM conducted its environmental analyses with the 2016 Oil and Gas Production Safety

Systems Rule and the 2016 Well Control and Blowout Preventer Rule in place").  According to

BOEM, it used the changes in regulations as a result of the *Deepwater Horizon* explosion to

determine what oil and gas "factors [would] have the greatest [environmental] impact potential"

to air quality.  AR0008532.  BOEM's discussion in the Multisale EIS of the importance of

blowout preventers "for the safety of the drilling crew, as well as the rig and the wellbore itself"

described how the Well Control Rule establishes requirements necessary to ensure proper

functioning of that piece of equipment.  AR0008398; *see also* AR0008396–99, 0009232,

0009239.

　　　BOEM also leaned on the new safety regulations when responding to comments.  In

response to public comments on the Supplemental EIS concerning the risk of catastrophic spills,

BOEM stated that "finalization of the Well Control Rule on April 29, 2016, resulted in reforms,

such as increased regulation of blowout preventers, that are expected to decrease the probability

of deepwater blowouts and the extent of oil spills from such blowouts."  AR0016309; *see also,*

*e.g.*, AR0009776, 0009796, 0009814–15.  BOEM also distributed public outreach materials on

the EISs touting that post-*Deepwater Horizon* reforms help "ensure" Interior can "safely and

responsibly expand development of its domestic energy resources."  AR0012465, 0016953.  And

BOEM responded to the National Oceanic and Atmospheric Administration's criticism of

BOEM's risk analysis in the Program EIS by noting that "regulatory reforms have been put into

place to reduce the likelihood of spills and require containment and response capabilities that, if

effective, would reduce the overall volume of oil released into the marine environment."

AR0015080; *see also* AR0015087, 0015093, 0015110, 0015121.

Ultimately, the Assistant Secretary relied on BOEM's risk analyses and on BSEE's

"raised standards" in deciding to hold Lease Sales 250 and 251 because, he stated, "oil- and gas-

related activities can be conducted safely and responsibly with strong regulatory oversight and

appropriate measures to protect human safety and the environment."  AR0001638, 0004132.  At

the time BOEM and the Assistant Secretary were relying on the new safety regulations, they

were aware that Interior was repealing the same rules.  *See supra* section III.  By December

2017—before BOEM completed its Supplemental EIS or the Assistant Secretary made the

decision to hold either lease sale—Interior already had drafted and submitted to the Office of

Management and Budget for review proposed rules to substantially curtail the Production Safety

Rule and the Well Control Rule.  *See* Compl. ¶ 121, ECF No. 1; Answer ¶ 121, ECF No. 24.

### 2.    Lax enforcement

BOEM stated in the Supplemental EIS that "[s]ubstantial preventative measures and

Federal regulatory requirements" would "mitigate" accidental events like oil spills, vessel

collisions, and pipeline failures.  AR0015601.  Underlying this conclusion was BOEM's

assumption that BSEE would rigorously enforce the requirements.  *See, e.g.*, AR0015808 (citing

"enforced regulatory procedures").  And in response to concerns that industry would not comply

with regulations, BOEM averred that "BSEE promotes compliance with safety and environmental standards" through various practices.  AR0016349–50.

In concluding that several environmental effects would be eliminated or adequately reduced through mitigation, BOEM also relied on the assumption that BSEE effectively ensures compliance with lease stipulations and mitigating measures.  *See, e.g.*, AR0015543–44, 0015561–65, 0016342–44.  BOEM noted, however, that these measures only would be effective if actually implemented and adhered to, which depends on BSEE's "rigorous" enforcement. *E.g.*, AR0016308, 0016313, 0016342–44, 0016346, *see also* 0015564–65, 0015631, 0015718, 0015748, 0015766.  BOEM relied on BSEE's implementation and enforcement of regulations and stipulations to address other risks, such as oil spill planning and preparedness, AR0015610, 0015612, hurricane preparedness, AR0016308–09, and ensuring platforms do not emit pollutants that violate federal air quality standards or, notably, subject Gulf Island National Seashore visitors to noxious gases, AR0015654, 0015656; *see also* AR0008203–04 (citing BSEE's ability to enforce its regulations in order to ensure mitigation), 0008243, 0008245 (stating mitigation measures are enforced through BSEE's inspection program), 0008347–48.

The record undermines BOEM's reliance on BSEE's enforcement.  The expert panels investigating the *Deepwater Horizon* disaster identified BSEE's systemic lax and ineffective enforcement of its regulations, lack of inspections, and implementation of safety reforms as a fundamental cause of the accident.  Nat'l Comm'n, *supra*, at 55–85, 126–27.  The Government Accountability Office more recently found in a 2017 report that BSEE had not corrected its deficiencies "in its investigative, environmental compliance, and enforcement capabilities identified by investigations after the Deepwater Horizon incident."  AR0027101–05.  Among other problems, the report noted that BSEE has failed to update its investigative and enforcement

policies and procedures and, as a result, has failed to "ensure quality control" and "continues to face risks to the effectiveness of its enforcement capabilities." AR0027102–03. The record lacks any indication that BOEM considered the Government Accountability Office report or any other evidence regarding the effectiveness or rigor of BSEE's enforcement and implementation of regulations.

### C.   Inaccurate Assumptions Undermining Oil and Gas Activity Level Forecasts Based on an Incorrect Royalty Rate

BOEM applied several inputs, including the cost of development and demand for oil, to forecast the amount and extent of oil and gas activities and, consequentially, environmental effects that would occur as a result of a lease sale. BOEM made incorrect assumptions about royalty rates in developing the inputs, causing it to underestimate the activities and effects.

BOEM assessed the environmental effects of a lease sale by first determining the types of oil and gas exploration, development, and production activities that would result from leasing, then forecasting the levels or frequencies of those activities.[12] AR0015489, 0015573–79. BOEM created different "scenarios" of activity levels that could result from a lease sale using a number of inputs, including, specifically, the price of oil, the cost of development, and "factors that influence oil and gas product-price and price volatility." AR0015580. BOEM forecast the activity levels under different scenarios by varying the values of the inputs used in the forecast; for example, by using a higher or lower cost of development, which depends in part on the royalty rate. AR0015580–81. In turn, BOEM used those activity scenarios to evaluate the context and intensity of the sale's environmental impacts. *Id*.; AR0015573. The level of an

---

[12] BOEM terms these activities "impact-producing factors"—a term of art—which BOEM defines to mean "an activity or process, as a result of a proposed lease sale, that could cause impacts on the environmental or socioeconomic setting." AR0015573. These activities and processes include those that are routine (*e.g.*, drilling a well or operating a pipeline), as well as those that are accidental or unexpected (*e.g.*, an oil spill, spill response, or vessel collision). AR0015574.

activity is the major determinant of the *magnitude* of environmental effects from that activity (the type and geographic location of the activity are the other factors).  AR0015629–31.

