## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GULF RESTORATION NETWORK, *et al.*,

Plaintiffs,

v.

DAVID BERNHARDT, *et al.*,

Defendants,

AMERICAN PETROLEUM INSTITUTE, *et al.*,

Intervenor-Defendants.

No. 1:18-cv-01674-RBW

## AMERICAN PETROLEUM INSTITUTE'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56, Intervenor-Defendant American Petroleum Institute ("API") respectfully cross-moves for an order entering summary judgment against Plaintiffs and denying Plaintiffs' claims for relief, and granting API's cross-motion for summary judgment. A Memorandum in Support of this motion is attached.

Respectfully submitted,

/s/ Steven J. Rosenbaum
Steven J. Rosenbaum
 D.C. Bar No. 331728
Bradley K. Ervin
 D.C. Bar No. 982559
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

*Attorneys for Defendant-Intervenor American Petroleum Institute*

April 15, 2019

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| GULF RESTORATION NETWORK, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID BERNHARDT, *et al.*, <br><br> Defendants, <br><br> and <br><br> AMERICAN PETROLEUM INSTITUTE, *et al.*, <br><br> Intervenor-Defendants. | No. 1:18-cv-01674-RBW |

**MEMORANDUM OF THE AMERICAN PETROLEUM INSTITUTE IN OPPOSITION
TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, AND IN SUPPORT OF ITS
CROSS-MOTION FOR SUMMARY JUDGMENT**

Steven J. Rosenbaum
  D.C. Bar No. 331728
Bradley K. Ervin
  D.C. Bar No. 982559
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

April 15, 2019

*Attorneys for Defendant-Intervenor American
Petroleum Institute*

1

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

    A.    OCSLA Mandates The Expeditious Exploration And Development Of The Nation's Critical OCS Oil And Gas Resources. ................................................ 2

    B.    Congress Designed A Four-Stage Government Review Process To Expedite OCS Exploration And Development. ..................................................... 3

ARGUMENT ...................................................................................................................... 6

I.    Plaintiffs' NEPA Claims Should Be Denied. .................................................... 6

    A.    Federal Defendants' Decisions Approving The Challenged Lease Sales Are Entitled to Substantial Deference, And Were Not Arbitrary Or Capricious. ............................................................................................................ 6

    B.    Congress Has Directed Federal Defendants To Promote And Expedite OCS Oil And Gas Development, And BSEE's Corresponding Environmental Safeguards Are Not Subject To Collateral Challenge In This Action ............................................................................................................. 9

II.    Plaintiffs Fail To Satisfy The Traditional Test For The Relief They Seek ...................... 12

    A.    Traditional Principles Of Equity Apply To Plaintiffs' Requests For Relief ......... 13

    B.    Plaintiffs Fail To Establish An Entitlement To Relief ......................................... 13

        1.    Plaintiffs' Speculative Environmental Harm Is Undercut By Existing Gulf Development And Mitigation ............................................. 14

        2.    Plaintiffs' Alleged Harm Is Greatly Outweighed By Harms To The Public Interest. ...................................................................................... 15

        3.    Plaintiffs' Alleged Harm Is Greatly Outweighed By The Harms To Business And Government Economic Interests ...................................... 17

CONCLUSION ................................................................................................................. 20

# TABLE OF AUTHORITIES

## Cases

*Am. Farm Bureau Fed'n v. EPA*,
559 F.3d 512 (D.C. Cir. 2009) ................................................................ 19

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) .......................................................................... 13, 17

*Ark Initiative v. Tidwell*,
816 F.3d 119 (D.C. Cir. 2016) .................................................................. 7

*Associated Gen, Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*,
713 F.3d 1187 (9th Cir. 2013) ............................................................... 11

*Banks v. Warner*,
No. 94-56732, 1995 WL 465773 (9th Cir. Aug. 7, 1995) ....................... 18

*California v. Watt*,
668 F.2d 1290 (D.C. Cir. 1981) ..................................................... 3, 9, 16

*Camp v. Pitts*,
411 U.S. 138 (1973)................................................................................ 18

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971)................................................................................. 7

*City of Auburn v. United States*,
154 F.3d 1025 (9th Cir. 1998) .................................................................. 6

*City of Nephi, Utah v. FERC*,
147 F.3d 929 (D.C. Cir. 1998) ............................................................... 12

*City of Olmsted Falls, OH v. FAA*,
292 F.3d 261 (D.C. Cir. 2002) ............................................................. 2, 6

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior*,
563 F.3d 466 (D.C. Cir. 2009) ......................................................... 2, 3, 5

*Ctr. for Sustainable Economy v. Jewell*,
779 F.3d 588 (D.C. Cir. 2015) ................................................................ 4

*Defs. of Wildlife v. BOEMRE*,
871 F. Supp. 2d 1312 (S.D. Ala. 2012)................................................... 2

*Del. Dep't of Nat. Res. & Envt'l Control v. U.S. Army Corps of Eng'rs*,
681 F. Supp. 2d 546 (D. Del. 2010)...................................................... 17

*Dep't of Health & Human Servs. Family Support Admin. v. Fed. Labor Relations Auth.*,
920 F.2d 45 (D.C. Cir. 1990)................................................................. 12

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004)................................................................................. 6

*Authorities upon which Defendant-Intervenor chiefly relies

*Diné Citizens Against Ruining Our Env't v. Jewell*,
　No. 15-cv-0209, 2015 WL 4997207 (D.N.M. Aug. 14, 2015) ................................. 16

*EarthLink, Inc. v. FCC*,
　462 F.3d 1 (D.C. Cir. 2006) ................................................................................. 8

*eBay Inc. v. MercExchange, LLC*,
　547 U.S. 388 (2006) ............................................................................................ 13

*Eco Tour Adventures, Inc. v. Zinke*,
　249 F. Supp. 3d 360 (D.D.C. 2017) ..................................................................... 18

*Habitat for Horses v. Salazar*,
　745 F. Supp. 2d 438 (S.D.N.Y. 2010) .................................................................. 18

*Holland Am. Ins. Co. v. Succession of Roy*,
　777 F.2d 992 (5th Cir. 1985) .............................................................................. 15

*Idaho Power Co. v. FERC*,
　312 F.3d 454 (D.C. Cir. 2002) ............................................................................ 19

*In Def. of Animals v. U.S. Dep't of the Interior*,
　737 F. Supp. 2d 1125 (E.D. Cal. 2010) ............................................................... 15