The federal royalty rate is a significant cost of development.  *See* Bureau of Ocean Energy Mgmt., *supra*, at 43–45.  A lower royalty rate logically reduces the total cost of development.  *See id.*  A lower cost of development in turn increases the amount of oil and gas exploration, development, and production activities expected to occur.  *See id.*; *see also* AR0000010 (BOEM claiming lower royalty rate "is expected to increase activity").

BOEM assumed a royalty rate of 18.75% for leases in less than 200 meters of water when it calculated the inputs to its activity forecasts.  AR0004132.  However, on July 6, 2017, several months before BOEM completed its Supplemental EIS, BOEM announced it was reducing the royalty rate for leases in less than 200 meters of water from 18.75% to 12.5% with the express intent to increase oil and gas activity in those waters.  AR0000006–07, 0000027.  BOEM did not incorporate the new royalty rate into its activity forecasts in the Supplemental EIS, instead continuing to assume the outdated 18.75% royalty rate still applied.

## STANDARD OF REVIEW

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Challenges to final agency action under NEPA are reviewed under the APA. *Sierra Club v. FERC*, 867 F.3d at 1367.  "In the APA context, summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review."  *Lewis v. Sec'y of Navy*, 195 F. Supp. 3d 277, 283 (D.D.C. 2016).

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A).  When considering a motion for summary

judgment, a court must determine whether the agency "examine[d] the relevant data and

articulate[d] a satisfactory explanation for its action including a 'rational connection between the

facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut.*

*Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371

U.S. 156, 168 (1962)).  Courts "do not hear cases merely to rubber stamp agency actions," *Nat.*

*Res. Def. Council v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000), nor can they "accept [an

agency's] bare conclusory allegations as fact," *Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir.

1997).  Instead, they must consider "whether the agency has explained its decision, whether the

facts on which the agency purports to have relied have some basis in the record, and whether the

agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F. Supp. 96, 105

(D.D.C. 1995); *accord State Farm*, 463 U.S. at 43; *see also Sierra Club v. Salazar*, 177 F. Supp.

3d 512, 532 (D.D.C. 2016) (court's review is guided by four principles: "deliberation,

transparency, rationality, and evidentiary propriety").  Importantly, "the focal point for judicial

review should be the administrative record already in existence, not some new record made

initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *see also Mercy Gen.*

*Hosp. v. Azar*, 344 F. Supp. 3d 321, 348 (D.D.C. 2018) (agency may not support decision with

evidence not in administrative record).

## ARGUMENT

Congress directed BOEM to complete a thorough NEPA analysis at the lease sale stage

under OCSLA.  43 U.S.C. § 1346(a)(1); *False Pass*, 733 F.2d at 609.  This requires BOEM "to

take into account the full environmental effects of its actions when deciding whether and in what

manner to pursue the lease sale." *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 504 (9th

Cir. 2014) (citing 42 U.S.C. § 4332(2)(C)).

> It is only at the lease sale stage that the agency can adequately consider cumulative effects of the lease sale on the environment, including the overall risk of oil spills and the effects of the sale on climate change.  It is also only at the lease sale stage that the agency can take into account the effects of oil production in deciding which parcels to offer for lease.

*Id.*  Accordingly, "the agency cannot shirk its responsibility to 'consider[ ] all foreseeable direct and indirect impacts' of the proposed action in its EIS."  *Id.* at 494 (citation omitted) (alterations in original).  "The agency also must 'discuss[ ] . . . adverse impacts' without 'improperly minimiz[ing] negative side effects.'"  *Id.* (citation omitted) (alterations in original).

BOEM's reliance on false and irrational assumptions meant that it did not take a "hard look" at the full, foreseeable environmental effects of holding Lease Sales 250 and 251, and caused it to arbitrarily underestimate and otherwise downplay the negative effects of the action.  Specifically, BOEM irrationally assumed the no action alternative of not holding a lease sale would have the same environmental effects as holding a lease sale.  And it incorrectly assumed that repealed regulations and nonexistent enforcement efforts would minimize the risks, and outdated royalty rates would continue to depress leasing demand and the associated effects of a lease sale on the environment.  BOEM's reliance on these false assumptions violates NEPA and is arbitrary and capricious, in violation of the APA.[13]

## I.      BOEM Irrationally and Unlawfully Assumed that the Same Environmental Effects Would Occur Even if It Did Not Hold the Lease Sales.

BOEM failed to compare the full environmental impacts of cancelling Lease Sales 250 and 251 (taking no action) with holding the sales, and thus failed to consider a true no action

---

[13] Plaintiffs have standing to bring this action on their own behalf and on behalf of their members, as demonstrated by the declarations attached to this Motion.  Exs. B–F; *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342–43 (1977) ("[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."); *accord Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007).

alternative or take the "hard look" that NEPA requires.  Instead, the agency simply assumed that the overall impacts of cancelling the lease sales would be the same as holding the lease sales because the leases would eventually be sold at some point in the future.

An EIS must include a clear, detailed evaluation all the alternatives, including the no action alternative, to define the issues and provide "a clear basis for choice among options." 40 C.F.R. § 1502.14; *see also Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988) ("Informed and meaningful consideration of alternatives—including the no action alternative—is thus an integral part of the statutory scheme.").  As part of the "hard look" required under NEPA, the agency must compare fully the impacts of its proposed action and alternatives with those of the no action alternative.  46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).  A full and fair consideration of taking no action in an EIS "allows policymakers and the public to compare the environmental consequences of the status quo to the consequences of the proposed action." *Ctr. for Biological Diversity v. U.S. Dept. of Interior,* 623 F.3d 633, 642 (9th Cir. 2010).  "Analysis of the 'no-action alternative' is at the heart of the NEPA process; thus, failure to provide a valid one casts a shadow over the process as a whole." *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1188 (9th Cir. 2013).  The "touchstone" for a court's inquiry into whether there is valid consideration of a no action alternative is "whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation." *Westlands Water Dist. v. U.S. Dept. of Interior*, 376 F.3d 853, 871–72 (9th Cir. 2004) (citation omitted).

By assuming that the effects from the proposed activity would occur, no matter what, BOEM failed to consider a true no action alternative, as NEPA requires.  Further, by ignoring important evidence in the record that the scale and magnitude of activities and effects likely to result from a lease sale varies over time based on demand and technological innovations, BOEM

failed to provide a complete and accurate discussion of differing impacts across alternatives and failed to make an informed decision, in violation of NEPA and the APA.