*La. Fed. Land Bank Ass'n, FLCA v. Farm Credit Admin.*,
　336 F.3d 1075 (D.C. Cir. 2003) .......................................................................... 20

*McDonald's Corp. v. Robertson*,
　147 F.3d 1301 (11th Cir. 1998) .......................................................................... 14

*Miami-Dade Cnty. v. U.S. EPA*,
　529 F.3d 1049 (11th Cir. 2008) ............................................................................ 8

*Milwaukee Cnty. Pavers Ass'n v. Fielder*,
　922 F.2d 419 (7th Cir. 1991) .............................................................................. 12

*Mobil Oil Expl. & Producing Se., Inc. v. United States*,
　530 U.S. 604 (2000) ............................................................................................ 18

*Monsanto Co. v. Geertson Seed Farms*,
　561 U.S. 139 (2010) ............................................................................ 12, 13, 15

*N. Slope Borough v. Andrus*,
　642 F.2d 589 (D.C. Cir. 1980) .............................................................................. 4

*N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*,
　854 F.3d 1236 (10th Cir. 2017) .......................................................................... 15

*Nader v. Nuclear Regulatory Comm'n*,
　513 F.2d 1045 (D.C. Cir. 1975) .......................................................................... 12

*Nat'l Comm. for the New River, Inc. v. FERC*,
　373 F.3d 1323 (D.C. Cir. 2004) ............................................................................ 8

*Native Vill. of Point Hope v. Salazar*,
　730 F. Supp. 2d 1009 (D. Alaska 2010) .............................................................. 19

*Natural Resources Defense Council v. U.S. Nuclear Regulatory Comm'n,*
   823 F.3d 641 (D.C. Cir. 2016) ................................................................. 7

*Nevada v. Dep't of Energy,*
   457 F.3d 78 (D.C. Cir. 2006) .................................................................... 7

*Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs,*
   817 F. Supp. 2d 1290 (D. Or. 2011) ....................................................... 18

*Partners in Forestry Coop. v. U.S. Forest Serv.,*
   638 F. App'x 456 (6th Cir. 2015) ............................................................. 7

*PGBA, LLC v. United States,*
   389 F.3d 1219 (Fed. Cir. 2004) .............................................................. 12

*Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of the Interior,*
   832 F. Supp. 2d 5 (D.D.C. 2011) .............................................................. 8

*Radio-Television News Dirs. Ass'n v. FCC,*
   184 F.3d 872 (D.C. Cir. 1999) ................................................................ 19

*Samuels v. Mackell,*
   401 U.S. 66 (1971) .................................................................................. 12

*Sec'y of the Interior v. California,*
   464 U.S. 312 (1984) ............................................................................. 3, 4

*Sierra Club v. U.S. Dep't of Energy,*
   867 F.3d 189 (D.C. Cir. 2017) .................................................................. 6

*Sierra Club v. Van Antwerp,*
   526 F.3d 1353 (11th Cir. 2008) ................................................................ 9

*\*Sierra Club, Inc. v. Bostick,*
   539 F. App'x 885 (10th Cir. 2013) ......................................................... 17

*Sugar Cane Growers Coop. of Fla. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) ................................................................. 20

*Swindol v. Aurora Flight Scis. Corp.,*
   805 F.3d 516 (5th Cir. 2015) ................................................................. 18

*Theodore Roosevelt Conservation P'ship v. Salazar,*
   616 F.3d 497 (D.C. Cir. 2010) .................................................................. 6

*\*Transwestern Pipeline Co. v. FERC,*
   988 F.2d 169 (D.C. Cir. 1993) ................................................................ 11

*Union Oil Co. of Cal. v. Morton,*
   512 F.2d 743 (9th Cir. 1975) ................................................................. 18

*US West Commncs. v. MFS Intelenet, Inc.,*
   193 F.3d 1112 (9th Cir. 1999) ............................................................... 11

*Vill. of Logan v. U.S. Dep't of Interior,*
   577 F. App'x 760 (10th Cir. 2014) ......................................................... 17

*Virgin Islands Tel. Corp. v. FCC*,
 444 F.3d 666 (D.C. Cir. 2006) ............................................................................ 12

*Weinberger v. Romero-Barcelo*,
 456 U.S. 305 (1982) ........................................................................................... 13

*Weiss v. Kempthorne*,
 580 F. Supp. 2d 184 (D.D.C. 2008) ..................................................................... 7

*Winter v. Natural Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) .......................................................................... 13, 14, 15, 19

## Statutes

5 U.S.C. §§ 551, *et seq.* ...................................................................................... 1

42 U.S.C. §§ 4321, *et seq.* .................................................................................... 1

43 U.S.C. § 1331(a) ............................................................................................. 2

43 U.S.C. § 1331(b) ............................................................................................. 3

43 U.S.C. § 1332(3) ........................................................................................... 10

43 U.S.C. § 1337(a)(1) ......................................................................................... 4

43 U.S.C. § 1340(c) ............................................................................................. 5

43 U.S.C. § 1344(a) ............................................................................................. 4

43 U.S.C. § 1346(d) ............................................................................................. 5

43 U.S.C. § 1351 ................................................................................................. 5

43 U.S.C. § 1351(h)(1)(D)(i) ................................................................................ 5

43 U.S.C. § 1802(1) .......................................................................................... 2, 9

43 U.S.C. § 1802(2)(A) .................................................................................... 3, 16

43 U.S.C. §§ 1331, *et seq.* .................................................................................... 2

## Other Authorities

H.R. Rep. No. 95-590 (1977), *reprinted in* 1978 U.S.C.C.A.N 1450 ......................... 3

*Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Blowout Preventer Systems and Well Control Revisions*, Correction and Extension of Public Comment Period,
 83 Fed. Reg. 31,343 (July 5, 2018) .................................................................. 10

*Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Blowout Preventer Systems and Well Control Revisions*, Proposed Rule,
 83 Fed. Reg. 22,128 (May 11, 2018) ............................................................ 10, 15

*Oil and Gas and Sulphur Operations on the Outer Continental Shelf—Oil and Gas Production Safety Systems*, Final Rule,
 83 Fed. Reg. 49,216 (Sept. 28, 2018) ........................................................... 10, 11

**Rules**

Fed. R. Evid. 201(b) ............................................................................................................ 18

Fed. R. Evid. 201(c) ............................................................................................................ 18