>A.   **BOEM Failed to Evaluate a True No Action Alternative By Assuming the Same Leases and Resulting Development Would Occur in the Future.**

In evaluating Lease Sales 250 and 251, BOEM projected that choosing the action alternative would result in hundreds of new wells and thousands of new kilometers of pipelines. AR0015583.  BOEM also surmised that taking no action (choosing Alternative E) would result in no new activities.  *E.g.*, AR0015683 ("For Alternative E, the cancellation of a proposed lease sale would result in no new activities associated with a proposed lease sale . . . .").

In direct contradiction to those projections, BOEM improperly assumed that under the no action alternative, future lease sales would continue to occur and, *critically*, the very same oil and gas exploration, development, and production activities would eventually occur under the no action alternative.  *E.g.*, AR0015488 ("If a lease sale were to be cancelled, the resulting development of oil and gas would most likely be postponed to a future lease sale . . . ."), 0015559–60 (same), 0015613 ("The opportunity for development of the estimated oil and gas that could have resulted from a proposed action (i.e., a single proposed lease sale) or alternative to a proposed action, as described above, would be precluded or postponed to a future lease sale.").  BOEM determined that, because of these assumptions, selecting the no action alternative would not significantly change overall activity.  *E.g.*, AR0015488, 0015559–60.  BOEM also illogically concluded that "[c]umulative impacts of current, past, and reasonably foreseeable future activities . . . would continue to occur under Alternative E."  AR0015490.

BOEM came to the same conclusions when evaluating environmental effects in its Multisale EIS.  *E.g.*, AR0008131, 0008228, 0008588.  In making the final decision to reject Alternative E in the Records of Decision in favor of holding Lease Sales 250 and 251, the

Assistant Secretary also improperly presumed that overall environmental effects would be the same.  AR0001640, 0004134–35.

By simply assuming that a comparable sale of leases would occur at some point in the future, BOEM presented an incomplete and misleading picture of the environmental benefits from not offering the lease sales (avoided environmental harm).  BOEM's erroneous assumption that the sales would inevitably occur prevented the agency from assessing how and to what extent wildlife or the environment would benefit from a reduction in the overall amount of leasing in the Gulf (*e.g.*, from a reduction in risk of oil spills or reduction in overall pollution).  This assumption is arbitrary and capricious, and violates NEPA's requirement to evaluate the environmental impacts of a no action alternative as compared to the action alternative.  *See Ctr. for Biological Diversity*, 623 F. 3d at 643–44.  And it violates NEPA's requirements to inform the public and the decisionmaker of the full extent of environmental impacts from holding a region-wide lease sale (as opposed to not doing so).  *See id.* at 642.

This case is similar to the situation in *Conservation Council for Hawaii v. National Marine Fisheries Service*, in which the court rejected the National Marine Fisheries Service's attempts to evade an evaluation of a no action alternative under the assumption that the Navy's military training activities would continue whether or not the Service issued a permit.  97 F. Supp. 3d 1210, 1236–37 (D. Haw. 2015).  The court explained, "In assuming that, no matter what, Navy activities would surely occur, [the Service] was neglecting to consider what would be a true 'no action' alternative from [the Service's] perspective. . . . This is a glaring deficiency in the FEIS."  *Id*.  Similarly, here, BOEM improperly assumed that the lease sales and attendant environmental effects will occur at some point, no matter what.  As a result, BOEM failed to evaluate a true no action alternative.

Another court in this district concluded BOEM could, as a legal matter, assume lease sales will occur at some point in the future. *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 174 (D.D.C. 2014).  Conservation Groups respectfully contend that holding was based on an incorrect interpretation of OCSLA that it "mandates" BOEM to "implement lease sales." *Id*.  OCSLA mandates no such thing.  It *authorizes* BOEM to hold lease sales if, after full environmental consideration, they are necessary to "meet national energy needs," but does not *mandate* particular results.  43 U.S.C. § 1344(a).  BOEM may well decide not to hold any given lease sale. *See* AR0014302–03.  By the court's reasoning in *Oceana*, an agency is not required to consider a true no action alternative as long as it is authorized to take the action at some point in the future.  To the contrary, the purpose of NEPA is to force agencies to effectively compare a true choice of no action versus action—not to presume no action results in future action.  This Court need not and should not follow the holding in *Oceana*. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (district court decisions not binding on any other court). *Oceana* is also distinguishable on the facts, for the reasons discussed below. *Oceana* simply does not excuse BOEM's failure to evaluate a true no action alternative here.

**B.**     **BOEM Irrationally Assumed that Future Leasing Would Result in the Same Effects Under the No Action Alternative.**

Even if BOEM could properly assume that lease sale activity would continue under the no action alternative, BOEM could not rationally assume that a future sale would result in the same post-lease activities and effects; it still needed to actually evaluate the consequences of delaying the lease sales and how that might affect the timing, scale, and magnitude of future lease sales or development.

BOEM's assumptions of identical environmental impacts for its proposed lease sales and for delayed lease sales under the no action alternative are unfounded.  In the Supplemental EIS,

BOEM speculated that, although the no action alternative would prevent new oil and gas activities, those activities would inevitably occur in the same manner and magnitude under an unspecified future lease sale.  This assumption necessarily presumes that an unspecified lease sale will be held in the future, that it would sell the same projected number of lease blocks in the same locations as the proposed lease sale, and that the same manner and degree of oil and gas activity would result.  Neither the EISs nor the record contains any support for this theory.  To the contrary, evidence in the record demonstrates that delaying the proposed lease sales would have meaningfully different consequences and environmental effects.

First, the record demonstrates that advances in drilling technology and geologic information over time influence the amount and geographic scope of the leases that are sold. AR0015632.  For example, there is significantly more industry interest in deepwater tracts now than there was several years ago, resulting in significantly different patterns of lease bidding and, subsequently, different risks and effects from development of those leases.  *See, e.g.*, AR00008397, 0015244 ("The greatest undiscovered resource potential in the U.S. [Outer Continental Shelf] is forecast to exist in the deep and ultra-deep waters of the [Gulf of Mexico].");  Nat'l Comm'n, *supra*, at vii–ix, 39–53, 73.  And BOEM noted that there are higher risks from blowouts and losses in deeper waters.  AR0009791–92; *see* AR0008397 ("[T]he loss of well control in deep water presents obstacles and challenges that differ from a loss of well control in shallow waters.").  Given these challenges and technological changes, the water depths targeted for lease bids by industry likely will change over time, along with the attendant risks and uncertainties.  The point is that BOEM cannot rationally assume industry will seek to lease in the future the same areas it projects for leasing in 2018 or that environmental risks will remain the same in the future.