**Regulations**

30 C.F.R. § 250.410 ............................................................................................................. 5

## INTRODUCTION

The Gulf of Mexico ("GOM") Outer Continental Shelf ("OCS") is the nation's premier locale for offshore oil and gas development, with its "Western and Central . . . Planning Areas . . . generating about 97 percent of [national] OCS oil and gas production." AR0004312. "There have been more than 100 lease sales since 1953 in the [GOM OCS] Region," AR004313, and today there are more than 3,000 active leases in the Western and Central GOM OCS, with more than 50,000 wells drilled. *See* AR0004314. Over 16 billion barrels of oil have been produced to date from the GOM OCS, with over 647 million barrels produced in the twelve month period through January 2019 alone. https://www.eia.gov/opendata/qb.php?sdid=PET.MCRFP3FM1.A; https://www.data.boem.gov/Production/OCSProduction/Default.aspx. The adjoining Gulf states—Texas, Louisiana, and Alabama—"administer robust oil and gas programs in state waters . . . ." AR0004314.

Asserting violations of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551, *et seq.*, Plaintiffs challenge two recent GOM OCS oil and gas lease sales. Notwithstanding the more than 100 previous GOM OCS lease sales, and Federal Defendants' preparation following public comment of three separate Environmental Impact Statements ("EIS") totaling over 1,100 pages and exhaustively analyzing all environmental aspects of additional oil and gas lease sales in the Gulf, Plaintiffs assert that Federal Defendants' decisions to conduct Lease Sales 250 and 251 and all subsequently issued leases should be vacated until Defendant Bureau of Ocean and Energy Management ("BOEM") further addresses the no-action alternative to the lease sales, and revisions in OCS oil and gas regulations and practice. *See* Compl. (Dkt. No. 1), ¶¶ 159–82.

"[T]his Court's inquiry is not whether it agrees with [BOEM's] actions, or whether it would have proceeded differently had it been standing in [BOEM's] shoes," but whether

Plaintiffs have met their burden of showing that BOEM's decisions to conduct the lease sales were arbitrary or capricious. *Defs. of Wildlife v. BOEMRE*, 871 F. Supp. 2d 1312, 1321–22 (S.D. Ala. 2012). *See also*, *e.g.*, *City of Olmsted Falls, OH v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) ("The party challenging an agency's action as arbitrary and capricious bears the burden of proof." (quotation and alteration omitted)). Plaintiffs have not met their burden here.

As the Federal Defendants have thoroughly demonstrated, their detailed examination of the environmental impacts of the proposed leasing and alternatives thereto fulfilled their NEPA obligations, and as Intervenor Chevron has demonstrated, Federal Defendants' revisions to offshore regulations and royalty rates do not impact the validity of the leasing decisions. Defendant-Intervenor America Petroleum Institute incorporates these arguments by reference, and focuses this brief on additional grounds supporting the challenged leasing decisions and precluding both Plaintiffs' arguments and the relief Plaintiffs seek.

## BACKGROUND

### A.   OCSLA Mandates The Expeditious Exploration And Development Of The Nation's Critical OCS Oil And Gas Resources.

The OCS is the area of submerged lands that lie seaward of a state's jurisdiction and that are subject to the "jurisdiction and control" of the United States. *See* 43 U.S.C. § 1331(a); *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472 (D.C. Cir. 2009). The OCS Lands Act ("OCSLA") mandates and governs the development of offshore oil and gas resources on the OCS. *See* 43 U.S.C. §§ 1331, *et seq.* Congress enacted OCSLA to promote and ensure the "expedited exploration and development of the [OCS] in order to achieve national economic and energy policy goals, assure national security, reduce dependence on foreign sources, and maintain a favorable balance of payments in world trade." *Id.* § 1802(1). Indeed,

Congress specified that it wished to "make [OCS] resources available to meet the Nation's energy needs as rapidly as possible." *Id*. § 1802(2)(A).

Congress substantially amended OCSLA in 1978 for the stated purpose of "promot[ing] the swift, orderly and efficient exploitation of our almost untapped domestic oil and gas resources in the Outer Continental Shelf."[1]  As the D.C. Circuit then observed, "the Act has an objective—the expeditious development of OCS resources." *California v. Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981).  "The first stated purpose of the Act, then, is to establish procedures to expedite exploration and development of the OCS." *Id*.  Indeed, "[t]he [Act's] remaining purposes primarily concern measures to eliminate or minimize the risks attendant to that exploration and development.  Several of the purposes, in fact, candidly recognize that some degree of adverse impact is inevitable." *Id*.

### B.  Congress Designed A Four-Stage Government Review Process To Expedite OCS Exploration And Development.

To facilitate OCSLA's developmental purpose and "forestall premature litigation regarding adverse environmental effects that . . . will flow, if at all, only from the latter stages of OCS exploration and production," *Sec'y of the Interior v. California*, 464 U.S. 312, 341 (1984), Congress created "four distinct statutory stages to developing an offshore oil [or gas] well: (1) formulation of a five year leasing plan . . .; (2) lease sales; (3) exploration by the lessees; (4) development and production," *id*. at 337; *see also Ctr. for Biological Diversity*, 563 F.3d at 472–73.  Congress delegated principal responsibility over this extensive and complex development program to the Secretary.  *See* 43 U.S.C. § 1331(b).[2]

---

[1] H.R. Rep. No. 95-590, at 8 (1977), *reprinted in* 1978 U.S.C.C.A.N 1450, 1460.

[2] The Secretary's delegated authority over OCS oil and gas development is divided between BOEM and the Bureau of Safety and Environmental Enforcement ("BSEE").  *See* 76 Fed. Reg. 64,432 (Oct. 18, 2011).  BOEM is (continued…)

First, at the five-year leasing program stage, Interior prepares "a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which [the Secretary] determines will best meet national energy needs for the five-year period following its approval...." 43 U.S.C. § 1344(a).  In short, "[t]he key national decisions as to the size, timing, and location of OCS leasing . . . are made at this first stage."  *Ctr. for Sustainable Economy v. Jewell*, 779 F.3d 588, 595 (D.C. Cir. 2015) (explaining that the program is the basis of "long-term plans" for oil and gas leasing and development for "[f]ederal, state, and local governments, and the companies that participate in national and international energy markets"). In deciding upon the five-year leasing program, OCSLA directs the Secretary to "consider[] [the] economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS], and the potential impact of oil and gas exploration on other resource values of the [OCS] and the marine, coastal, and human environments."  43 U.S.C. § 1344(a)(1). "[P]rospective lease purchasers acquire no rights to explore, produce, or develop at this first stage . . . ."  *Sec'y of the Interior*, 464 U.S. at 338.