Second, the record demonstrates oil and gas supply and demand over time is highly volatile in nature.  The volatility of oil and gas markets changes the number and sizes of leases that industry will purchase and the amount of resulting development and production.  *See supra* p. 15; *see also* AR0015341–42, 0015614 (noting "uncertainty in oil prices" makes future oil and gas activities speculative), 0015632 (same).  For example, lower oil and gas demand or increased energy supply from elsewhere (*e.g.*, growing renewables) in the future may reduce industry interest in purchasing leases in the Gulf of Mexico.  AR0015293; *see also* AR0014284–85.  BOEM cannot rationally assume industry will have the same demand for and acquire the same offshore leases in the future when U.S. and worldwide supply and demand and prices for oil and gas will be different.

Finally, the record demonstrates that Lease Sales 250 and 251 are unique in scope and size.  The Secretary's practice for nearly four decades had been to offer smaller, discrete portions of the Gulf of Mexico in each lease sale.  Offering essentially all unleased acres is the exception to this decades-long rule.  *See supra* p. 9.  BOEM cannot rationally assume this deviation from the typical leasing practice will become the established regime in future five-year programs, and thus result in future lease sales of the same scope and magnitude if these lease sales were not held.  BOEM even admitted that a future lease sale is unlikely to make up for a canceled lease sale in size and scope.  AR0012652.

Despite all this evidence, BOEM did not evaluate how holding the proposed lease sales would compare with delaying the effects until later in time: when the lease sale offerings, demand and supply, and lease bidding patterns will different.  In the Supplemental EIS, BOEM did not evaluate what environmental effects might result if the agency chose to hold only 8 or 9 lease sales (after cancelling Lease Sales 250 and/or 251) rather than the 10 lease sales that the

agency had planned to hold under its 2017–2022 Program.  At no point did the agency discuss the effects of delaying the lease sales and delaying the subsequent development and production projected to take place.  Neither did BOEM provide any support for its assumption that canceling the proposed lease sales would not change overall oil and gas activity significantly.

Courts have rejected similar environmental analyses when the agency relied on faulty assumptions about its no action alternative in the face of differing future conditions.  In *Center for Biological Diversity v. U.S. Department of Interior*, the Ninth Circuit held an EIS invalid because the agency assumed that the "mining would occur in the same manner" and result in the same environmental impacts no matter who owned the lands being evaluated.  623 F.3d at 642– 43.  As here, the precise *manner and extent* of mining activity depended on the details of how each landowner opted to authorize the extent, scope, and timing of mining leasing activities; so the agency could not simply assume the activities would occur in the same way under the action and no action alternatives.  *Id.*  Similarly, in *North Carolina Wildlife Federation v. North Carolina Department of Transportation*, the Fourth Circuit held that the agency acted arbitrarily and capriciously by preparing an EIS that inaccurately relied on data that assumed the action would be taken even under the no action alternative; in effect assuming the existence of the proposed project under all the alternatives.  677 F.3d 596, 599–600, 602–03 (4th Cir. 2012).  As in that case, BOEM here relied on findings that incorporate the underlying assumption that the lease sale actions would take place even under the no action alternative.

The facts here distinguish this case from *Oceana.*  37 F. Supp. 3d 147.  Although the plaintiffs in that case similarly argued that BOEM failed to consider a true no action alternative, they did not present any facts or arguments like those above undermining BOEM's prediction that effects would be the same if lease sales were delayed.  *See id.* at 171–174.  Most

significantly, the court did not grapple with the question whether the agency should have analyzed the effects of delaying lease sales under the no action alternative.  It simply found BOEM had reasonably recognized "that even if it cancelled this lease sale, another *lease sale* in the same area would likely eventually go forward," *id.* at 172 (emphasis added); it did not consider whether future *leases* would be purchased in the same geographic location or encompass the same amount (or types) of area, given the volatility of the market and technological changes.[14]  In addition, BOEM did, in the EIS in that case, "undertake a separate analysis in consideration of the no action alternative that was different from its analysis for the other alternatives," as required by NEPA.  *Id.* at 174.  Here BOEM never conducted such a separate analysis.  *Cf., e.g.*, AR0015613 ("[A] separate treatment of the cumulative effects under Alternative E [no action] is not considered here."), 0015692 (stating no action would result in no "new" impacts but would result in same "major" impacts as action alternative).

NEPA requires BOEM to take a "hard look" at its alternatives, by fully comparing the effects of its action alternatives to its no action alternative.  *See* 40 C.F.R. § 1502.14; 46 Fed. Reg. at 18,027.  BOEM's spurious consideration of the no action alternative does not satisfy NEPA's requirements.  The agency's faulty assumption that the same effects would occur under the no action alternative as under the proposed lease sale created an improper standard against which to compare the expected effects of the proposed lease sale.  This faulty assumption prevented BOEM from accurately assessing the environmental effects likely to result from the proposed lease sale and caused it to significantly undervalue the environmental benefits of not holding the lease sale.  BOEM's improper treatment of the no action alternative therefore

---

[14] Industry purchases only a very small subset of the lease blocks (parcels) offered in each lease sale, resulting in different geographic distributions and total sizes of leases purchased in each sale.  *See, e.g.*, AR0002402–06, 0007964–70.

violates NEPA and is arbitrary and capricious under the APA.

## II.     BOEM Failed to Rationally Assess the Effects of the Lease Sales on the Environment.

In its Supplemental EIS, BOEM incorrectly presumed various mechanisms would be implemented to limit the lease sales' adverse environmental effects.  Recently enacted safety rules, rigorous enforcement of offshore safety and environmental regulations, and a higher royalty rate were critical underpinnings of BOEM's conclusions that leasing effects would be limited and drilling risks minimal.  The problem is that none of those things fully exist.  BSEE is repealing the most important provisions of the safety rules.  The Government Accountability Office has found that BSEE is not enforcing the regulations it does have on the books.  And BOEM has reduced the royalty rate to increase drilling.  The Supplemental EIS does not reflect these realities.  Rather, it unlawfully relies on "incorrect assumptions or data," in violation of NEPA, *Native Ecosystems Council*, 418 F.3d at 964, and "fails to consider an important aspect of the problem [and] "offers an explanation for [BOEM's] decision that runs counter to the evidence before the agency," in violation of the APA, *State Farm*, 463 U.S. at 43.  The Supplemental EIS contravenes NEPA's primary disclosure and information objectives by presenting an inaccurate picture of the lease sales' environmental effects for agency decisionmakers and the public at large.