Second, at the lease sale stage (which is at issue in this case), Interior conducts the lease sales provided for in the previously-adopted five-year program, 43 U.S.C. § 1337(a)(1), by "solicit[ing] . . . bids and . . . issu[ing] . . . offshore leases," *Sec'y of the Interior*, 464 U.S. at 338. "A lessee does not, however, acquire an immediate or absolute right to explore for, develop, or produce oil or gas on the OCS; those activities require separate, subsequent federal authorization"  *Id*. at 317.  *See also id*. at 339; *N. Slope Borough v. Andrus*, 642 F.2d 589, 593 (D.C. Cir. 1980) (noting that "no drilling—not even of an exploratory nature" is authorized).

_____

responsible for, among other things, lease sales, and BSEE is responsible for, among other things, drilling operation safety and environmental protection.

Third, at the exploration stage, "Interior reviews and determines whether to approve the lessees' . . . exploration plans."  *Ctr. for Biological Diversity*, 563 F.3d at 473.  *See also* 43 U.S.C. § 1340(c).  In making this decision, the Secretary "shall disapprove such plan if he determines that (A) any proposed activity under such plan would result in any condition described in section 1334(a)(2)(A)(i) of this title [serious harm or damage to life (including fish and other aquatic life), to property, to any mineral (in areas leased or not leased), to the national security or defense, or to the marine, coastal, or human environment], and (B) such proposed activity cannot be modified to avoid such condition."  43 U.S.C. § 1340(c)(1).  In making exploration plan approval decisions, the Secretary must "consider available relevant environmental information . . . ."  43 U.S.C. § 1346(d).

Fourth, at the development and production stage, the Department of the Interior, along with affected state and local governments, reviews an additional and more detailed plan from the lessee, *see* 43 U.S.C. § 1351, for (in typical cases) construction of a production platform, installation of processing equipment, and the laying of pipelines, all of which may remain in place for decades.  *See* 43 U.S.C. § 1351(c).  "If Interior finds that the plan would 'probably cause harm or damage . . . to the marine, coastal or human environments,' then the plan, and consequently the leasing program, may be terminated."  *Ctr. for Biological Diversity*, 563 F.3d at 473 (quoting 43 U.S.C. § 1351(h)(1)(D)(i)).  *See also* 43 U.S.C. § 1351(h)(1)(D)(i) ("The Secretary shall disapprove a plan . . . if the Secretary determines," under specified conditions, "that . . . implementation of the plan would probably cause serious harm or damage to life . . ., to property, to any mineral deposits . . ., or to the marine, coastal or human environments . . . .").

A lessee operating under an approved exploration or development plan must also obtain a permit prior to drilling a well pursuant to the plan.  *See* 30 C.F.R. § 250.410.

**ARGUMENT**

**I.      Plaintiffs' NEPA Claims Should Be Denied.**

The Federal Defendants have fully demonstrated that Plaintiffs' arguments fail to establish any NEPA violation in connection with Lease Sales 250 and 251. *See* Fed. Defs.' Br. at 8-26. As set forth below, basic legal principles governing the review of agency action under the APA and NEPA further underscore the Federal Defendants' showing and Plaintiffs' failure to satisfy their burden to establish that Federal Defendants' challenged leasing decisions are arbitrary or capricious. *E.g.*, *City of Olmsted Falls*, 292 F.3d at 271. Moreover, Plaintiffs' assertions that BOEM acted arbitrarily in relying upon BSEE's revisions of regulations governing worker and environmental safety of OCS oil and gas drilling operations represents an impermissible collateral attack on those revised regulations, and are therefore inappropriate in this challenge to BOEM's lease sale decisions.

**A.      Federal Defendants' Decisions Approving The Challenged Lease Sales Are Entitled to Substantial Deference, And Were Not Arbitrary Or Capricious.**

Plaintiffs' claims fail on the merits. NEPA "does not mandate particular results, but simply prescribes the necessary process." *Sierra Club v. U.S. Dep't of Energy,* 867 F.3d 189, 203 (D.C. Cir. 2017) (quotation omitted). *See also Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (NEPA is "meant to ensure a fully informed and well-considered decision, not necessarily the best" (quotation omitted)). "[I]nherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004). For this reason, "[g]reat" deference is owed "an agency determination regarding NEPA requirements." *City of Auburn v. United States*, 154 F.3d 1025, 1032 (9th Cir. 1998).

6

Pursuant to the APA, "the agency action under review is 'entitled to a presumption of regularity,'" *Weiss v. Kempthorne*, 580 F. Supp. 2d 184, 188 (D.D.C. 2008) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)), and "[a] reviewing court does not consider whether the agency correctly assessed the proposal's environmental impacts," *Partners in Forestry Coop. v. U.S. Forest Serv.*, 638 F. App'x 456, 459 (6th Cir. 2015) (quotation omitted).   Rather, in the NEPA context, "[t]he role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious." *Nevada v. Dep't of Energy,* 457 F.3d 78, 87-88 (D.C. Cir. 2006) (citations omitted); *see also Natural Resources Defense Council v. U.S. Nuclear Regulatory Comm'n*, 823 F.3d 641, 653 (D.C. Cir. 2016) ("Our only task is to determine whether the [agency] has considered the relevant factors and articulated a rational connection between the facts found and the choice made.") (quotation omitted).

"[T]he scope of judicial review under the arbitrary-and-capricious standard is narrow and a court is not to substitute its judgment for that of the agency . . . ." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (quotation omitted).   An agency action may be set aside only if the agency identified no "rational connection between the facts found and the choice made," "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem," or if the agency's "explanation for its decision [is] counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. (quotation omitted).   A court's review under this standard is highly deferential, and "[i]t is well settled that the court will not 'flyspeck' an agency's environmental analysis, looking for any deficiency no matter how minor," *Nevada*, 457 F.3d at 93.