### A.     BOEM Unreasonably Assumed Drilling Safety Would Be Ensured by Regulations Being Repealed.

Throughout the Supplemental EIS and its supporting documentation, BOEM repeatedly cited post-*Deepwater Horizon* safety reforms as a significant reason for concluding that post-lease drilling operations would be safe and oil spill risks low.  BOEM knew at the time that Interior was repealing substantial portions of these reforms, largely erasing the safety gains.  *See* AR0016347.  Yet BOEM continued to rely on those vanishing safety measures in its

Supplemental EIS.  *E.g.*, AR0016309.  *See generally supra* pp. 16–18.  Such "[r]eliance on facts that an agency knows are false at the time it relies on them is the essence of arbitrary and capricious decisionmaking," *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003), and violates NEPA's hard look requirement, *Native Ecosystems Council*, 418 F.3d at 964 ("agency may not rely on incorrect assumptions or data in an EIS").

BSEE promulgated the Well Control Rule and Production Safety Rule to enact measures it determined are necessary to improve worker safety and reduce the risks of blowouts, losses of well control, and catastrophic oil spills.  *E.g.*, 81 Fed. Reg. at 25,890; 81 Fed. Reg. at 61,838.  It concluded, based on extensive evidence, that the measures—particularly those governing real-time monitoring and blowout preventer specifications—would significantly reduce these risks. *E.g.*, 81 Fed. Reg. at 25,890–91, 25,894, 25,986; *see also* 81 Fed. Reg. at 61,834.

The safety improvements from these two rules formed a critical foundation for BOEM's conclusions that the risks of blowouts and catastrophic oil spills are so low that the events are not "reasonably foreseeable" to result from a lease sale, and thus do not warrant concern.  BOEM expressly relied on these rules in several places in its Supplemental EIS as well as in the Program EIS and Multisale EIS that it incorporated by reference.  *See supra* pp. 16–18.  It ultimately concluded that it did not expect a catastrophic spill "*partly* given the extremely low probability of such a spill in general, but *more importantly*, as a result of the comprehensive reforms to [Outer Continental Shelf] oil and gas regulation and oversight put in place after the *Deepwater Horizon* event," including the Well Control Rule.  AR0014563 (emphases added) (citing AR0016953).  The Records of Decision for the lease sales similarly relied directly on safety and environmental protections that BSEE had enacted since the *Deepwater Horizon* explosion as

evidence that the risk of oil spills is low and the ability to respond to such spills is sufficient. AR0001638, 0004132–33.

While BOEM was relying on the new safety rules in its NEPA analysis, Interior was moving forward with repeals of many of the rules' most important safety provisions and thereby increasing the risks of blowouts, losses of well control, and catastrophic spills. *See supra* pp. 10–13. The repeals of these critical measures in the Production Safety Rule and Well Control Rule therefore invalidate the critical assumptions in BOEM's NEPA analyses of these risks: the risks will be significantly greater under the rollbacks than BOEM concluded in its EISs.

BOEM admits that the proposed repeals "were under consideration when BOEM finalized the 2018 Supplemental EIS." Answer ¶ 122, ECF No. 24. Yet BOEM consciously ignored the repeals or any potential effect they might have in its assessments of safety and spill risks. When commenters on the draft Supplemental EIS asked BOEM to analyze the effects of the repeals, BOEM responded simply that, although it was "aware of changing regulations[,] . . . [t]he information used to conduct these analyses was the best available information at *that* time." AR0016347 (emphasis added). But the information was not the best available—or even correct—at the time BOEM completed its NEPA analysis. The record contains no evidence that BOEM conducted a new analysis based on, or otherwise considered, the rollbacks before issuing the final Supplemental EIS.

BOEM's continued use of those incorrect assumptions is arbitrary and capricious and violates NEPA's "hard look" requirement. *Native Ecosystems Council*, 418 F.3d at 964; *Mo. Pub. Serv. Comm'n*, 337 F.3d at 1075.[15] The "deficiencies are significant enough to undermine

---

[15] BOEM also provided no explanation for why it continued to rely on outdated assumptions it knew were no longer valid. *See Point Hope*, 740 F.3d at 499 (stating agency must "articulate[] a rational basis for its decision to use" the

informed public comment and informed decisionmaking" on whether and how to offer the leases

for sale. *Sierra Club v. FERC*, 867 F.3d at 1368; *see also Sierra Club v. U.S. Army Corps of*

*Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983) (stating if judge finds "the EIS sets forth statements

that are materially false or inaccurate, he may properly find that the EIS does not satisfy the

requirements of NEPA, in that it cannot provide the basis for an informed evaluation or a

reasoned decision").  The effects of the rule rollbacks are serious, so as a result of BOEM's

misestimate, both the public and the decisionmaker were led to understand the risks from the

lease sales are much lower than they are in actuality.  This is not the "hard look" NEPA requires.

BOEM futilely attempted to paper over its failures at the last minute before Lease Sale

251, outside of its NEPA process.  The Assistant Secretary conjectured in the Record of Decision

that the safety rollbacks would not affect safety or drilling risk, so do not undermine BOEM's

prior analyses.  BOEM blindly deferred to BSEE's conclusions that the regulatory repeals would

leave critical safety provisions intact and will not change environmental risks.  AR0004052–56,

0004132–33.  The sole support for these rationalizations is an "Administrative Record for the

Insert" to the sale's Record of Decision that BOEM compiled immediately prior to the issuance

of the Record of Decision, outside the NEPA process.  AR0004052–56.  The document briefly

describes the changes to the 2016 safety regulations and simply notes, without further analysis,

that BOEM agreed with BSEE's conclusion that the rollbacks will not affect safety.

AR0004052–53.

These rationalizations cannot cure BOEM's NEPA violations.  For one, the Assistant

Secretary only provided this additional information in the decision document for Lease Sale 251.

---

assumptions it does under NEPA and the APA).  Nor did BOEM "respond *meaningfully*" to the objections raised by
the commenters, violating the APA's requirement that the agency's decision be "deliberative."  *See Sierra Club v.
Salazar*, 177 F. Supp. 3d at 532 (quoting *BNSF Ry. Co. v. Surface Transp. Bd.*, 741 F.3d 163, 168 (D.C. Cir. 2014)).

So regardless whether the argument is valid, it cannot retroactively remedy the Assistant

Secretary's misinformed decision to hold Lease Sale 250.  That decision must stand or fall based

on the rationale presented in its own record of decision and the NEPA analysis on which it is

based.  *See Haw. Longline Ass'n. v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 30 (D.D.C.