Moreover, "[w]hen an agency is evaluating scientific data within its technical expertise, an extreme degree of deference to the agency is warranted." *Nat'l Comm. for the New River, Inc. v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (quotation omitted). *See also*, *e.g.*, *Miami-Dade Cnty. v. U.S. EPA*, 529 F.3d 1049, 1065 (11th Cir. 2008) (court "must look at the agency's decision not as the chemist, biologist, or statistician that it is qualified neither by training nor experience to be, but as a reviewing court exercising certain minimal standards of rationality") (quotation and alterations omitted).[3]   Likewise, an agency decision is subject to "particularly deferential review" where it involves "predictive judgments about areas that are within the agency's field of discretion and expertise . . . as long as they are reasonable." *EarthLink, Inc. v. FCC*, 462 F.3d 1, 12 (D.C. Cir. 2006).

As detailed in the Federal Defendants' brief, BOEM conducted the challenged leases sales pursuant to three thorough EISs—covering the five-year 2017-2022 leasing program, the ten proposed Gulf of Mexico lease sales under the five-year program, and the challenged lease sales. *See* Fed. Defs.' Br. at 6-8; *See also* AR0004522–5416 (supplemental EIS reviewing the challenged lease sales); AR0005417–7274 (multisale EIS reviewing ten proposed Gulf of Mexico lease sales); AR0014242–15179 (leasing program EIS).   Individually and collectively, these extensive environmental reviews disclosed and analyzed, among other things, the Gulf of Mexico environment, anticipated direct, indirect and cumulative impacts to that environment from oil and gas development arising from the proposed lease sales, and mitigation measures designed to control and lessen such impacts.   In each instance, Interior and BOEM relied on scientific, technical, and predictive judgments and data.   *See*, *e.g.*, AR0004652–63 (describing

---

[3] That deference extends to an agency's choice of methodology, to which a court "must defer . . . so long as it bears a rational relationship between the method and that to which it is applied." *Pub. Emps. for Envtl. Responsibility v. U.S. Dep't of the Interior*, 832 F. Supp. 2d 5, 26 (D.D.C. 2011) (quotation and alteration omitted).

estimates of oil spill impacts from future oil and gas development); AR004689–731 (describing

agency modeling of emissions and air quality impacts from development); AR005594–620

(predicting levels of development activity and resulting impacts over several decades);

AR0005634–44 (predicting types and volumes of discharges into the Gulf of Mexico).

Such expert and predictive disclosures are well within Federal Defendants' expertise, and

are all that NEPA requires.  *See supra*; *see also Sierra Club v. Van Antwerp*, 526 F.3d 1353,

1361 (11th Cir. 2008) ("substantial deference [owed] to the agency, not only when reviewing

decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when

reviewing drafting decisions like how much discussion to include on each topic, and how much

data is necessary to fully address each issue").

> **B.    Congress Has Directed Federal Defendants To Promote And Expedite OCS Oil And Gas Development, And BSEE's Corresponding Environmental Safeguards Are Not Subject To Collateral Challenge In This Action.**

Plaintiffs further complain that the Federal Defendants ignored changes to federal energy

policy and OCS regulations designed to increase development.  *See* Pls.' Br. at 1 ("The sales

were part of a bigger effort by Interior to greatly increase the oil and gas production from

offshore waters.").  *See also id*. at 41–45.  But Congress in OCSLA itself established the primacy

of expedited OCS oil and gas development, and reinforced that overriding policy in amending

OCSLA in 1978 and mandating the four-stage system for such development.  *See supra* pp. 2–5.

In short, contrary to Plaintiffs' suggestions that Interior has independently adopted new

policies "to greatly increase the oil and gas production from offshore waters," Pls.' Br. at 1; *see

also*, *e.g.*, *id*. at 41–45, Congress ***directed*** Interior to promote and expedite OCS exploration and

development.  *See* 43 U.S.C. § 1802(1); *Watt*, 668 F.2d at 1316; *supra* pp. 2–3.  While Congress

also provided that such exploration and development be pursued "subject to environmental

safeguards," 43 U.S.C. § 1332(3), the agency has promulgated regulations designed to ensure that safety.

Beginning in 2010, Interior "promulgated several rulemakings . . . to improve worker safety and environmental protection" in OCS oil and gas development operations. *Oil and Gas and Sulphur Operations on the Outer Continental Shelf—Oil and Gas Production Safety Systems*, Final Rule, 83 Fed. Reg. 49,216, 49,217 (Sept. 28, 2018). Those rulemakings included a Blowout Preventer Systems and Well Control rulemaking ("Well Control Rule") and a Production Safety Systems rulemaking ("Safety System Rule"). *See id.* "Since that time, BSEE . . . [became] aware that certain provisions . . . created potentially unduly burdensome requirements for oil and natural gas production operators on the OCS, without meaningfully increasing safety of the workers or protection of the environment." *Id. See also Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Blowout Preventer Systems and Well Control Revisions*, Proposed Rule, 83 Fed. Reg. 22,128, 22,129 (May 11, 2018).

In light of this experience with the operation of its own regulations, on December 29, 2017 BSEE published a proposed revised Safety System Rule, which was finalized on September 28, 2018 after public comment, *see* 83 Fed. Reg. at 49,217, and on May 11, 2018, BSEE published a proposed revised Well Control Rule, *see* 83 Fed. Reg. at 22,128–29.[4] BSEE concluded that the revisions "reduce or eliminate some of the concerns expressed by the operators" regarding unduly burdensome operation requirements, "while ensuring safety and protection of the environment." 83 Fed. Reg. at 49,217.

---

[4] On July 5, 2018, BSEE extended the public comment period on the revised Well Control Rule. *See Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Blowout Preventer Systems and Well Control Revisions*, Correction and Extension of Public Comment Period, 83 Fed. Reg. 31,343 (July 5, 2018). A final revised Well Control Rule has not yet issued.

Far from "vanishing safety measures," Pls.' Br. at 32, BSEE concluded that the revisions to its regulations will not have any "meaningful[]" impact on OCS safety or environmental protection, *see, e.g.*, 83 Fed. Reg. at 49,217.  That Plaintiffs disagree with BSEE is irrelevant in this challenge to BOEM's decisions to conduct the challenged lease sales, and this action is not a proper avenue for Plaintiffs' (erroneous, *see* Fed. Defs.' Br. at 16-18) claim that BSEE's revised regulations are "largely erasing the safety gains" of the prior regulations, Pls.' Br. at 32.