2003) (stating agency may not justify earlier decision with new environmental analysis that "was

not '*before the Secretary at the time he made his decision*'" (quoting *Citizens to Preserve*

*Overton Park v. Volpe*, 401 U.S. 402, 420 (1971))).

 The new rationalization also cannot justify the decision to hold Lease Sale 251 that was

reliant on an admittedly flawed NEPA analysis for several reasons, both substantive and

procedural.  First, NEPA prohibits BOEM from simply noting its agreement with BSEE's

environmental assessments on the repeals' effects without performing its own analysis.  *Gov't of*

*the Province of Manitoba v. Salazar*, 691 F. Supp. 2d 37, 48 n.8 (D.D.C. 2010) ("One agency

cannot rely on another's examination of environmental effects under NEPA." (quoting *Or. Envtl.*

*Council v. Kunzman*, 714 F.2d 901, 905 (9th Cir. 1983))).  BOEM must "independently assess"

the environmental risks of the rollback.  *Id.* (quoting *Steamboaters v. FERC*, 759 F.2d 1382,

1394 (9th Cir. 1985)); *see also Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16

(D.C. Cir. 2015) (stating "[a]dministrative law does not permit" agency to "excuse its inadequate

responses by passing the entire issue off onto a different agency").

 The only apparent way in which BOEM conducted an independent assessment was by

reasoning that the repeals leave the critical safety provisions intact.  AR0004052.  This

conclusion is wrong and directly "counter to the evidence before the agency."  *State Farm*, 463

U.S. at 43.  For example, BOEM stated the repeal of the Production Safety Rule merely "revised

outdated standards and requirements as well as clarifying requirements that were unclear in the"

original rule.  AR0004052.  BOEM did not acknowledge that the repeal, in fact, eliminates an entire inspection system and the crucial requirement that equipment operate under the "most extreme conditions."  82 Fed. Reg. at 61,709.  These are not mere "outdated standards," as BOEM claims, but are major, recently enacted safety regimes.  *Contra* AR0004052.  Their repeals will, under BSEE's own reasoning, increase "the number of production incidents resulting in oil spills, injuries and fatalities."  AR0007275.

BOEM similarly erred in stating that the Well Control Revision "will NOT: eliminate the [blowout preventer] requirements or the [blowout preventer] itself."  AR0016780.  On the contrary, the proposed repeal would remove the requirements that the blowout preventer be capable of closing and sealing the wellbore "at all times" and "achiev[ing] an effective seal." 83 Fed. Reg. at 22,138–39 (revising 30 C.F.R. §§ 250.730(a), .731(a)(5)); *see also id.* at 22,139– 40 (revising 30 C.F.R. § 250.734 to reduce blowout preventer power capability and remove blowout preventer "centering mechanism" requirement).  BOEM also stated the repeal "will NOT . . . remove real-time monitoring requirements."  AR0004053.  But the proposed repeal expressly states it would "remov[e] many of the prescriptive real-time monitoring requirements," including "completely remov[ing] existing paragraph (b) with its associated prescriptive requirements."  83 Fed. Reg. at 22,137 (revising 30 C.F.R. § 250.724).  BOEM averred the repeal "will NOT . . . remove third party requirements for [blowout preventer] testing." AR0004053.  Again, that statement does not reflect the reality that the proposed repeal removes the performance standards for third parties that test blowout preventers.  83 Fed. Reg. at 22,138 (revising 30 C.F.R. § 250.732); *see also id.* at 22,138–42 (revising 30 C.F.R. §§ 250.731(d), (f), .734, .738 .739).  BOEM's claims about the retention of other critical safety measures are similarly untrue.  *Compare* AR0004053 (stating repeal would not "remove drilling margin

requirements; . . . remove failure reporting to BSEE; [or] eliminate the [blowout preventer] dual

shear ram requirement"), *with* 83 Fed. Reg. at 22,133, 22,137, 22,139 (expressly removing these

requirements (revising 30 C.F.R. §§ 250.414, .730(c), .734(a)(1)(ii))).

BOEM cannot rationally claim the rule revisions do not affect environmental risks on the

basis that they leave critical safety provisions intact when the provisions BOEM cites are

specifically being repealed.  As explained above, those repeals will substantially reduce safety

under BSEE's own reasoning.  *See supra* pp. 11–12.  BOEM provides no rational basis for its

assertion that the rollbacks "do not change the conclusions of the 2018 . . . Supplemental EIS."

AR0004133.  It simply engages in "wishful or whimsical thinking" that they will not do so.

*Sierra Club v. Salazar*, 177 F. Supp. 3d at 532–33 (stating agency must "supply a reasoned

analysis" and "examine the relevant data" (citations omitted)).

Even if BOEM's rationale were factually correct, it fails to comply with NEPA because it

was not presented in the EIS.  "That is where the [agency's] defense of its position must be

found."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1214 (9th Cir.

1998); *see also Nat'l Wildlife Fed'n v. Marsh*, 568 F. Supp. 985, 997 (D.D.C. 1983) ("Congress

mandated in section 102(2)(C) of NEPA that the pertinent information be contained wholly

within the impact statement.").  "Materials in the administrative record, but not incorporated in

any way into the EIS," such as a record of decision, "cannot bring an otherwise defective EIS

into compliance with NEPA."  *Hammond v. Norton*, 370 F. Supp. 2d 226, 252 n.17 (D.D.C.

2005); *accord Grazing Fields Farm v. Goldschmidt*, 626 F.2d 1068, 1072 (1st Cir. 1980); *cf.*

*High Country Conservation Advocates v. U.S. Forest Serv.*, 52 F. Supp. 3d 1174, 1192 n.4 (D.

Colo. 2014) (referring to record of decision as "post-hoc justification" for EIS).  The reason for

this strict requirement is that "other parts of an administrative record do not receive the same

wide circulation and consequent comment comparable to that accorded an environmental impact statement." *Nat'l Wildlife Fed'n*, 568 F. Supp. at 997.  Presenting its reasoning in a last-minute decision document does not bring BOEM into compliance with NEPA.

Finally, BOEM's last-minute rational was post-hoc and did not factor into the decision whether to hold the lease sale.  BOEM had committed to hold the sale regardless whether it found that the rule rollbacks increase environmental and safety risks.  By the time BOEM staff first raised the rule rollback issue on June 8, 2018, more than one-dozen individuals in BOEM and Interior's Solicitor's office had signed off on the Record of Decision, including, critically, BOEM's Acting Director.  AR0004084, 0004087.  Agencies may not use the NEPA process to simply "justify[] decisions already made," but must actually "assess[] the environmental impact of proposed agency actions." 40 C.F.R. § 1502.2(g).  "[T]he comprehensive 'hard look' mandated by Congress and required by [NEPA] must be timely, and it must be taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." *Metcalf v. Daley*, 214 F.3d 1135, 1142 (9th Cir. 2000); *see also* 40 C.F.R. §§ 1500.1(c), 1502.1.  The latter is precisely what happened here.