"Without overtly challenging" the revised regulations in their Complaint, *see Transwestern Pipeline Co. v. FERC*, 988 F.2d 169, 172 (D.C. Cir. 1993) (rejecting collateral challenge to FERC order implementing deregulation policies), Plaintiffs ask this Court to conclude that they are insufficiently protective of the environment and that BOEM's decision not similarly to disagree with BSEE was arbitrary and capricious. *See* Pls.' Br. at 32–39.  Because, if Plaintiffs' argument is accepted by this Court, it would call into question the revised regulations, "[i]t should be obvious, therefore, that [Plaintiffs] ha[ve] brought an impermissible collateral attack on the regulation[s]." *Transwestern Pipeline*, 988 F.2d at 174.

BSEE has concluded, *see supra*—and BOEM has relied on BSEE's conclusion, *see* AR0004052–56; AR0003132–33—that the revised regulations will not meaningfully impact worker safety and environmental protection, and BSEE's conclusions "are not subject to collateral attack in this proceeding."  *US West Commncs. v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1124 (9th Cir. 1999) (explaining that challenged interconnection agreement complied with FCC regulations, and holding that plaintiff could not make collateral attack on regulations through their application in interconnection agreement).  *See also Associated Gen, Contractors of Am., San Diego Chapter, Inc. v. Cal. Dep't of Transp.*, 713 F.3d 1187, 1200 (9th Cir. 2013) (argument that action taken in conformance with statute and regulations was unlawful "is an impermissible

collateral attack on the facial validity of the federal Act and regulations"); *Milwaukee Cnty. Pavers Ass'n v. Fielder*, 922 F.2d 419, 424 (7th Cir. 1991) (plaintiff cannot collaterally challenge statute and regulations by challenging action taken in conformance with statute and regulations); *Dep't of Health & Human Servs. Family Support Admin. v. Fed. Labor Relations Auth.*, 920 F.2d 45, 49 (D.C. Cir. 1990) (agency's "health-based argument" on government-wide smoking regulation was an impermissible collateral attack on regulation); *Nader v. Nuclear Regulatory Comm'n*, 513 F.2d 1045, 1054 (D.C. Cir. 1975) (refusing to entertain argument that "would inexorably draw us into a collateral review" of agency rules). Plaintiffs' policy-based challenge to BSEE's underlying safety and operational regulations is an impermissible collateral attack. *See City of Nephi, Utah v. FERC*, 147 F.3d 929, 934 (D.C. Cir. 1998) (rejecting city's argument that small customers should obtain mitigating discount from FERC rate design order).

## II. Plaintiffs Fail To Satisfy The Traditional Test For The Relief They Seek.

Even leaving aside the myriad substantive deficiencies in their claims, Plaintiffs' requests that this Court "[v]acate or enjoin leases" issued in the challenged lease sales and "[e]nter any other appropriate injunctive relief to ensure that Defendants comply with NEPA and the APA," Compl. (Dkt. 1), Request for Relief ¶¶ 4–5, constitute requests for permanent injunctive relief. *See, e.g.*, *PGBA, LLC v. United States*, 389 F.3d 1219, 1228 (Fed. Cir. 2004) ("[R]elief in the form of an order setting aside the [decision] . . . is tantamount to a request for injunctive relief.") (citing *Samuels v. Mackell*, 401 U.S. 66, 71–73 (1971) for the proposition that when "the practical effect of the two forms of relief will be virtually identical," the propriety of the relief "should be judged by essentially the same standards"); *Virgin Islands Tel. Corp. v. FCC*, 444 F.3d 666, 671–72 (D.C. Cir. 2006) ("set aside" and "vacate" are synonymous); *cf. Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 155–57 (2010) (finding, *inter alia*, injunction superfluous

12

where vacatur ordered by the district court had the same practical effect, and propriety of vacatur was not challenged before the Court).

Even assuming *arguendo* that Federal Defendants' challenged leasing decisions violated an applicable statutory provision, Plaintiffs have failed to show the appropriate balance of equities and public interests necessary to establish an entitlement to the vacatur or injunctive relief they seek. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22–32 & n.5 (2008) (relief inappropriate "even if plaintiffs are correct on the underlying merits" of their NEPA claim, upon examining "the balance of equities and consideration of the public interest").

### A.     Traditional Principles Of Equity Apply To Plaintiffs' Requests For Relief.

"[I]njunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. Because "[a]n injunction is a matter of equitable discretion[,] it does not follow from success on the merits as a matter of course." *Id.* at 32; *see also id.* at 31–33 (injunction inappropriate even assuming a NEPA violation arising out of the Government's failure to prepare an EIS). Instead, even if it has established the merits of its claim, "a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). That "traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation." *Monsanto*, 561 U.S. at 157.

### B.     Plaintiffs Fail To Establish An Entitlement To Relief.

"[A] court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). In addition, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).

13

Plaintiffs have failed to carry their burden of establishing that the balance of hardships or public interest support an order vacating or enjoining the leases issued by BOEM.  *See*, *e.g.*, *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (applicant for injunctive relief must carry burden on all factors); *Winter*, 555 U.S. at 22–32 & n.5 (plaintiff not entitled to injunction where plaintiff failed to establish balance of equities or public interest *even if* Court assumed likelihood of success on underlying merits of NEPA claim and the existence of irreparable harm).

### 1.    Plaintiffs' Speculative Environmental Harm Is Undercut By Existing Gulf Development And Mitigation.

Plaintiffs assert their members' alleged interests in the use and enjoyment of the Gulf for aesthetic, recreational, scientific, and educational pursuits.  *See* Pls.' Br. at 23 n.13 (citing declarations by Plaintiffs' members).  But, as Plaintiffs' concession that the Gulf "is not pristine" in light of "[a] myriad of oil and gas operations," Pls.' Br. at 5; *see also* Declaration of Kenneth Saxon (Dkt. No. 41-6), ¶ 7 ("From the beach, I can see the oil tanker traffic in the Gulf moving across the water like a highway."), makes clear, however, the challenged lease sales must be considered in the overall context of oil and gas development on the Gulf of Mexico.

In that context, the challenged leases do not represent an expansion of oil and gas development activities into new areas or regions.  Instead, as Plaintiffs concede, *see* Pls.' Br. at 6, and as detailed *supra* p. 1, the Gulf of Mexico's oil and gas infrastructure is already well and deeply developed, with over 100 lease sales previously conducted in the Gulf OCS, 50,000 wells drilled, and 3,000 active leases extant, *see id*.