### B.     BOEM Disregarded that Safety Regulations Are Not Being Enforced When Assessing Drilling Safety.

BOEM relied substantially on the implementation and enforcement of Interior's offshore safety regulations when assessing and disclosing the risks of accidental events, like oil spills, on the environment in its Supplemental EIS.  The record before the agency, however, demonstrates that BSEE is not actually enforcing these regulations adequately.  BOEM's unsupported reliance on effective enforcement in its risk assessments "runs counter to the evidence before the agency," *State Farm*, 463 U.S. at 43, evidences a failure to "respond meaningfully to objections raised by a party," *BNSF Ry.*, 741 F.3d at 168 (citation omitted), and violates NEPA's hard look

prohibition on relying on inaccurate assumptions or data, *Native Ecosystems Council*, 418 F.3d at 964.

BOEM specifically cited BSEE's enforcement of the safety regulations when discussing environmental risks and harms in the Supplemental EIS. *See supra* pp. 18–19. For example, BOEM concluded that "*enforced* regulatory procedures" would "ensure public and work place safety and environmental protection." AR0015808 (emphasis added). And it relied on BSEE's "rigorous enforcement programs" and "rigorous inspection program" to conclude that mitigation stipulations in lease terms would be adequately implemented to avoid harmful effects to marine mammals and the environment. *E.g.*, AR0016343, 0016344, 0016346.

The Government Accountability Office found, however, that BSEE's enforcement and inspection programs are anything but rigorous. AR0027102–03. The Office found "BSEE continues to face risks to the effectiveness of its enforcement capabilities" that helped precipitate the *Deepwater Horizon* disaster. *Id.* The report's conclusions are irreconcilably at odds with BOEM's assumptions about BSEE's enforcement efforts. Without "any reasonable basis to conclude that [regulations are] being adequately enforced," BOEM's discussion of such enforcement in the EIS is a "logical nullity" and invalidates its associated conclusions. *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 589 (4th Cir. 2012) (finding NEPA document invalid because court was "unable to divorce the agency's demonstrably incorrect assumption of . . . effective [enforcement] from its ultimate conclusion"). BOEM's assumptions and conclusions regarding safety risks and subsequent environmental impacts run counter to the evidence before the agency, in violation of the APA and NEPA. *See State Farm*, 463 U.S. at 43; *Native Ecosystems Council*, 418 F.3d at 964.

When commenters confronted BOEM with this incongruity between its analyses and the

Government Accountability Office report, BOEM expressly declined to even consider the report. BOEM initially acknowledged at the five-year program stage that it would evaluate "[t]he role of BSEE, its regulatory compliance responsibilities, the shortcomings in regulatory oversight identified in the [Government Accountability Office] report, and implemented or planned remedies . . . in future lease sale EISs."  AR0015118.  But in the "future lease sale EIS," on the exact same page of the Supplemental EIS on which BOEM stated it was relying on BSEE's "rigorous inspection program" to assess whether mitigation would be effective, BOEM claimed it could not consider the Government Accountability Office report because "BSEE's operations are outside of the leasing process."  AR0016346–47; *see also* AR0009838 ("[Government Accountability Office] report is outside the scope of this Multistate EIS").  BOEM "cannot have it both ways;" "it cannot simultaneously rely on [BSEE's enforcement] and then brush off comments about [that enforcement] as beyond its purview."  *Del. Dep't of Nat. Res.*, 785 F.3d at 18.  The Government Accountability Office report seriously undermines BOEM's reliance on BSEE enforcement when assessing risks.  By disregarding that report, BOEM failed to consider an important aspect of the problem.  *State Farm*, 463 U.S. at 43.[16]

## C.  BOEM Unreasonably Assumed that a Policy Intended to Increase Offshore Drilling Would Have No Meaningful Effect on Offshore Drilling.

BOEM estimated the number of leases that would be sold and resulting oil and gas activity from the lease sale using an assumption that the royalty rate for leases in less than 200 meters of water would be 18.75%.  BOEM reduced that shallow-water royalty rate in June 2017 to 12.5% specifically to increase oil and gas leasing and development.  However, BOEM never

---

[16] BOEM also failed explain why it "chang[ed] its course" from the Program EIS and decided not to evaluate BSEE's enforcement shortcomings in the future lease sale EISs.  *See Republic Airline Inc. v. U.S. Dep't of Transp.*, 669 F.3d 296, 299 (D.C. Cir. 2012) (agency "is obligated to supply a reasoned analysis for the change" (quoting *State Farm*, 463 U.S. at 42)).

considered that this policy to encourage more leasing would also increase the activity resulting from the lease sales and the associated environmental effects.  As a result, the Supplemental EIS underrepresents the likely environmental effects of the 2018 lease sales.  BOEM's failure "to consider [this] important aspect of the problem" and its reliance on an incorrect assumption (the 18.75% royalty rate) violate the APA and NEPA.  *State Farm*, 463 U.S. at 43; *see Native Ecosystems Council*, 418 F.3d at 964; *Mo. Pub. Serv. Comm'n*, 337 F.3d at 1075.

As explained on page 21 above, the royalty rate affects the inputs BOEM used to forecast activity levels and the magnitude of environmental effects that would result from a lease sale (i.e., a lower royalty rate results in greater activity and effect levels).  BOEM stated that it presumed an 18.75% shallow-water royalty rate when it estimated activity levels, despite the fact that Interior had reduced that rate to 12.5% explicitly to increase bidding and lease activity.  AR0004132; *see, e.g.*, AR0000006–07.  BOEM's use of the inaccurately higher royalty rate "arbitrarily and capriciously skewed" its estimated levels of development and production lower, impeding a "full and fair discussion of the potential effects" of the lease sales.  *Native Ecosystems Council*, 418 F.3d at 965; *see Point Hope*, 740 F.3d at 505 (stating "NEPA required BOEM to base its analysis on the full range of likely production").  BOEM provided no rationale for why it used this incorrect assumption.  *See Sierra Club v. Salazar*, 177 F. Supp. 3d at 532–33.  By doing so, BOEM failed to take a hard look at the effects of Lease Sales 250 and 251.