Under these circumstances, the incremental environmental impacts of the potential future development of the challenged leases are both relatively limited in comparison to existing oil and gas development, *see supra*, and wholly speculative.  *E.g.*, *Winter*, 555 U.S. at 21–23 (injunctive

relief may not issue on mere "possibility" of harm, especially when "this is not a case in which the defendant is conducting a new type of activity with completely unknown effects on the environment"); *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1253 (10th Cir. 2017) ("speculative assertions are insufficient to carry the [plaintiff's] burden" of making a "clear showing" of irreparable harm); *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient [to make out a clear showing of irreparable harm]; there must be more than an unfounded fear on the part of the applicant.").

Nor are Plaintiffs' alleged increased concerns for health and safety sufficient to make the requisite "clear showing" of irreparable harm. *Winter*, 555 U.S. at 22. For example, among other things, Plaintiffs claim that potential future development may threaten water contamination. *See, e.g.*, Saxon Decl., ¶ 13. But extensive federal regulations ensure the safety of all wells. *See, e.g., supra* pp. 4–5, 9–11; 83 Fed. Reg. at 49,216–63; 83 Fed. Reg. at 22,128–62; 30 C.F.R., Part 250. These mitigation measures further greatly diminish Plaintiffs' attempted showing of harm qualifying for extraordinary relief. *See, e.g.*, *Monsanto*, 561 U.S. at 163–64 (government limitations on future actions may reduce or eliminate claimed injury); *In Def. of Animals v. U.S. Dep't of the Interior*, 737 F. Supp. 2d 1125, 1138 (E.D. Cal. 2010) (Government measures designed to mitigate harm undercut plaintiff's claim of irreparable injury); *cf. Winter*, 555 U.S. at 22–23 (criticizing lower courts for failure to consider mitigation measures undertaken by the Government in assessing whether injunctive relief was appropriate).

### 2.   Plaintiffs' Alleged Harm Is Greatly Outweighed By Harms To The Public Interest.

"[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation omitted). Here, the national and local public interests tip strongly against the requested injunctive relief.

By directing Interior to implement OCSLA to "make [OCS] resources available to meet the Nation's energy needs as rapidly as possible," 43 U.S.C. § 1802(2)(A), Congress has, in effect, already determined "that some degree of adverse impact is inevitable" and secondary to the expedited development of the OCS. *Watt*, 668 F.2d at 1316. *See also Diné Citizens Against Ruining Our Env't v. Jewell*, No. 15-cv-0209, 2015 WL 4997207, at *50 n.25 (D.N.M. Aug. 14, 2015) (Congress's directive that Interior conduct onshore lease sales "already determined that the economic benefits of [oil and gas] drilling outweigh its environmental costs").

Indeed, the oil-and-gas industry is a significant job creator and economic engine in the Gulf of Mexico region.  As BOEM explained, the challenged lease sales "would lead to beneficial impacts arising from industry expenditures, government revenues, corporate profits, and other market impacts." AR0004844.  *See also* AR0004845–47.  Indeed, "[t]he petroleum industry as whole in the Gulf of Mexico region has matured over several decades and is well-developed, expansive, extensive, and deeply intertwined in the regional communities of the five coastal states . . . ." AR0004847.  *See also* AR0004850 ("[I]ncreased economic demand would lead to more hiring, and this additional employment would further the positive economic trend and new workers spend their wages in the community."); AR0006262 ("Extraction of oil [and] natural gas . . . entails spending on various processes, including [geophysical] surveying, drilling, platform fabrication, shipbuilding, and various support services," which "supports businesses further along supply chains and supports spending by workers.").

The challenged lease sales also contribute greatly to the national economy.  In BOEM's "low scenario," GOM OCS lease sales during the five-year leasing program will result in an average of over 57,000 jobs, $4 billion in labor income, and $7.5 billion in value added benefits throughout the United States, **per year for 50 years**.  In BOEM's "high scenario," the impact is

far greater, supporting an average 1420,000 jobs, $8.7 billion in labor income, and nearly $14 billion in value added benefits, **per year for 50 years**. AR0006268–71. Direct payments to the United States, in the form of bonus bids, rentals and royalties, total $144 billion under the low scenario and $945 billion -- *i.e.*, **almost $1 trillion** -- under the high scenario. AR0006268.

Plaintiffs' legal challenge will, at best, delay and, at worst, eliminate these enormous economic values. Such economic injury surrounding the challenged leases weighs heavily against injunctive relief. *See Del. Dep't of Nat. Res. & Envt'l Control v. U.S. Army Corps of Eng'rs*, 681 F. Supp. 2d 546, 563 (D. Del. 2010) (the public interest would be undermined by injunctive relief that would impose "harm [on] the local economy" by reducing and thus "economic vitality").

### 3. Plaintiffs' Alleged Harm Is Greatly Outweighed By The Harms To Business And Government Economic Interests.

In addition to the public interests, an injunction's potential to cause private and governmental economic harm may weigh heavily in the balance in environmental cases. Such "financial harm can be weighed against environmental harm—and in certain instances outweigh it." *Sierra Club, Inc. v. Bostick*, 539 F. App'x 885, 892 (10th Cir. 2013); *see also Amoco Prod.*, 480 U.S. at 545 (hypothetical environmental harm outweighed by "committed" oil company investments); *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 767–68 (10th Cir. 2014) (balance of equities tipped in defendants' favor where "[d]efendants have shown that they would suffer immediate and significant harm in the form of construction related delays if an injunction issues now stopping this project. The economic cost alone of stopping construction cannot easily be overlooked . . . .").

Oil and gas development is carried out through private oil and gas companies, which acquire leases through a sealed bidding process and then engage in exploration efforts that, if

successful, will lead to production. *See* Decl. of Erik Milito (Dkt. 23-1), ¶ 5.[5]  The Government

receives significant revenue from both the lease sales and royalties from subsequent oil and gas

production. *See* AR0006262 ("Government revenues are generated from offshore oil and gas

activities through bonus bids, rental payments, and royalty payments."); *see also* AR0006265.[6]

In exchange, lease operators obtain valuable contractual and property interests in the purchased

leases. *See*, *e.g.*, *Mobil Oil Expl. & Producing Se., Inc. v. United States*, 530 U.S. 604, 607–08

(2000); *Union Oil Co. of Cal. v. Morton*, 512 F.2d 743, 747 (9th Cir. 1975).  All of these

interests would be undermined by Plaintiffs' requested relief.