As with its flawed assumptions concerning the safety regulations, the Assistant Secretary attempted to paper over BOEM's erroneous effects analysis at the last minute before Lease Sale 251 in the Record of Decision.  The Assistant Secretary claimed that the forecasted activity scenario "based originally on the 18.75% royalty rates, remained valid," because any additional activity from the lower 12.5% royalty rate allegedly would be within the margins of error for the

scenarios.  AR0004132.  For the same reasons explained above, this effort does not retroactively validate the decision to hold Lease Sale 250, nor does it comply with NEPA's requirement that relevant analyses be in the EIS itself.  *See supra* pp. 35–36, 38–39.

And just as with its alleged reconsideration of the safety rule rollbacks, the Assistant Secretary and BOEM failed to provide a rational basis for why the erroneous royalty rate assumptions in the NEPA analyses were inconsequential, relying instead on unsupported, conclusory statements.  For instance, the Assistant Secretary asserted in the Record of Decision that BOEM "reanalyzed the forecasted . . . activity expected from a proposed lease sale following the reduction in royalty rates from 18.75% to 12.5%," and suggested BOEM "modeled" this range of activity.  AR0004132; *see also* AR0004052.  "Stating that a factor was considered, however, is not a substitute for considering it."  *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986).  The administrative record must contain evidence supporting the agency's assertion.  *Id.*; *see also Sierra Club v. Salazar*, 177 F. Supp. 3d at 532–33 (explaining agency must provide court with record support for its conclusions); *cf. Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 204 (D.C. Cir. 2007) ("When an agency uses a computer model, it must 'explain the assumptions and methodology used in preparing the model.'" (quoting *U.S. Air Tour Ass'n v. FAA*, 298 F.3d 997, 1008 (D.C. Cir. 2002))).  The record in this case contains no evidence that BOEM actually conducted any sort of reanalysis or modeling of activity using the lower royalty rate.  The Court "cannot defer to a void."  *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1121 (9th Cir. 2010) (finding agency failed to take hard look under NEPA when agency "used *no* method to analyze" the issue in question).

The record does contain a "discussion document" about the royalty rate concern,

although it falls far short of being a scientific or mathematical analysis.  AR0016580–82.  In it,

BOEM described, for the first time,[17] how its Office of Resource Evaluation had used a series of

spreadsheet-based models to estimate the anticipated oil and gas activity resulting from a single

lease sale.  AR0016581.  The discussion document offers a chart "extracted from one of

[BOEM's] studies"—it does not identify which study—to allegedly show that the any increase in

activity resulting from the lower royalty rate would "reside[] well within the range of uncertainty

predicted."  AR0016581-82.[18]  The discussion document, however, provides no actual estimate

of the change in activity level due to the royalty rate reduction.  So there is no way to know from

the document how or even if BOEM actually determined that the change is within the "range of

uncertainty," as it claims, or whether that determination is valid.  Based on the evidence in the

discussion document, it seems the agency's reasoning is nothing more than "mere conjecture and

abstract theorizing offered in a vacuum," which falls short of the APA's rationality requirement.

*Sierra Club v. Salazar*, 177 F. Supp. 3d at 533 (quoting *Kan. Gas & Elec. Co. v. FERC*, 758 F.2d

713, 721 (D.C. Cir. 1985)).  Courts must ensure the agency examined the relevant data and

adequately explained the methodology and analysis of its model.  *Shands Jacksonville*, 139 F.

Supp. 3d at 262.  The record provides no evidence that BOEM did so here.

---

[17] This was the first time BOEM explained the "critical aspects" of its methodology underlying how it estimated the activity levels central to its assessment of the lease sales' environmental effects, well after any opportunity for public input on the lease sales had passed.  It was not available or known to the public before BOEM made its lease sale decisions, in violation of the APA, but only through the administrative record in this litigation.  *See Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 262 (D.D.C. 2015) ("Given the APA's requirement that an agency 'examine the relevant data and articulate a satisfactory explanation for its action,' 'it is especially important for the agency to identify and make available technical studies and data that it has employed' prior to the comment period." (citations omitted)); *see also Owner-Operator Ass'n*, 494 F.3d at 199 ("[T]he most critical factual material that is used to support the agency's position on review must have been made public *in the proceeding* and exposed to refutation." (citation omitted)).

[18] Shallow-water oil and gas activity in 2007 and 2008 was higher than the upper limit of uncertainty in 2018, so it is not unreasonable to require BOEM to consider whether the royalty rate reduction might cause activity to return to those levels.  *See* AR0016582.

BOEM's post-NEPA assessment of the royalty rate change is quite similar to the type of analysis struck down as arbitrary and capricious in *AEP Texas North Co. v. Surface Transportation Board*. 609 F.3d 432 (D.C. Cir. 2010). The agency in that case had pointed to a chart of several models to justify its conclusion that one model's calculation for a given year "does not vary significantly more than other models." *Id.* at 442. The court took issue with that type of analysis: "As far as can be ascertained from the decision, the Board's analysis consisted of nothing more than an estimation measured by a cursory glance at the graph." *Id.* So although the agency was permitted to use its expertise in applying a model, "that does not mean the Board was free to choose methods for comparison without opportunity for comment by the parties and without any apparent rigor in its analysis." *Id.* at 443 (finding agency's conclusion arbitrary and capricious as a result). So too here, BOEM's analysis consisted of little more than a "cursory glance" at a graph before asserting that any changes due to reduced royalty rates would not vary significantly from the original activity level estimates. Such cursory analysis without opportunity for public comment or additional rigor is arbitrary and capricious.

## CONCLUSION

For the foregoing reasons, the Court should declare Lease Sales 250 and 251 along with the related EIS unlawful, arbitrary, capricious, an abuse of discretion, and otherwise contrary to NEPA and the APA. The Court should vacate Lease Sales 250 and 251 and the leases granted thereunder, and remand the Supplemental EIS to prepare a new, legally compliant EIS.

Respectfully submitted this 15th day of February, 2019.


/s/ Stephen D. Mashuda
Stephen D. Mashuda (DC Bar No. WA0005)
Christopher D. Eaton (*pro hac vice*)
EARTHJUSTICE
705 Second Ave., Suite 203
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
smashuda@earthjustice.org
ceaton@earthjustice.org

Brettny Hardy (*pro hac vice*)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
bhardy@earthjustice.org

*Attorneys for Plaintiffs Gulf Restoration Network,*
*Sierra Club, and Center for Biological Diversity*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 15, 2019, I caused the foregoing to be filed and served upon counsel of record via the Court's CM/ECF filing system, which will send notice of such to all counsel of record.

/s/ Stephen D. Mashuda
Stephen D. Mashuda