 If the existing leases are vacated or enjoined, operators and suppliers—the companies

that identify, access, and ultimately produce petroleum resources over the decades-long life of

the well, Milito Decl., ¶ 7—will be deprived of their rational reliance interests in development.

*See Habitat for Horses v. Salazar*, 745 F. Supp. 2d 438, 457 (S.D.N.Y. 2010) (government's

reliance interests in preparing personnel for planned agency action and retaining independent

---

[5] Although the APA restricts this Court's consideration of the merits of Plaintiffs' claims to the administrative record, *see Camp v. Pitts*, 411 U.S. 138, 142 (1973), this Court may consider extra-record materials in determining whether injunctive relief is appropriate. Indeed, because "[t]he issue of injunctive relief is generally not raised in the administrative proceedings . . ., there usually will be no administrative record developed on these issues. Thus, it will often be necessary for a court to take new evidence to fully evaluate claims of irreparable harm and claims that the issuance of the injunction is in the public interest." *Eco Tour Adventures, Inc. v. Zinke*, 249 F. Supp. 3d 360, 369 n.7 (D.D.C. 2017) (quotation and alterations omitted); *see also*, *e.g.*, *Nw. Envtl. Def. Ctr. v. U.S. Army Corps of Eng'rs*, 817 F. Supp. 2d 1290, 1300 (D. Or. 2011) ("Courts may also consider extra-record evidence in determining whether a party will suffer irreparable harm in the absence of injunctive relief.").

[6] For example, in 2017 the Government received nearly $3.8 billion in revenue from private extraction of more than 612 million barrels of oil and more than 1 billion mcf of natural gas on the Gulf of Mexico OCS. *See* Department of the Interior Office of Natural Resources Revenue, Natural Resources Revenue Data, Gulf of Mexico (2017) *available at* https://revenuedata.doi.gov/explore/offshore-gulf/ (last visited April 2, 2019). This Court may take judicial notice of government records and materials available on government websites. *See*, *e.g.*, *Banks v. Warner*, No. 94-56732, 1995 WL 465773, at *1 (9th Cir. Aug. 7, 1995) ("It is entirely proper for a court to take judicial notice of records and reports of administrative agencies."); *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 519 (5th Cir. 2015) (finding "the accuracy of these public records contained on the Mississippi . . . and the Virginia State . . . websites cannot reasonably be questioned"); Fed. R. Evid. 201(b) (permitting a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot be reasonably questioned"); Fed. R. Evid. 201(c) (A reviewing court "must take judicial notice if a party requests it and the court is supplied with the necessary information.").

contractors precluded injunctive relief); *Idaho Power Co. v. FERC*, 312 F.3d 454, 460 (D.C. Cir. 2002) (injury where plaintiff requested "an agency [action] that replaces a certain [contract] outcome with one that contains uncertainty").

Taken together, and coupled with the public interests outlined above, the injuries to these economic interests strongly weight the balance of harms against issuance of Plaintiffs' requested relief. *See Winter*, 555 U.S. at 23–27 (aggregating harm to non-movants with public interest in denying injunctive relief). Moreover, even assuming *arguendo* Plaintiffs' success on the merits, remand is "generally appropriate when," as here, "'there is at least a serious possibility that the [agency] will be able to substantiate its decision' given an opportunity to do so, and when vacating would be 'disruptive.'" *Radio-Television News Dirs. Ass'n v. FCC*, 184 F.3d 872, 888 (D.C. Cir. 1999) (quotation omitted); *accord Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 528 (D.C. Cir. 2009).

Here, there is no question but that Federal Defendants could remedy any NEPA procedural errors upon remand through further consideration of the challenged lease sales. *See*, *e.g.*, *Native Vill. of Point Hope v. Salazar*, 730 F. Supp. 2d 1009, 1019 (D. Alaska 2010) (remanding to BOEM so that the agency could satisfy its obligations under NEPA, but not vacating the lease sale decision). The economic disruption to the Government and leaseholders—whose sealed lease bids have subsequently been publicized and paid, and who have begun the lengthy and complex process of planning future operations—is apparent.

Indeed, the publication of competitors' winning sealed lease bids—each company's confidential valuation of individual lease blocks—at the conclusion of each lease sale alone makes it impossible to re-conduct the lease sales in a fair and competitive manner. In this context, any statutory violations would justify, at most, a remand in this case. *See La. Fed. Land*

*Bank Ass'n, FLCA v. Farm Credit Admin.*, 336 F.3d 1075, 1085 (D.C. Cir. 2003) (remanding in light of economic harm that would result from vacatur); *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002) (same).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied, and API's cross-motion for summary judgment should be granted.

Respectfully submitted,

*/s/ Steven J. Rosenbaum*
Steven J. Rosenbaum
  D.C. Bar No. 331728
Bradley K. Ervin
  D.C. Bar No. 982559
COVINGTON & BURLING LLP
One CityCenter
850 Tenth St., N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

April 15, 2019

*Attorneys for Defendant-Intervenor*
*American Petroleum Institute*

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of April, 2019, I caused a true and correct copy of the foregoing with the Court electronically and served by the Court's CM/ECF System upon the listed counsel of record:

Christopher D. Eaton
Stephen D. Mashuda
Earthjustice
705 Second Ave., Suite 203
Seattle, WA 98104
Tel: (206) 343-7340
Fax: (206) 343-1526
ceaton@earthjustice.org
smashuda@earthjustice.org

Brettny Elaine Hardy
Earthjustice
50 California St., Suite 500
San Francisco, CA 94111
Tel: (415) 217-2142
Fax: (415) 217-2040
bhardy@earthjustice.org

*Counsel for Plaintiffs*

Thomas Ports, Jr.
Environment & Natural Resources Division
United States Department of Justice
Washington, D.C. 20044
Tel: (202) 305-0492
Thomas.Ports.Jr@usdoj.gov

*Counsel for Federal Defendants*

John C. Martin
Holland & Hart LLP
975 F Street, NW
Suite 900
Washington, DC 20004
Tel: (202) 654-6915
JCMartion@hollandhart.com

Sarah C. Bordelon
Holland & Hart LLP
5441 Kietzke Lane
Second Floor
Reno, NV 85911
Tel: (775) 327-3000
Fax: (775) 786-6179
scbordelon@hollandhart.com

*Counsel for Intervenor-Defendant Chevron U.S.A. Inc.*

*/s/  Steven J. Rosenbaum*
Steven J. Rosenbaum