**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

GULF RESTORATION NETWORK, et al.,

*Plaintiffs*,

v.

DAVID BERNHARDT, et al.,

*Defendants*,

and

AMERICAN PETROLEUM INSTITUTE, et al.,

*Intervenor-Defendants*.

Civil Action No. 18-01674-RBW

Hon. Reggie B. Walton

**PLAINTIFFS' OPPOSITION TO FEDERAL DEFENDANTS' AND
INTERVENOR-DEFENDANTS' CROSS-MOTIONS FOR SUMMARY
JUDGMENT AND REPLY IN SUPPORT OF PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................... iv

INTRODUCTION ...................................................................1

ARGUMENT .......................................................................2

I.      NEPA AND OCSLA REQUIRE BOEM TO ACCURATELY ASSESS THE
        REASONABLY FORESEEABLE EFFECTS OF A LEASE SALE BEFORE
        HOLDING THE SALE.......................................................2

II.     BOEM'S ASSUMPTION THAT THE LEASE SALES' EFFECTS WOULD
        OCCUR UNDER THE NO ACTION ALTERNATIVE IS IRRATIONAL AND
        VIOLATES NEPA...........................................................4

        A.      BOEM Failed to Disclose and Analyze the Impacts of a True No Action
                Alternative.......................................................5

        B.      BOEM Failed to Evaluate the Effects of Delaying the Lease Sale.........9

III.    BOEM'S RELIANCE ON INCORRECT ASSUMPTIONS AND DATA
        VIOLATES NEPA..........................................................11

        A.      BOEM's Assessment of Catastrophic Oil Spills Was Premised on an
                Admittedly Incorrect Assumption Regarding Applicable Regulations. ...12

                1.      BOEM relied on inaccurate facts and assumptions regarding the
                        applicability of the Safety Rules when assessing future risks. ...13

                2.      BOEM was required to consider that the repeals to the Safety
                        Rules would invalidate its assumptions and increase risk. ........17

                3.      BOEM's *post hoc* claim that rollbacks of the 2016 Safety Rules do
                        not affect safety is based on an incorrect understanding of changes. ...21

        B.      BOEM Failed to Address Evidence that Its Assumptions Regarding the
                Level of Enforcement by BSEE Were Incorrect....................25

        C.      BOEM's Incorrect Assessment of Royalty Rate Impacts in the EIS Is Not
                Cured by Its *Post Hoc* Claim that the Error Is Minimal. .............28

IV.     VACATUR OF BOEM'S DECISIONS AND THE LEASE SALES IS THE
        PROPER REMEDY.........................................................33

        A.      The APA Explicitly Requires Vacatur of Unlawful Agency Action. ....33

        B.      The Four-Factor Test for Injunctions is Not Relevant to Evaluating the
                Customary Relief of Vacatur Under the APA. ......................34

C.    The Limited Exceptions to the Default APA Standard Do Not Apply Here. ........36

    1.    Courts in this Circuit rarely apply the *Allied-Signal* framework to remand without vacatur in NEPA cases.....................................................38

    2.    The NEPA flaws here are significant and not easily corrected. ................40

    3.    Any alleged inconveniences do not warrant straying from the default remedy of vacatur. .......................................................................42

CONCLUSION.....................................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Advocates for Highway and Auto Safety v. Fed. Motor Carrier Safety Admin.*,
  429 F.3d 1136 (D.C. Cir. 2005) .................................................................................37

*AEP Texas North Co. v. Surface Transp. Board.*,
  609 F.3d 432 (D.C. Cir. 2010) ..................................................................................30

*\*Alaska v. Andrus*,
  580 F.2d 465 (D.C. Cir. 1978) ........................................................................34, 40, 41

*Allied Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*,
  988 F.2d 146 (D.C. Cir. 1993) ............................................................................37, 41

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ................................................................................33

*Amoco Prod. Co. v. Vill. of Gambell*,
  480 U.S. 531 (1987)............................................................................................43, 44

*Anacostia Riverkeeper v. Jackson*,
  713 F. Supp. 2d 50 (D.D.C. 2010) .............................................................................37

*Black Oak Energy LLC v. FERC*,
  725 F.3d 230, 233 (D.C. Cir. 2013) ..........................................................................39

*Bob Marshall All. v. Hodel*,
  852 F.2d 1223 (9th Cir. 1988) ....................................................................................6

*Citizens Against Burlington v. Busey*,
  938 F.2d 190 (D.C. Cir. 1991) ..............................................................................6, 26

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971)............................................................................................34, 42

*Calvert Cliffs' Coordinating Comm. v. U.S. Atomic Energy Comm'n*,
  449 F.2 1109 (D.C. Cir. 1971) ....................................................................................3

*\*Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*,
  97 F. Supp. 3d 1210 (D. Haw. 2015) .......................................................................4, 8

*Cowpasture River Pres. Ass'n v. Forest Serv.*,
  911 F.3d 150 (4th Cir. 2018) ....................................................................................24

*Crowley's Yacht Yard, Inc. v. Pena*,
  863 F. Supp. 18 (D.D.C. 1994) ...................................................................33

*Ctr. for Biol. Div. v. EPA*,
  861 F.3d 174 (D.C. Cir. 2017) ....................................................................37

*\*Ctr. for Biol. Div. v. U.S. Dep't of Interior*,
  623 F.3d 633 (9th Cir. 2010) .....................................................................10

*Ctr. for Biol. Div. v. U.S. Dep't of the Interior*,
  563 F.3d 466 (D.C. Cir. 2009) ....................................................................42

*Ctr. for Food Safety v. Vilsack*,
  734 F. Supp. 2d 948 (N.D. Cal. 2010) ........................................................41

*Ctr. for Native Ecosystems v. Salazar*,
  795 F. Supp. 2d 1236 (D. Colo. 2011) ........................................................43

*Davis v. Mineta*,
  302 F.3d 1104 (10th Cir. 2002) ..................................................................45

*Davis County Solid Waste Management v. EPA*,
  108 F.3d 1454 (D.C. Cir. 1997) ..................................................................37

*Del. Dep't of Nat. Res. & Envtl. Control v. EPA*,
  785 F.3d 1 (D.C. Cir. 2015) ...................................................................19, 25

*Del. Riverkeeper Network v. Fed. Energy Reg. Comm'n*,
  753 F.3d 1304 (D.C. Cir. 2014) ..................................................................38

*Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) .....................................................................................2

*Env't v. U.S. Office of Surface Mining Reclamation and Enf't*,
  No. 12-cv-01275-JLK, 2015 WL 1593995 (D. Colo. April 6, 2015) .....................43

*Envtl. Def. v. U.S. Army Corps of Eng'rs*,
  515 F. Supp. 2d 69 (D.D.C. 2007) ..............................................................18

*FCC v. Nextwave Pers. Commc'ns Inc.*,
  537 U.S. 293 (2003) ...................................................................................33

*Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*,
  374 F. Supp. 2d 1116 (S.D. Fla. 2005) ........................................................26

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
  681 F.3d 581 (4th Cir. 2012) .....................................................................27

v

*Friends of the Capital Crescent Trail v. Fed. Transit Admin.*,
 200 F. Supp. 3d 248 (D.D.C. 2016) ...................................................................39

*Friends of the Earth v. U.S. Army Corps of Eng'rs*,
 109 F. Supp. 2d 30 (D.D.C. 2000) .....................................................................39

*\*Friends of the River v. FERC*,
 720 F.2d 93 (D.C. Cir. 1983) ..........................................................17, 23, 27, 29

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
 805 F.2d 1050 (D.C. Cir. 1986) .........................................................................30

*Grand Canyon Tr. v. FAA*,
 290 F.3d 339 (D.C. Cir. 2002) ...........................................................................32

*Great Basin Res. Watch v. Bureau of Land Mgmt.*,
 844 F.3d 1095 (9th Cir. 2016) ......................................................................22, 29

*Greater Yellowstone Coal. v. Bosworth*,
 209 F. Supp. 2d 156 (D.D.C. 2002) ..............................................................38, 39

*\*Greater Yellowstone Coal. v. Kempthorne*,
 577 F. Supp. 2d 183 (D.D.C. 2008) ..........................................................11, 29, 38

*\*Hammond v. Norton*,
 370 F. Supp. 2d 226 (D.D.C. 2005) .........................................................21, 22, 29

*Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*,
 281 F. Supp. 2d 1 (D.D.C. 2003) .......................................................................22

*High Country Cons. Advocates v. Forest Serv.*,
 67 F. Supp. 3d 1262 (D. Co. 2014) ...............................................................36, 39

*Humane Soc'y v. Dep't of Commerce*,
 432 F. Supp. 2d 4 (D.D.C. 2006) .......................................................................39

*Humane Soc'y v. Johanns*,
 520 F. Supp. 2d 8 (D.D.C. 2007) ..................................................................38, 39

*Humane Soc'y v. Zinke*,
 865 F.3d 585 (D.C. Cir. 2017) ...........................................................................42

*Jones v. D.C. Redevelopment Land Agency*,
 499 F.2d 502 (D.C. Cir. 1974) ...........................................................................40

*Kleppe v. Sierra Club*,
 427 U.S. 390 (1976)...........................................................................................40

*Massachusetts v. Watt,*
  716 F.2d 946 (1st Cir. 1983) ........................................................................40, 41

*Metro. Edison Co. v. People Against Nuclear Energy,*
  460 U.S. 766 (1983) ........................................................................................2

*Mo. Pub. Serv. Comm'n v. FERC,*
  337 F.3d 1066 (D.C. Cir. 2003) ........................................................................12

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ........................................................................34, 35, 36

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ...................................................................................... *passim*

*Nance v. EPA,*
  645 F.2d 701 (9th Cir. 1981) ........................................................................20

*Nat'l Audubon Soc. v. Hoffman,*
  132 F.3d 7 (2d Cir. 1997) ........................................................................17, 26

*Nat'l Wildlife Fed'n v. Norton,*
  332 F. Supp. 2d 170 (D.D.C. 2004) ........................................................................11, 38

*Native Ecosystems Council v. U.S. Forest Serv.,*
  418 F.3d 953 (9th Cir. 2005) ........................................................................18, 25

*Native Ecosystems Council v. Marten,*
  883 F.3d 783 (9th Cir. 2018) ........................................................................11, 17, 30

*Native Vill. of Point Hope v. Jewell,*
  740 F.3d 489 (9th Cir. 2014) ........................................................................3, 18, 29

*Native Vill. of Point Hope v. Salazar,*
  730 F. Supp. 2d 1009 (D. Alaska 2010) ........................................................................3

*Native Vill. of Point Hope v. Salazar,*
  No. 1:08-cv-0004-RRB, 2010 WL 2943120 (D. Alaska July 21, 2010) ................................36

*N.C. Wildlife Fed. v. N.C. Dep't of Transp.,*
  677 F.3d 596 (4th Cir. 2012) ........................................................................10

*New York v. Nuclear Regulatory Comm'n,*
  681 F.3d 471 (D.C. Cir. 2012) ........................................................................17

*Oceana v. Bureau of Ocean Energy Mgmt.,*
  37 F. Supp. 3d 147 (D.D.C. 2014) ........................................................................7, 10

*Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n,*
  896 F.3d 520 (D.C. Cir. 2018) ...................................................................................23, 32, 34

*Or. Nat. Desert Ass'n v. Jewell,*
  840 F.3d 562 (9th Cir. 2016) ...............................................................................................12

*Or. Nat. Desert Ass'n v. Rose,*
  921 F.3d 1185 (9th Cir. 2019) .......................................................................................12, 29

*Petroleum Commc'ns., Inc. v. FCC,*
  22 F.3d 1164 (D.C. Cir. 1994) .............................................................................................33

*PGBA, LLC v. United States*
  389 F.3d 1219 (Fed. Cir. 2004) ...........................................................................................35

*Pit River Tribe v. Forest Serv.,*
  469 F.3d 768 (9th Cir. 2006) ...............................................................................................36

*Pollinator Stewardship Council v. EPA,*
  806 F.3d 520 (9th Cir. 2015) ...............................................................................................37

*Pub. Emps. for Envtl. Responsibility v. Fish and Wildlife Serv. (PEER v FWS),*
  189 F. Supp. 3d 1 (D.D.C. 2016) ...................................................................................38, 43

*Reed v. Salazar,*
  744 F. Supp. 2d 98 (D.D.C. 2010) .................................................................................39, 43

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989)........................................................................................................22, 40

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,*
  481 F.2d 1079 (D.C. Cir. 1973) .........................................................................................2, 3

*Sec'y of the Interior v. Cal.,*
  464 U.S. 312 (1984).................................................................................................................3

*Shands Jacksonville Med. Ctr. v. Burwell,*
  139 F. Supp. 3d 240 (D.D.C. 2015) .....................................................................................30

*\*Sierra Club v. Costle,*
  657 F.2d 298 (D.C. Cir. 1981) ...........................................................18, 25, 27, 29, 30

*Sierra Club v. Fed. Energy Regulatory Comm'n,*
  827 F.3d 36 (D.C. Cir. 2016) ...............................................................................................40

*Sierra Club v. FERC,*
  867 F.3d 1357 (D.C. Cir. 2017) .....................................................................................16, 19

*Sierra Club v. Salazar,*
   177 F. Supp. 3d 512 (D.D.C. 2016) ..........................................................20, 29, 30

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   645 F. 3d 978 (8th Cir. 2011) ...............................................................................45

*Sierra Club v. U.S. Army Corps of Eng'rs,*
   701 F.2d 1011 (2d Cir. 1983)................................................................................18

*Sierra Club v. U.S. Dep't of Agric., Rural Util. Serv.,*
   841 F. Supp. 2d 349 (D.D.C. 2012) ......................................................................36

*Sierra Club v. Van Antwerp,*
   719 F. Supp. 2d 77 (D.D.C. 2010) ..................................................................34, 39

*Sierra Forest Legacy v. U.S. Forest Service,*
   652 F. Supp. 2d 1065 (N.D. Cal. 2009) ................................................................26

*Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs,*
   683 F.3d 1155 (9th Cir. 2012) ..............................................................................24

*St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard,*
   85 F. Supp. 3d 197 (D.D.C. 2015) ........................................................................18

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
   282 F. Supp. 3d 91 (D.D.C. 2017)........................................................................44

*Stewart v. Azar,*
   313 F. Supp. 3d 237 (D.D.C. 2018) ......................................................................42

*Sugar Cane Growers Coop. of Fla. v. Veneman,*
   289 F.3d 89 (D.C. Cir. 2002) ...............................................................................20

*Stand Up for California! v. U.S. Dep't of the Interior,*
   879 F.3d 1177, (D.C. Cir. 2018) ...........................................................................39

*Tribal Vill. of Akutan v. Hodel,*
   869 F.2d 1185 (9th Cir. 1988) ..............................................................................39

*Vill. of Palatine v. Postal Serv.,*
   756 F. Supp. 1079 (N.D. Ill. 1991) .......................................................................21

*Virgin Islands Telephone Corp. v. FCC,*
   444 F.3d 666 (D.C. Cir. 2006)..............................................................................35

*WildEarth Guardians v. Mont. Snowmobile Ass'n,*
   790 F.3d 920 (9th Cir. 2015) ................................................................................30

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019) .............................................................36, 43, 44

*Wilderness Soc'y v. Salazar*,
  603 F. Supp. 2d 52 (D.D.C. 2009) ...........................................................................20

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .............................................................................................32, 35

*\* Authorities upon which we chiefly rely are marked with an asterisk*

## Statutes

5 U.S.C. § 706 ..............................................................................................................29, 33

42 U.S.C. § 4332 ...............................................................................................................20

43 U.S.C. § 1332 .............................................................................................................3, 41

43 U.S.C. § 1344 ..............................................................................................................3, 7

43 U.S.C. § 1346 ..................................................................................................................3

## Regulations

40 C.F.R. § 1500.1 .....................................................................................................5, 12, 32

40 C.F.R. § 1502.9 .............................................................................................................32

40 C.F.R. § 1502.14 ........................................................................................................4, 12

40 C.F.R. § 1502.24 .......................................................................................................12, 32

## Federal Register Notices

46 Fed. Reg. 18,026 (Mar. 23, 1981) ...............................................................................17

83 Fed. Reg. 22,128 (May 11, 2018) ................................................................................23

## INTRODUCTION

This case focuses on a unique and economically important part of our country—the Gulf of Mexico—an ecosystem that "contains some of the nation's most diverse and productive natural resources."  AR0026754; Pls.' Mem. Supp. Mot. Summ. J. ("Pls.' Br.") 5–6, ECF. No. 41-1.  For more than 50 years, the Department of the Interior ("Interior") has offered parcels of the public land in the Gulf for lease to private companies for oil and gas development in what has amounted to over 100 lease sales.  Mem. Am. Petroleum Inst. ("API") Opp. Pls' Mot. Summ. J. ("API Br.") 1, ECF No. 47.  There are now nearly 3,000 operating platforms, 50,000 wells, and spider webs of pipelines crisscrossing the sea floor.  *Id*.; Pls. Br. 6.  The environmental and economic impacts of that development have been widespread, and, in the case of *Deepwater Horizon*, catastrophic.  Pls. Br. 6–8.  Now, the Federal Government has embarked on an ambitious program to increase oil and gas development in the region by pushing the lease sale process into overdrive at a time when the Gulf's marine ecosystems are already heavily burdened and its economies are still recovering from the devastation of past oil spills.  *Id*. 6–12.

Putting aside the questionable environmental and economic prudence of that course, the problem here is that the Bureau of Ocean and Energy Management ("BOEM"), the agency tasked with managing the industrial development of offshore resources, is adopting a business as usual approach to the environmental analysis of its two most recent lease sale offerings in the Gulf, Lease Sales 250 and 251.  BOEM points to its "historical experience" as well as "historical data" to evaluate the environmental impacts of those lease sales, ignoring recent changes to policy and safety regulations that call the applicability of its historical experiences into question.

Lease Sales 250 and 251 are substantially different in kind from previous lease sales. They were region-wide sales, each amounting to the largest lease sale offerings in the history of

the U.S. (in geographic size) by a substantial amount (at the time). They also occurred at a time of changing safety risks, as part of aggressive shifts in policy to promote development and decrease competition. Yet BOEM failed to account for these momentous changes in its Supplemental Environmental Impact Statement ("Supplemental EIS"). BOEM further made illogical assumptions and ignored record evidence about the impacts of two lease sales. The core legal matter in this case is not the substantive results of the lease sale decisions (flawed as they may be), but BOEM's failure to take a clear-eyed, informed look at the consequences of those decisions before taking action, in violation of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA"). This Court should vacate the Lease Sale decisions and the issued leases, and remand the Supplemental EIS to BOEM to comply with NEPA—the ordinary remedy required for violations of the APA and NEPA.

## ARGUMENT

I. **NEPA and OCSLA Require BOEM to Accurately Assess the Reasonably Foreseeable Effects of a Lease Sale Before Holding the Sale.**

Federal Defendants and Intervenors ("Defendants") discount and mischaracterize BOEM's statutory obligations under both NEPA and the Outer Continental Shelf Lands Act ("OCSLA"). Both rely on references in the case law to NEPA's "rule of reason." *See, e.g.*, Fed. Defs.' Cross-Mot. Summ. J. ("Fed. Br.") 10, 25, ECF No. 40; API Br. 6–7. However, the rule of reason reinforces the fundamental requirement that the agency's analysis further the twin goals of environmentally informed decision-making and public participation. *Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 n.7 (1983); *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767–68 (2004). It does not replace the agency's duty to take a hard look or provide license to the agency to use inaccurate information, to cut corners in its evaluation of impacts, or to ignore reasonably foreseeable environmental impacts. *Scientists'*

*Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F. 2d 1079, 1092 (D.C. Cir. 1973)

("[I]mplicit in this rule of reason is the overriding statutory duty of compliance with impact

statement procedures to the 'fullest extent possible.'" (quoting *Calvert Cliffs' Coordinating*

*Comm. v. U.S. Atomic Energy Comm'n*, 449 F.2 1109, 1114–15 (D.C. Cir. 1971))).

Defendants' characterizations of OCSLA are similarly off the mark.  Although oil and

gas production is one goal of OCSLA, it is not the "overriding" or prime policy of the statute,

as API contends.  API Br. 3, 9–10.  Rather, OCLSA explicitly requires BOEM to balance

"environmental safeguards," 43 U.S.C. § 1332(3), and expressly authorizes BOEM to take

account of the environment in making decisions, including those made at the lease sale stage,

*id.* § 1346(d); *see also id.* § 1344(a)(3) (requiring that BOEM ensure "to the maximum extent

practicable" that the timing and location of leasing occurs "so as to obtain a proper balance

between the potential for environmental damage, the potential for the discovery of oil and gas,

and the potential for adverse impact on the coastal zone."); *Native Vill. of Point Hope v.*

*Salazar*, 730 F. Supp. 2d 1009, 1013 (D. Alaska 2010) (describing OCSLA as calling for

"balance between energy development and environmental protection").  To help BOEM

achieve that balance, OCLSA specifically requires BOEM to comply with NEPA at the lease

sale stage.  43 U.S.C. § 1346(a)(1); *Sec'y of the Interior v. Cal.*, 464 U.S. 312, 338 (1984).

A lease sale—the first stage at which rights are transferred from the government to private

entities—involves a key spatial decision about where and whether to open areas to oil and gas

activities.  Pls. Br. 4–5, 14, 22 (citing cases).  Therefore, "[i]t is only at the lease sale stage that

the agency can adequately consider . . . the overall risk of oil spills [and] take into account the

effects of oil production in deciding which parcels to offer for lease."  *Native Vill. of Point Hope*

*v. Jewell*, 740 F.3d 489, 504 (9th Cir. 2014).  NEPA is vital at this stage to illuminate the effects

of these consequential decisions and fully inform the agency and the public about a full array of alternatives that could avoid significant impacts.

## II. BOEM's Assumption that the Lease Sales' Effects Would Occur under the No Action Alternative Is Irrational and Violates NEPA.

In its opposition, Federal Defendants focus on BOEM's inclusion of an alternative of "no action" as part of its EIS, implying that a brief description of such an alternative is the sum total required of the agency. Fed. Br. 8–9. That is both incorrect and misses the point. Describing an alternative of no action under NEPA is not sufficient. BOEM must take a hard look at all the alternatives in its environmental analysis, including the no action alternative, so that the agency can provide a "clear basis for choice among options." 40 C.F.R. § 1502.14; *Conservation Council for Haw. v. Nat'l Marine Fisheries Serv.*, 97 F. Supp. 3d 1210, 1217–18 (D. Haw. 2015) ("'[S]ubstantial treatment' must be devoted 'to each alternative considered in detail . . . so that reviewers may evaluate their comparative merits.'" (quoting 40 C.F.R. § 1502.14(b)). Despite the fact that BOEM briefly described a "no action" alternative, BOEM made no meaningful distinction between impacts that might result from not holding a lease sale (no action alternative) as compared to holding a lease sale (action alternatives). By equating the effects, BOEM failed to "[r]igorously explore and objectively evaluate" the impacts of the no action alternative, slanting the NEPA process towards action without true consideration. 40 C.F.R. § 1502.14(a).

The deficiencies in BOEM's analysis manifest in two distinct ways. First, BOEM improperly assumed that even if it canceled an individual lease sale, the resulting development of oil and gas would occur eventually, so the impacts of not holding a lease sale would be the same as holding a lease sale. Second, even if BOEM could properly assume that a lease sale in some form will eventually happen, BOEM ignored how delaying a lease sale to some unknown future date would result in different environmental effects and different magnitudes of effects than one

held today.  In doing so, BOEM ignored its own record evidence demonstrating that, *inter alia*, price fluctuations, technological changes, and varying industry interest likely mean that a later lease sale will garner a much different intensity of interest, in different places, and with different technologies.

### A.     BOEM Failed to Disclose and Analyze the Impacts of a True No Action Alternative.

BOEM concluded in both the Supplemental and the Final Multisale EIS for Lease Sales 249-261 ("Multisale EIS") that the impacts of not holding a lease sale would be the same as holding the sale.  Pls. Br. 14–15, 25–26 (citing record).  Under BOEM's reasoning, there is no practical difference between the two choices and hence no practical difference in their effects.  NEPA prohibits this kind of meaningless paper exercise.  40 C.F.R. § 1500.1(c) ("NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action.").  In their opposition, Federal Defendants do not dispute that BOEM concluded "lease sales will likely occur in the foreseeable future" even if it chose not to hold either Lease Sale 250 or 251, or that BOEM determined that "the resulting development of oil and gas would most likely be postponed to a future lease sale."  Fed. Br. 9.  Instead, Federal Defendants insist that the "rule of reason" permits such specious analysis because BOEM will predictably sell the same leases in the foreseeable future that will cause the same "negative environmental impacts."  *Id*. at 10.  Such reasoning does not hold water.

Adopting Federal Defendants' logic reads the word "no" out of the no action alternative.  Under that reasoning, an agency could always assume the same action will occur under the "no action" alternative if the agency has the "historical experience" of taking the same action in the past.  *See* Fed. Br. 8.  That would eliminate all meaning from NEPA's no action alternative requirements and condemn agencies to a pattern of behavior that is never reevaluated.  Although

NEPA encourages agencies to include as part of their no action alternative analysis "situations where a choice of taking no action . . . would result in predictable actions *by others*," as Federal Defendants' highlight, Fed. Br. 10 (emphasis added), an agency cannot use this invitation to presume its *own* future actions in order to erase the required consideration of no action.

For example, the Department of Transportation cannot shortchange consideration of the environmental benefits of choosing not to build a highway simply because it has very often and predictably built highways in the past.  Similarly, the Forest Service cannot ignore the beneficial impacts of leaving an area of forest undisturbed because it has a history of logging in the same or other locations.  Taken to its logical end, BOEM's position would mean that it would never need to reconsider its practice of predictably holding lease sales, leaving lease sale action as a fait accompli and rendering BOEM's EIS meaningless.  NEPA does not allow agencies to predetermine the outcome of their analysis as BOEM has done here.  *Citizens Against Burlington v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991) ("Deference [] does not mean dormancy, and the rule of reason does not give agencies license to fulfill their own prophecies . . . ."); *see also Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228 (9th Cir. 1988).

Federal Defendants also attempt to minimize the importance of the impacts resulting from the no action alternative, emphasizing that overall impacts would "only be reduced by a small percentage, if any" and would "not significantly change."  Fed. Br. 9.  This reasoning makes little sense given that BOEM also concluded that "a single proposed lease sale, *no matter which alternative is selected*, would represent only a *small proportion*" and "a *small contribution*" to overall activity, but recognized that the effects of these action alternatives nevertheless required full analysis.  AR0015584 (emphasis added).  BOEM should have evaluated the impacts of no action just as it evaluated the impacts of its action alternatives, given

6

that all the alternatives similarly represented comparatively small changes in overall activity.

Federal Defendants' effort to equate this situation with the EIS upheld in *Oceana v. Bureau of Ocean Energy Management* does not excuse BOEM's failings here.  Fed. Br. 9–10 (citing 37 F. Supp. 3d 147 (D.D.C. 2014)).  Federal Defendants ignore all the stark factual distinctions between these cases that Plaintiffs detailed in their opening brief.  *See* Pls. Br. 27, 30–31.  Plaintiffs respectfully reassert that the findings in *Oceana* were in error and are distinguishable.  First, the *Oceana* court incorrectly determined that OCSLA *obligates* BOEM to hold a future lease sale.  37 F. Supp. 3d at 174.  It reached that determination because "[t]he plaintiffs present[ed] no facts or argument undermining that assumption."  *Id.*  In comparison, Plaintiffs here have demonstrated that OSCLA only *authorizes* BOEM to hold a lease sale, but does not mandate a sale no matter the environmental harms illuminated by the agency's analysis.  *Supra* at p. 3; Pls. Br. 27; 43 U.S.C. § 1344 (a)(1) (stating that leasing decisions must consider the potential environmental impacts of oil and gas exploration).

Second, in *Oceana*, BOEM undertook a separate, lengthier analysis of its no action alternative.  37 F. Supp. 3d at 174 (citing a two page record excerpt of "separate analysis" different from the no action alternative description cited at 171–72).  BOEM undertook no such separate analysis here.  And Federal Defendants only draw parallels between the *descriptions* of the no action alternatives in the two EISs.  Fed. Br. 10 & n.2 (citing *Oceana*, 37 F. Supp. 3d at 171–72 to argue the description of no action alternative in that case mirrored the "summary" from BOEM's EIS); *see also* Pls. Br. 31.  They do not contend BOEM undertook the same sort of separate analysis here that was important to the court's decision in *Oceana*.

Third, the *Oceana* court did not consider any facts or arguments undermining BOEM's assumptions that delaying a lease sale results in the same effects as holding the lease sale now.

37 F. Supp. 3d at 172 n.24 (assuming without explanation that "another lease sale in the same area would likely present the same environmental risks, *albeit further into the future*" (emphasis added)).  In contrast here, Plaintiffs have presented record evidence and arguments demonstrating that delaying the lease sale would have different impacts, evidence that BOEM failed to analyze.  *See infra* at 8-11.  Finally and most importantly, following in the footsteps of the *Oceana* court would, in this case, create the perverse results described above.  It would allow an agency to keep taking the same action over and over again, once it first sets course on a chosen path, without any accountability or reasoned analysis of a true "no action" alternative.  This Court can, and should, choose not to apply *Oceana*'s finding to this case.

Other district courts have reached the opposite conclusion from *Oceana* in similar circumstances.  As described in Plaintiffs' opening brief, the court in *Conservation Council* determined that even though the agency in that case had included a "no action" alternative in its EIS, it did not truly analyze such an alternative because it assumed the proposed action would occur in some form no matter what.  97 F. Supp. 3d at 1236–37; Pls. Br. 26.  The facts here match closely.  Although BOEM has technically included and described what it calls an alternative of no action, the reality is that "[w]ith what it called a 'no action' alternative," BOEM "was assuming the very [] activities" that it "was proposing to engage in," i.e., a lease sale in some form.  97 F. Supp. 3d at 1237.  "This is a glaring deficiency."  *Id.*  Contrary to Federal Defendants' characterization, the salient point is not whether BOEM *described* an alternative of not holding a lease sale.  Fed. Br. 11.  The legal problem is that BOEM never gave "[s]ubstantial treatment" to an alternative of not holding a lease sale.  97 F. Supp. 3d at 1217–18.  That subverts the NEPA process and renders its EIS arbitrary and capricious.

**B.       BOEM Failed to Evaluate the Effects of Delaying the Lease Sale.**

Even if BOEM could justifiably assume that a lease sale action will happen at some future point under the no action alternative, BOEM failed to account for the disparate effects of holding a lease sale at some undetermined time in the future rather than holding the lease sale now.  As Plaintiffs detailed in their opening brief, the record demonstrates that delaying the lease sale will result in different environmental effects.  Pls. Br. 28–29 (citing the record).  For example, oil and gas supply and demand are highly volatile.  *Id*. at 29.  Similarly, advances in technology have caused companies to seek leases in ever deeper water over time, changing environmental risks.  *Id*. at 28.  This volatility results in different amounts, intensities, and locations of development along with the attendant impacts.  *See, e.g.*, AR0015580 ("The activity level associated with a proposed lease sale could vary based on a number of factors, including the price of oil . . . cost of development, and resource availability[], among other things.").

Federal Defendants do not dispute that the record demonstrates variations in activity levels and environmental effects, depending on the timing of a lease sale, nor do they dispute that BOEM viewed those uncertainties as an important part of its analysis for the lease sale action alternatives.  *See* Fed. Br. 11.  Rather, the Federal Defendants mischaracterize Plaintiffs' concerns as irrelevant simply because BOEM estimated impacts as a "range of possibilities" for each *action* alternative.  *Id*.  Presumably, Federal Defendants believe that the impacts of a delayed lease sale under BOEM's contemplated "no action" alternative would fall within this same "range of possibilities" projected for the action alternatives.  However, BOEM did not demonstrate or even analyze in the Supplemental EIS whether this presumption is true.  Moreover, the range of possibilities BOEM estimated for each lease sale alternative do not address how holding the lease sale later in time would affect the amount and extent of activity.

Under the no action alternative, BOEM assumed that a lease sale will happen at some "reasonably foreseeable" time in the future.  *See* Fed. Br. 8.  Even if that were true, BOEM was required to evaluate whether the same range of impacts and activities would occur if the lease sale occurred ten, twenty, or thirty years later.  Those different timeframes would likely produce a different range of impacts, depending on the size of the sale and the projected activity forecasts.  This is reflected in the analysis the agency conducted for its action alternatives.  For example, in the Multisale EIS, BOEM stated that 88 percent of the projected oil production activity and 83 percent of the projected gas production activity from the region-wide lease sales would occur in the Central Planning Area.  AR0005578.  As a result, the agency predicted only 17–91 wells under Alternative C (which included leases in just the Western Planning Area) as compared to the 53–984 wells the agency predicted for its preferred Alternative A (region-wide lease sale including both planning areas).  AR0005577.  Just as a lease sale that encompasses a smaller geographic area would result in a much different amount of activity, a lease sale that took place in 2028 or 2038 might generate a different range of activity and impacts over the same 50 years as a result of future price volatility, industry interest, technological advances, and other factors.  But BOEM never estimated or calculated what that estimated range of impacts might be.  Instead, BOEM simply assumed the same range of activity and impacts would apply.

Circuit courts have rejected similar NEPA analyses that relied on incorrect assumptions in the face of differing future conditions.  Pls. Br. 30 (citing *Ctr. for Biol. Div. v. Dep't of Interior*, 623 F.3d 633, 642–43 (9th Cir. 2010); *N.C. Wildlife Fed. v. N.C. Dep't of Transp.*, 677 F.3d 596, 599-600, 602-03 (4th Cir. 2012)).  Federal Defendants do not address these cases at all, apart from asking this Court to summarily dismiss them because the *Oceana* court did.  Fed. Br. 11 n.3.  To the contrary, the court's reasoning in *Oceana* does not apply here.  The *Oceana* court

distinguished those two cases as resting on the agency's incorrect factual assumptions; i.e., limited to the agency's failure to consider the impacts of different land owners and different methodologies.  37 F. Supp. 3d at 173–74.  The *Oceana* court reached a different holding because the plaintiffs in *Oceana* did not present any facts or arguments undermining BOEM's assumptions.  *Id* at 174.  Here, in contrast, Plaintiffs have presented facts and arguments demonstrating that BOEM's analysis was factually flawed because the agency assumed, contrary to the record, that the timing of a lease sale would not change the range of impacts.

BOEM failed to fully evaluate its no action alternative, as NEPA requires.  BOEM cannot simply describe a no action alternative, and then impermissibly short-circuit its responsibilities to analyze that alternative by presupposing the same effects will happen anyway at some future date.  Even if that assumption were permissible, BOEM was required to at least conduct a substantial evaluation of how any delays in the timing of its proposed lease sales might affect the range of possible impacts.  By failing to do so, BOEM violated NEPA.

## III.    BOEM's Reliance on Incorrect Assumptions and Data Violates NEPA.

The issue here is not whether BOEM has conducted a sufficient quantity of analysis or provided sufficient detail, as Defendants contend, but whether the agency's analyses and conclusions were based on correct assumptions and accurate facts.  Quantity of analysis does not equate to quality of analysis.  "An agency fails to meet its 'hard look' obligation when it 'rel[ies] on incorrect assumptions or data' in drafting an EIS."  *Native Ecosystems Council v. Marten*, 883 F.3d 783, 795 (9th Cir. 2018) (alteration in original) (citation omitted); *Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 198 (D.D.C. 2008) (use of inaccurate data in model invalidates EIS).  That is precisely what BOEM did in this case.  It incorrectly assumed, contrary to the evidence before it, that regulations planned for repeal would continue to apply to reduce

future oil spill risks, that its sister agency—the Bureau of Safety and Environmental Enforcement ("BSEE")—was adequately enforcing its regulations, and that superseded royalty rates would limit the amount of development in the future.  No amount of "deference" can "excuse [BOEM] from ensuring the accuracy and scientific integrity of its analysis, a NEPA requirement."  *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 570 (9th Cir. 2016) (citing 40 C.F.R. §§ 1500.1(b), 1502.24).  *Contra* API Br. 6–9.  BOEM's use of and reliance on inaccurate assumptions and factual premises in the Supplemental EIS skewed its presentation of the lease sales' environmental impacts to agency decisionmakers and the public at large, in violation of NEPA and the APA.

### A.   BOEM's Assessment of Catastrophic Oil Spills Was Premised on an Admittedly Incorrect Assumption Regarding Applicable Regulations.

Throughout its NEPA analysis, BOEM relied on the then-new 2016 Production Safety Rule and Well Control Rule ("Safety Rules") as "comprehensive reforms" "that are expected to decrease the probability of deepwater blowouts and the extent of oil spills from those blowouts." AR0016953, 0016308–09.  BOEM counted on the continued existence of those rules to conclude that they make the risk of a catastrophic oil spill, blowout, or loss of well control low enough that the events are not reasonably expected to result from the proposed lease sale.  *E.g.*, AR0004132– 33.  All the while, BOEM knew that critical provisions of those rules would soon be repealed, so the agency could not bank on their existence to reduce safety risks.  Yet the agency did not address the effect of the rule repeals or whether its catastrophic oil spill risk analysis remained valid.  BOEM's continued reliance on assumptions about risk mitigation it knew to be false "is the essence of arbitrary and capricious decisionmaking" and violates NEPA.  *Mo. Pub. Serv. Comm'n v. FERC*, 337 F.3d 1066, 1075 (D.C. Cir. 2003) (reliance on inaccurate assumptions or facts violates APA); *see also* 40 C.F.R. § 1502.24.

Defendants do not contest that BOEM knew the Safety Rules were being repealed, that the agency failed to consider the effects of repealing the rules, or that the repeals invalidated its assumptions regarding risk mitigation.  Rather, they incorrectly contend BOEM "did not need to" consider the repeals as part of its analysis and attempt to shift the focus from BOEM's inaccurate assumptions to *post hoc*, defective rationalizations for why its assessment of oil spill risks is otherwise satisfactory.  Fed. Br. 12–18.  None of these arguments justify BOEM's substantial reliance on inaccurate facts and assumptions regarding applicable safety measures.

       *1.*     *BOEM relied on inaccurate facts and assumptions regarding the applicability of the Safety Rules when assessing future risks.*

The Safety Rules were a significant component—if not the primary component—of BOEM's catastrophic spill analyses and conclusions in its Supplemental EIS.  Federal Defendants attempt to disclaim this reliance on the Safety Rules, asserting that its conclusions were instead based on "historical data and statistical analysis."  Fed. Br. 12–14.  This misrepresents the conclusions presented in the Supplemental EIS and in the prior EISs incorporated by reference.  Although BOEM considered historical data and quantitative assessments as part of those analyses, that information informed only the agency's understanding of the historical baseline risk; BOEM expressly and substantively relied *primarily* on the Safety Rules to support its conclusions about the actual, future risks likely to result from the lease sale.

As an initial matter, it is important to distinguish between BOEM's assessment of the risk of catastrophic spills, which is the focus of this claim, and its assessment of smaller accidental oil spills, which is not.  Catastrophic spills threaten more acute harm to the environment and, because they generally are caused by blowouts and losses of well control, are highly dependent on the types of safety measures addressed in the Safety Rules.  *E.g.*, AR0014348 ("Incidents with the greatest potential for catastrophic consequences are likely to be losses of well control . .

13

. where primary and secondary barriers fail, wells do not bridge . . . , and discharge is of long duration and/or occurs in an environmentally sensitive area and/or at a sensitive time."). Smaller accidental spills, on the other hand, occur due to a wider variety of causes (aside from losses of well control) and generally result in more localized environmental harms. *See, e.g.*, AR0005691 (tying likelihood of spill to amount of oil handled). Federal Defendants rely in large part on BOEM's assessment of smaller spills to suggest the Safety Rules were not important to its catastrophic spill analyses. Fed. Br. 12–13 (citing AR0005688–96 (Section 3.2.1.4-.6 of the Multisale EIS)). BOEM analyzed the risks of a catastrophic event and loss of well control, however, in a separate analysis. *See* AR0005669 (stating analysis of catastrophic spill located in Chapter 3.4 of the 2017–2022 Final Programmatic Environmental Impact Statement ("Program EIS")); Fed. Br. 13–14; *see also* AR0005697–700 (Multisale EIS Section 3.2.2, assessing risks of losses of well control). Its assessment of smaller spills in sections 3.2.1.4–.6 in the Multisale EIS is irrelevant to whether the agency improperly relied on false assumptions about the Safety Rules in its catastrophic spill analyses. *Contra* Fed. Br. 13.

The historical data and quantitative assessment in the Program EIS simply confirm the unremarkable fact that catastrophic spills and losses of well control have been infrequent in the past. BOEM calculated catastrophic spill frequency estimates on a per-well basis using "loss of well control data from 1964 through 2014." AR0014349. But BOEM prefaced this assessment with the caveat that "*[a]ctual* risk can be highly variable depending on . . . an operator's approach to risk management." AR0014349 (emphasis added). The historical data could not predict the approach to risk management that would be employed on future development pursuant to the lease sales. For this reason, BOEM relied primarily on the Safety Rules that would govern those oil and gas operations when it assessed the actual, future risks of

14

catastrophic spills and losses of well control—those likely to result from holding the lease sale.

Against the historical backdrop, BOEM determined the Safety Rules' new provisions (e.g., blowout preventer testing, well containment systems, and regulatory oversight) "make [a catastrophic spill] event less likely than in the past" (i.e., compared to the historical data analysis). AR0014348. It also used the Safety Rules to draw conclusions about impacts of a catastrophic spill, stating it used "the changes in regulation as a result of the 2010 Deepwater Explosion, oil spill, and response to determine the impact producing factors that have the greatest impact potential." AR0008532.

BOEM ultimately determined that a catastrophic spill is unlikely to result from a lease sale "*partly* given the extremely low probability of such a spill in general, but *more importantly*, as a result of the comprehensive reforms to [Outer Continental Shelf] oil and gas regulation and oversight put in place after the *Deepwater Horizon* event." AR0014563 (emphasis added)[1]; *see also, e.g.*, AR0008398, 0009814–15, 0015080, 0016309. While that statement may "not vitiate the quantitative analysis," Fed. Br. 14 n.4, it clearly demonstrates that the Safety Rules were *more* important to BOEM's risk analysis than any purported quantitative assessment. The passage even goes on to say that "these reforms help *ensure* that the U.S. can safely and responsibly expand the development of its domestic energy resources." AR0014563 (emphasis added). Indeed, the Assistant Secretary expressly relied on the Safety Rules to mitigate the catastrophic oil spill risk when issuing the lease sale decisions. *E.g.*, AR0004132–33 (referencing the raised standards and stating that "BOEM conducted its environmental analyses

---

[1] This statement concerns BOEM's ultimate determination about the likelihood of a Catastrophic Discharge Event based on its assessment in Section 3.4 of the Program EIS. *Contra* Fed. Br. 14 n.4 (suggesting statement refers to different analysis). Although the sentence preceding this statement references BOEM's conclusion regarding the likelihood of a Catastrophic Discharge Event in Section 3.3, that section indicates that the conclusion came from the "separate[]" evaluation of Catastrophic Discharge Events, which appears in Section 3.4 as BOEM notes. AR0014347.

with the [Safety Rules] in place").  These statements demonstrate that BOEM did far more than merely "cite[] the 2016 Rules generally."  *Contra* Fed. Br. 12.

Moreover, BOEM expressly represented to the public and decisionmakers reading the Supplemental EIS and the EISs to which it tiered that the Safety Rules would "decrease the probability" of a catastrophic oil spill.  In response to comments on the Supplemental EIS, BOEM explicitly stated the Safety Rules "resulted in reforms . . . that are expected to decrease the probability of deepwater blowouts and the extent of spills from such blowouts." AR0016308–09; *see also* AR0009776, 0009796 (stating "[s]afety measures and technologies have increased since the *Deepwater Horizon* oil spill" in response to comments on the Multisale EIS), AR0015080 (responding to National Oceanic and Atmospheric Administration's critiques of catastrophic risk analysis by pointing to "regulatory reforms" in Safety Rules); Pls. Br. 17–18. BOEM also distributed materials at its public meetings touting the benefits of the rules.  *See, e.g.*, AR0016953, 0012465.  Those representations were plainly false when critical components of the rules were being eliminated.  The Supplemental EIS therefore misled the decisionmakers and the public as to the risks of catastrophic spills.  *Cf. Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (stating EIS must "ensure[] that the[] environmental consequences, and the agency's consideration of them, are disclosed to the public").

The fact that BOEM considered other data as *part* of its catastrophic spill analysis does not correct BOEM's misrepresentation in the EISs regarding the beneficial impacts of the Safety Rules, nor does it change the reality that the Safety Rules were a significant component of BOEM's catastrophic spill analysis.  While Federal Defendants now prefer to distance themselves from these statements, nowhere in the record did BOEM indicate that the historical data or quantitative analysis was *independently* sufficient to support its conclusion that the actual

risk of catastrophic spills, blowouts, or losses of well control is sufficiently low.[2]  To the contrary, BOEM stated that the historical low probability of these events only "partly" informed the conclusion.  AR0014563.  Nor could BOEM rationally rely solely on historical probabilities to accurately assess future risk.  *See, e.g.*, *New York v. Nuclear Regulatory Comm'n*, 681 F.3d 471, 481 (D.C. Cir. 2012) ("That past leaks have not been harmful with respect to groundwater does not speak to whether and how future leaks might occur, and what the effects of those leaks might be.").  Contrary to Federal Defendants' assertions, BOEM *did* rely on the Safety Rules' risk reduction to conclude the future risk of catastrophic oil spills was sufficiently low.  BOEM therefore was required to ensure that its assumptions about the rules' future applicability and the likelihood of mitigation were accurate.

> 2.   *BOEM was required to consider that the repeals to the Safety Rules would invalidate its assumptions and increase risk.*

Federal Defendants wrongly claim BOEM "was not required to consider" the effects of the repeals.  Fed. Br. 14–16.  Because BOEM expressly relied on the continued, future applicability of the Safety Rules to mitigate the risks of catastrophic spills and loss of well control, it was incumbent on the agency to assure—on the basis of "substantial evidence"—that the measures will be in place and provide the assumed mitigation.  *E.g.*, 46 Fed. Reg. 18,026, 18,041 (Mar. 23, 1981); *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 17 (2d Cir. 1997); *see also Marten*, 883 F.3d at 795 (agency may not rely on inaccurate assumptions in EIS).  BOEM failed to do so.

---

[2] To the extent BOEM now contends those data or analysis "form the foundation" of its analysis, it is an impermissible *post hoc* rationalization that cannot justify its action. Fed. Br. 12; *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("Courts may not accept . . . counsel's *post hoc* rationalizations for agency action."); *Friends of the River v. FERC*, 720 F.2d 93, 106 (D.C. Cir. 1983) ("And of particular importance, the EIS requirement inhibits *post hoc* rationalizations of inadequate environmental decisionmaking.").

Federal Defendants argue that the "best available information" was that the Safety Rules would remain in place.  Fed. Br. 14–15.  That may have been true in 2016, but certainly was not at the time BOEM completed its Supplemental EIS.  By that point, the evidence before BOEM indicated it was virtually certain that many of the mitigation measures from the Safety Rules would *not* be in place.  Interior already had drafted and submitted to the Office of Management and Budget the proposed repeals.  *See* Answer ¶ 121, ECF No. 24.  And BOEM acknowledged at the time that it was "aware of [the] changing regulations."  AR0016347.  Despite that awareness, BOEM offered no substantial evidence that the risk reduction measures would remain in place.

That BOEM did not even *consider* how the proposed repeals would affect its risk assessment "amounts to a failure to present a 'complete analytic defense'" of its risk model, as required by NEPA.  *Envtl. Def. v. U.S. Army Corps of Eng'rs*, 515 F. Supp. 2d 69, 81 (D.D.C. 2007) (quoting *Sierra Club v. Costle*, 657 F.2d 298, 333 (D.C. Cir. 1981)); *see also Point Hope v. Jewell*, 740 F.3d at 499.  BOEM's decision to continue relying on the inaccurate assumption that the Safety Rules would apply unchanged is arbitrary.  *See St. Lawrence Seaway Pilots Ass'n, Inc. v. U.S. Coast Guard*, 85 F. Supp. 3d 197, 206 (D.D.C. 2015) ("Because the Coast Guard provided no rational justification for its decision to continue using data the source of which affirmatively stated was inaccurate, the Court must find that its actions were arbitrary and capricious.").  It resulted in an EIS that "did not provide a 'full and fair' discussion of the potential effects" of the lease sales on catastrophic spill risk to inform decisionmakers and the public.  *Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 965 (9th Cir. 2005) (citation omitted) (finding use of inaccurate assumption "arbitrarily and capriciously skewed" EIS's effects analysis); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1030 (2d Cir. 1983).  This deficiency is more than a mere "flyspeck."  *Contra* API Br. 7.  It pervades

the agency's environmental analyses and, more importantly, was foundational in the Assistant Secretary's express reliance on the Safety Rules and their effect on mitigating the risk of a catastrophic oil spill in his Records of Decision for both lease sales.  AR0001638, 0004132; *see supra* pp. 13-16.  The "deficiencies are significant enough to undermine informed public comment and informed decisionmaking" regarding the lease sales.  *Sierra Club v. FERC*, 867 F.3d at 1368.

Federal Defendants' contention that BOEM was not required to consider the repeals because the specific details of the final rules were "speculative" misses the point.  Fed. Br. 15; *see also* Chevron U.S.A. Inc.'s Mem. P. & A. Supp. Cross-Mot. Summ. J ("Chev. Br.") 4, ECF No. 50-1.  The question is whether BOEM's assumptions were accurate based on the available information at the time.  It is precisely *because* BOEM speculated that the Safety Rules *would* be fully applicable that it was required to assess whether and how the proposed repeals affected that assumption.  Indeed, BOEM recognized as much in its "insert" for the Lease Sale 251 administrative record when it purported to recheck its previous conclusions about oil spill risks in light of the proposed repeals.  AR0004052–53.[3]

BOEM did not "use the best available information" when it completed the Supplemental EIS and issued the Records of Decision for Lease Sales 250 and 251.  *Contra* Fed. Br. 15.  The best available information at that time clearly demonstrated it was extremely unlikely that the Safety Rules would remain fully in place.  It does not matter that the information used to conduct the catastrophic risk analyses "*was* the best available information" when BOEM completed its earlier, programmatic NEPA analyses.  *Contra id.* (emphasis added) (quoting AR0016347).

---

[3] The agency's litigation position that it was not required to consider the repeals contradicts its apparent position in the insert—when it purported to consider the repeals—so should be rejected on that ground alone. *See, e.g.*, *State Farm*, 463 U.S. at 50.

BOEM was required to incorporate current information that was the best available at the time it completed its final Supplemental EIS, particularly when commenters on the draft EIS specifically asked BOEM to do so. *E.g.*, *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 16 (D.C. Cir. 2015) (failure to respond meaningfully to objections violates APA); *Sierra Club v. Salazar*, 177 F. Supp. 3d 512, 532 (D.D.C. 2016) (same). Interior already had proposed the Production Safety Standard repeals in the Federal Register and had submitted proposed repeals of the Well Control Rule to the Office of Management and Budget. BOEM was aware of these concrete proposals. Yet it continued to insist the Safety Rules would apply in full. Because the current information at the time demonstrated that critical provisions of the rules would be repealed, it was irrationally speculative for BOEM to continue assuming those provisions would be in place.

The cases Federal Defendants cite do not support the proposition that BOEM was permitted to ignore the proposed repeals. Fed. Br. 15. The primary case goes on to state: "however, an environmental impact statement which is incomplete due to the omission of ascertainable facts, or *the inclusion of erroneous information*, violates the disclosure requirement of 42 U.S.C. § 4332(2)(C)." *Wilderness Soc'y v. Salazar*, 603 F. Supp. 2d 52, 60–61 (D.D.C. 2009) (emphasis added) (quoting *Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1192 n.1 (9th Cir. 1988)). *Contra* Chev. Br. 9 (asserting BOEM can ignore errors in its Supplemental EIS because "BOEM would have an updated understanding" of the repeals in the future when it considers lease-specific authorizations). BOEM's Supplemental EIS included erroneous information regarding the future applicability of the Safety Rules. And BOEM omitted ascertainable facts, specifically the planned repeals that had been submitted for review.

Federal Defendants' argument that the specific details of a final regulation may be

uncertain does not change the fact that the agency must consider whether its assumptions are likely to hold. *Contra* Fed. Br. 15–16 (citing cases).[4]  Once the repeals were proposed, it became irrational for BOEM to presume that Interior would not repeal at least some portions of the Safety Rules.  At that point it was more speculative than not to assume the regulations would remain unchanged.  BOEM had the necessary information at the time it completed the Supplemental EIS to determine whether its assumptions about the Safety Rules were accurate. *Contra* Fed. Br. 15 n.5.

> 3. *BOEM's* post hoc *claim that rollbacks of the 2016 Safety Rules do not affect safety is based on an incorrect understanding of changes.*

The repeals eliminate many critical requirements of the original rules, which undoubtedly will affect drilling safety and risk management.  The record demonstrates BOEM either misunderstood or ignored the changes.  Defendants' attempts to trivialize the changes misstate their significance.  Fed. Br. 16–18; Chev. Br. 4–10; API Br. 10–12.  Contrary to those representations, the repeals *do* eliminate safety and environmental regulations.  The changes represent substantial modifications invalidating, or at least undermining, BOEM's assumptions regarding risk, which BOEM needed to consider and analyze in order to meet NEPA's requirements.  BOEM failed to do so.  Its belated endeavors to claim that the rollbacks of the Safety Rules do not at all affect the risk analyses not only fail to comply with NEPA's procedural requirements, but are substantively incorrect.  *See* Fed. Br. 16–18; AR0004052–56.[5]

The sole place in the record where BOEM acknowledged the repeals is in an "insert" for

---

[4] The proposed legislation in *Nance v. EPA* did not negate the agency's assumption, nor did it involve NEPA. 645 F.2d 701, 708, 712 (9th Cir. 1981) (contrasting applicable standard to the "exacting requirements" of an EIS); *Village of Palatine v. Postal Service* involved whether the agency should have used scientific estimates contained in a state ordinance; it did not involve the agency's reliance on existing law. 756 F. Supp. 1079, 1086 (N.D. Ill. 1991).

[5] Courts may not consider intervenors' *post hoc* rationalizations when the agency had not offered the rationale at the time. *Hammond v. Norton*, 370 F. Supp. 2d 226, 250 n.16 (D.D.C. 2005). The Court should disregard Intervenors' arguments about the repeals' purported safety. *E.g.*, Chev. Br. 4–10.

Lease Sale 251.  AR0004052–56.  As a threshold matter, BOEM's post-EIS discussion of this issue in the "insert" is procedurally improper under NEPA.  Pls. Br. 38–39.  Federal Defendants do not address this argument.  The requirement that the analysis appear within the EIS ensures "NEPA's goal of allowing the public the opportunity to 'play a role in . . . the decisionmaking process'" is given effect.  *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1104 (9th Cir. 2016) (alteration in original) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989)).  Therefore, "a post-EIS analysis—conducted without any input from the public—cannot cure deficiencies in an EIS."  *Id.*  BOEM's post-EIS attempts to "double check" whether the planned repeals affect its prior conclusions cannot possibly correct the false assumptions and factual statements in the Supplemental EIS.  *See id.* (rejecting similar agency attempt to claim it had "double check[ed]" validity of erroneous EIS statements using new data); *see also Hammond v. Norton*, 370 F. Supp. 2d 226, 250 n.15 (D.D.C. 2005).  This proposition is even more compelling for Lease Sale 250, which BOEM held before it ever attempted to address the errors in its EIS.  *See Haw. Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 281 F. Supp. 2d 1, 30 (D.D.C. 2003).

Not only does the insert fail to comply with NEPA, but it lacks any actual risk analysis and is rife with misstatements about how the repeals would change safety requirements.  The Court cannot defer to a decision that is devoid of actual analysis.  BOEM's assertions in the insert that the revisions "will NOT" eliminate any safety requirements also are flatly false, AR0004053; they demonstrate an arbitrary consideration of the repeals that is directly "counter to the evidence before the agency."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

As Plaintiffs explained, the proposed repeals expressly state they are "removing" safety

requirements.  Pls. Br. 36–38.  Federal Defendants reassert the repeals "*did not* eliminate" blowout preventer requirements, but "merely amended the language."  Fed. Br. 16–18.  This is semantics.  An "amendment" that expressly removes requirements still eliminates those requirements, even if it sometimes (but not always) replaces them with other language.  *Contra id.* 17; Chev. Br. 4–8.  Defendants' attempts to direct the Court to the portions of the Safety Rules that will remain ignore the repeals' express deletions of safety requirements.  The repeals of the Well Control Rule, for example, state "BSEE would *completely remove* existing paragraph (b) with its associated prescriptive requirements" for real-time monitoring, and that BSEE is "*removing all references* to a [BSEE-Approved Verification Organization]" to conduct equipment inspections.  83 Fed. Reg. 22,128, 22,137–38 (May 11, 2018) (emphases added).  The reasons BSEE decided to eliminate these safety requirements are irrelevant.  *Contra* Fed. Br. 17; Chev. Br. 4–8.[6]  Even if they were relevant, those reasons do not demonstrate the repeals will ensure safety; they demonstrate the repeals allow industry to maintain the pre-2016 status quo.  *See, e.g.*, Fed. Br. 17 (stating blowout preventer requirements were repealed to "more accurately reflect" existing industry practice); Chev. Br. 6 (stating real-time monitoring requirements were repealed to leave preexisting industry "practices intact").  The fact of the matter is that BOEM assumed the requirements of the Safety Rules would remain fully intact and, when questioned about that error, wrongly stated that no requirements were being eliminated.  NEPA requires the use of accurate facts and assumptions, which BOEM failed to do.[7]

---

[6] Federal Defendants' argument offers no citation to any consideration of these reasons in the administrative record, so is simply a *post hoc* rationalization that the Court should not consider. *See, e.g.*, *State Farm*, 463 U.S. at 50; *Friends of the River*, 720 F.2d at 106.

[7] Chevron's suggestion that Plaintiffs must provide record evidence showing that the repeals "would" cause environmental harm misstates the burden under NEPA, which requires the federal agency to assess the potential for harm. Chevron Br. 4; *see Oglala Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 534–35 (D.C. Cir. 2018) ("Indeed, placing the burden on the Tribe to show harm was especially inappropriate because the inadequate EIS may well make doing so impossible.").

API's argument that a plaintiff may not collaterally attack the validity of a regulation by challenging a separate agency action is misplaced for similar reasons.  API Br. 11–12.  Plaintiffs have not challenged the legal validity of the repeals.  They challenge only whether BOEM's NEPA assessment of oil spill risks is based on an accurate understanding of the Safety Rules and their repeal.  *Cf., e.g.*, *Cowpasture River Pres. Ass'n v. Forest Serv.*, 911 F.3d 150, 170–71 (4th Cir. 2018) ("The Forest Service frames Petitioners' argument as an impermissible collateral attack on FERC's actions, but that ignores the Forest Service's obligation."); *Snoqualmie Valley Pres. All. v. U.S. Army Corps of Eng'rs*, 683 F.3d 1155, 1160 (9th Cir. 2012) (holding NEPA challenge not a collateral attack on related substantive action because remedy is a new NEPA analysis that "would have no effect on the validity" of the substantive action).[8]

In addition to applying false assumptions, Defendants continue to impermissibly rely on another agency to satisfy BOEM's own NEPA obligations.  *E.g.*, Fed. Br. 16–17; Chev. Br. 4–9 (relying on BSEE's reasoning to claim repeals do not affect safety).  Plaintiffs explained in their opening brief why BOEM must independently assess the environmental risks, Pls. Br. 36, a point Defendants do not address.  Although Plaintiffs do not in this case challenge the validity or reasoning behind the repeals, it is important to note that BSEE has provided no analysis or explanation for its conclusory assertions that the revisions will maintain safety, either in the proposed rules themselves or in the supporting documents.  Accordingly, there is no "examination" of safety risk to which BOEM could have deferred.

The fact is that BOEM presented to the agency decisionmaker and the public skewed analyses and conclusions regarding catastrophic spill risks based on inaccurate assumptions and

---

[8] The non-NEPA cases on which API relies are inapposite: the fact that the effect on risk results from another agency's regulation rather than a non-regulatory action does not excuse an agency from considering that effect nor preclude a plaintiff from challenging the agency's failure under NEPA.

facts, in violation of NEPA.  Defendants do not address either of these legal issues.

**B.     BOEM Failed to Address Evidence that Its Assumptions Regarding the Level of Enforcement by BSEE Were Incorrect.**

BOEM fundamentally relied on what it assumed would be rigorous implementation and enforcement of Interior's safety and environmental regulations when assessing and disclosing the risks of accidental events and oil spills on the environment.  When presented with a Government Accountability Office Report ("GAO Report") demonstrating that BSEE is not adequately enforcing its regulations, however, BOEM turned a blind eye to evidence that its assumptions were incorrect.  BOEM's failure to consider this important issue or address the flaws in its reliance on BSEE's supposedly rigorous enforcement program violates NEPA and the APA. *See, e.g.*, *State Farm*, 463 U.S. at 43; *Native Ecosystems Council v. Forest Serv.*, 418 F.3d at 964; *see also Del. Dep't of Nat. Res.*, 785 F.3d at 18 (stating agency cannot simultaneously rely on other agency's actions while declining to consider concerns about those actions).

When the accuracy of an agency's analysis in a NEPA document is challenged, the agency "must provide a 'complete analytic defense of its model (and) respond to each objection with a reasoned presentation.'"  *Costle*, 657 F.2d at 333 (citation omitted).  BOEM failed to provide any such defense or response to the GAO Report's findings.  It initially acknowledged the need to do so, AR0015118, but ultimately declined to consider the report on the basis that "BSEE's operations are outside of the leasing process," AR0016346–47; *see also* AR0009838. That statement is belied by BOEM's express reliance on BSEE's operations (i.e., enforcement) to mitigate the effects of the lease sale.  *See* Pls. Br. 19 (citing reliance in AR); Fed. Br. 18. BOEM's decision to ignore evidence undermining the accuracy of its assumptions violates NEPA and the APA.

Plaintiffs do not contest that BOEM is permitted to assume other agencies will enforce

regulations and that regulated industry will comply, absent evidence to the contrary.  *See* Fed. Br. 18–19 (citing, among others, *Fla. Keys Citizens Coal., Inc. v. U.S. Army Corps of Eng'rs*, 374 F. Supp. 2d 1116, 1149 (S.D. Fla. 2005) (declining to assume public would disobey regulations when contention was "not supported by the Administrative Record").  The problem here is that there *is* substantial evidence undermining that assumption: the federal government's own oversight agency found, based on the evidence, that BSEE is not adequately enforcing its regulations.  AR0027102–03, 0027216–17.  BOEM assumed rigorous enforcement would substantially reduce risks, even if it would not completely mitigate those risks to zero.  *Contra* Fed. Br. 19 n.7 (incorrectly conflating BOEM's assumptions about the level of enforcement with those about the remaining level of risk).  And while NEPA may not require mitigation plans to be "perfect," there still must be evidence to support BOEM's actual assumptions about the efficacy of the mitigation.  *Hoffman*, 132 F.3d at 17.

The cases Federal Defendants cite do not support its suggestion that there is no legal flaw in the disconnect between its assumptions about enforcement and reality.  Fed. Br. 19.  The quoted language from *Citizens Against Burlington* does not appear in that opinion.  Fed. Br. 19 (quoting 938 F.2d at 206).  In any event, that case is inapposite because it involved whether the agency had provided enough "specifics" about a mitigation plan, not whether its assumptions about the plan were undermined by record evidence.  938 F.2d at 206.  Federal Defendants' reliance on *Sierra Forest Legacy v. U.S. Forest Service* is similarly misplaced because the footnote cited in that case did not involve whether an agency's assumptions about risk mitigation were reasonable under NEPA; it involved whether the *court* should assume the agency would disregard its challenged new policy.  652 F. Supp. 2d 1065, 1090 n.13 (N.D. Cal. 2009).  The problem with BSEE's enforcement here, according to the GAO is that it needs to develop such a

new policy to remedy its past failures.  AR0027102–04.

At the very least, BOEM is required to address evidence that the mitigation is not actually being implemented.  *See, e.g.*, *Costle*, 657 F.2d at 333.  BOEM completely failed in the EISs to address that evidence or its effect on BOEM's assumptions.  It does not matter that the evidence of non-enforcement might be less egregious than that in *Friends of Back Bay v. U.S. Army Corps of Engineers*.  *Contra* Fed. Br. 20–21 (citing 681 F.3d 581 (4th Cir. 2012)).  What matters is that the evidence undermines BOEM's enforcement assumptions and that BOEM did not address it.  *Cf. Friends of Back Bay*, 681 F.3d at 588–89 (finding NEPA violation because agency did not address record evidence that its assumptions were "demonstrably incorrect").  There is no "rational connection" between BOEM's assumption that BSEE is rigorously enforcing its regulations and the facts found by the GAO Report that it is not.  BOEM's irrational reliance on BSEE's enforcement efforts substantially undermines BOEM's assessment of risks to the environment resulting from a lease sale, in violation of NEPA and the APA.

Federal Defendants attempt to address the GAO Report in their brief.  Fed. Br. 20.  The Court should not consider this *post hoc* explanation, which appears nowhere in the record.  *See, e.g.*, *State Farm*, 463 U.S. at 50; *Friends of the River*, 720 F.2d at 106.  But even if it did, this new characterization of the report unduly downplays the significance of the Report's findings.  The GAO found "long-standing deficiencies in [BSEE's] investigative environmental compliance and enforcement capabilities."  AR0027216.  It explained BSEE was continuing to use inadequate pre-*Deepwater Horizon* policies and procedures and had reversed "steps taken to address post-*Deepwater Horizon* incident concerns."  AR0027217; *see, e.g.*, AR0027226 (finding BSEE's training for equipment inspectors "did not teach them how to inspect the equipment").  Ultimately, the GAO concluded, "BSEE's deficient oversight capabilities continue

to undermine its ability to effectively oversee offshore oil and gas development." AR0027227.

This is not an endorsement that "[BSEE] is enforcing its regulations," as Federal Defendants

contend. Fed. Br. 20. Nor does it "show[] the oversight and enforcement process is working."

*Id.* Rather, the Report clearly demonstrates that BSEE is *not* effectively enforcing its regulations

or overseeing offshore oil and gas development, contrary to BOEM's express assumptions.

BOEM's reliance on inaccurate assumptions about enforcement and failure to address or respond

to comments and evidence demonstrating the error violates NEPA and the APA.

     C.    **BOEM's Incorrect Assessment of Royalty Rate Impacts in the EIS Is Not Cured by Its *Post Hoc* Claim that the Error Is Minimal.**

Federal Defendants admit BOEM calculated ranges of reasonably foreseeable activity

levels resulting from a lease sale using a superseded 18.75% shallow-water royalty rate, and that

it did not revise its calculations in the final Supplemental EIS even after it knew that the royalty

rate had been reduced to 12.5% to spur increased leasing and development. Fed. Br. 21–23; *see*

*also* AR0004132. As a result, the Supplemental EIS offered an inaccurately low projection of

reasonably foreseeable levels of activity, skewing the descriptions of environmental effects

presented to agency decisionmakers and the public at large. The *post hoc* rationalizations now

offered by Defendants claiming the error was "minimal" or "harmless" are unsupported and do

not remedy BOEM's violation of NEPA and the APA.

BOEM knew it was using an incorrect rate when it finalized the Supplemental EIS, as it

had reduced the rate to 12.5% approximately four months earlier. AR0000006–08, 0004132.

Yet BOEM offered no justification for continuing to use an incorrect rate. It was only after

Plaintiffs asked BOEM, following Lease Sale 250, whether the agency had accounted for the

royalty rate change that BOEM first endeavored to explain away the erroneous analysis; and

even that was only as part of its internal record, which it did not make available to the public.

*See* AR0016580–82.

BOEM was required in the EIS to provide a "rational connection between the factual inputs, modeling assumptions, modeling results and conclusions drawn from these results." *Costle*, 657 F.2d at 333.  The assessment of activity levels in its Supplemental EIS provided the foundational basis for BOEM's assessment of nearly every type of environmental effect. AR0015580–81.  BOEM's use of inaccurate data and assumptions resulted in the disclosure and assessment of activity levels and environmental effects that were falsely skewed lower than they would be had BOEM used the royalty rate that was implemented to increase activity levels. Such a distorted presentation of environmental effects violates NEPA's hard look requirement and undermines the law's public disclosure purpose.  *E.g.*, *Point Hope v. Jewell*, 740 F.3d at 505 (stating "NEPA required BOEM to base its analysis on the full range of likely production"); *Kempthorne*, 577 F. Supp. 2d at 198 (holding use of inaccurate data in model invalidates EIS).

BOEM's post-EIS—and in the case of Lease Sale 250, post-decisional—administrative record insert cannot retroactively bring BOEM into compliance with NEPA.  *Great Basin*, 844 F.3d at 1104; *Hammond*, 370 F. Supp. 2d at 252 n.17; *see also State Farm*, 463 U.S. at 50; *Friends of the River*, 720 F.2d at 106.  In its internal "discussion document," BOEM states it used spreadsheet-based models to estimate the anticipated oil and gas activity resulting from a single lease sale.  AR0016581.  BOEM then used those activity levels to assess the magnitudes of ensuing environmental effects.  The "models" appear nowhere in the administrative record, so cannot possibly be reviewed by the parties or Court to determine if they have any reasonable basis.  *See Or. Nat. Desert Ass'n v. Rose*, 921 F.3d 1185, 1191 (9th Cir. 2019) (rejecting agency's conclusion because NEPA document "contains virtually no references to any material in support" (citation omitted)); *Sierra Club v. Salazar*, 177 F. Supp. 3d at 532–33 (explaining

29

agency must provide court with record support for its conclusions); *see also* 5 U.S.C. § 706

("court shall review the whole record" when determining compliance with APA).  Nonetheless,

BOEM admits it used an inaccurate, outdated shallow-water royalty rate when calculating

activity levels under the model.  AR0016580.

Moreover, the explanation BOEM proffered does not justify its use of an erroneous

model.  For one, the record contains no evidence that BOEM "reanalyzed" or "modeled" the

activity level projections using the correct royalty rate.  AR0004052, 0004132; *see also* Fed. Br.

21–22 (asserting BOEM "conducted additional probabilistic analyses" but providing no record

citation).  BOEM simply claims it conducted those analyses.  An agency may not "ask[] [a court]

to assume the adequacy and accuracy of partial data without providing any basis for doing so.

NEPA requires more."  *WildEarth Guardians v. Mont. Snowmobile Ass'n*, 790 F.3d 920, 927

(9th Cir. 2015); *see also Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir.

1986) ("Stating that a factor was considered, however, is not a substitute for considering it.").

"The technical complexity of the analysis does not relieve the agency of the burden to consider

all relevant factors and to identify the stepping stones to its final decision."  *Costle*, 657 F.2d at

333.  BOEM has pointed to no such stepping stones in the record.

At best, BOEM took a cursory look at a chart from an unidentified "stud[y]" to declare

the increase in activity resulting from the lower royalty rate would "reside[] well within the

range of uncertainty predicted."  AR0016581–82.  Neither the chart nor the discussion document

offers any actual range of uncertainty.  Instead they demonstrate a lack of "any apparent rigor in

[BOEM's] analysis," *AEP Texas North Co. v. Surface Transp. Board.*  609 F.3d 432, 442–43

(D.C. Cir. 2010), and offer nothing more than "mere conjecture and abstract theorizing offered in

a vacuum," *Sierra Club v. Salazar*, 177 F. Supp. 3d at 533.  BOEM's post-EIS discussion

therefore does not constitute the hard look or rational connection between the facts found and conclusions reached that NEPA and the APA require.

Moreover, BOEM's explanation defies basic logic and elementary math.  BOEM states it used data, including the 18.75% royalty rate, to model the "*range*" of activity levels that would result on a per lease sale basis.  AR0004132, 0016580–81.  This statement necessarily implies that it used the 18.75% royalty rate when calculating both the low and high end values of the range.  *See* AR0015580–81 (showing "low activity" and "high activity" levels).  If a lower royalty rate increases activity, as BOEM acknowledges, then the values of both endpoints of the range should actually increase if it used the 12.5% royalty rate—the maximum activity expected would increase.  In that sense, the question is not whether the forecast under the reduced royalty rate falls "within the range of uncertainty predicted," as BOEM contends, but whether it changes the high end of that range.  Of course the Court does not sit as a statistician to answer that question.  Rather it ensures the agency examined the relevant data and adequately explained the methodology and analysis of its model.  *Shands Jacksonville Med. Ctr. v. Burwell*, 139 F. Supp. 3d 240, 262 (D.D.C. 2015).  BOEM did not do so.

Federal Defendants claim that BOEM's earlier determination that the royalty rate change would have "minimal" impact excuses its subsequent use of an incorrect royalty rate; it did not need to "supplement" or "redo" its NEPA analysis.  Fed. Br. 23–25 (citing AR0000007).  They offer no authority for the proposition that an agency may use false assumptions when it finalizes an EIS if it concludes the impact is minimal.  Rather "rel[iance] on incorrect assumptions or data" violates NEPA's hard look requirement.  *Marten*, 883 F.3d at 795 (citation omitted).

Federal Defendants' argument also seeks to apply the wrong legal standard.  The question here is not whether there has been a "'substantial change in the proposed action' or a 'significant

new circumstance' that would require supplementation of an EIS," as Federal Defendants

contend.  Fed. Br. 25 (quoting 40 C.F.R. § 1502.9(c)).  Those standards apply when there is a

change *after* the agency has completed an EIS.  The royalty rate change occurred *before* BOEM

completed the final Supplemental EIS.  Regardless whether the requirement was triggered to

prepare a supplement, it was incumbent on the agency to use accurate data and assumptions at

the time it issued the final Supplemental EIS.  40 C.F.R. §§ 1500.1(b), 1502.24.

Chevron similarly is incorrect that the miscalculation is excusable "harmless error."  *See*

Chev. Br. 11.  The APA's harmless error rule applies in NEPA cases only when the error is "a

failure of precision []or a technicality," or "when an agency subsequently completed a

comprehensive environmental review before the matter reached [the circuit] court."  *Oglala*

*Sioux Tribe v. U.S. Nuclear Regulatory Comm'n*, 896 F.3d 520, 534 & n.10 (D.C. Cir. 2018).

An actual error or failure to consider a relevant factor when assessing environmental effects

cannot by definition be harmless "because the point of NEPA is to require an adequate EIS

before a project goes forward, so that [the project] does not begin without knowledge" of the

relevant effects.  *Id.* at 536; *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008)

("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may

be little if any information about prospective environmental harms and potential mitigating

measures."); *Grand Canyon Tr. v. FAA*, 290 F.3d 339, 347 (D.C. Cir. 2002) (finding error "not

harmless" because it prevented agency from analyzing environmental impacts).  In addition,

Chevron's assertion that the error is harmless is premised on BOEM's conclusion in the

administrative record insert that the royalty rate change would not affect activity levels.  Chev.

Br. 11 (citing AR0016777–78).  As explained above, that conclusion itself is fatally flawed.

There is no evidence in the record showing that the incorrect royalty rate had no effect on

BOEM's assessment of environmental effects.

## IV.    Vacatur of BOEM's Decisions and the Lease Sales Is the Proper Remedy.

BOEM held Lease Sales 250 and 251 in reliance on an arbitrary EIS without discharging its NEPA obligations.  Federal Defendants do not address relief at all in their opposition and cross-motion.  Intervenors dedicate most of their briefing on relief rebutting a request Plaintiffs have not made.  Plaintiffs are not seeking an injunction.  Rather, they request the ordinary remedy of vacatur for an action taken arbitrarily and not in compliance with law.  Intervenors' arguments fail because they blur the important distinctions between vacatur and injunctions, and because they have shown no basis to depart from the normal remedy of vacatur.  Accordingly, the Court should declare the NEPA review unlawful and vacate the lease sale decisions and leases issued pursuant to those decision.

### A.    The APA Explicitly Requires Vacatur of Unlawful Agency Action.

Vacatur is the ordinary remedy for unlawful agency action under the APA, which provides the cause of action for the NEPA claims raised in this case.  5 U.S.C. § 706(2)(A) (directing "reviewing court" to "hold unlawful and set aside" arbitrary or unlawful agency action); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1084 (D.C. Cir. 2001) (stating that where a plaintiff "prevails on its APA claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order"); *Petroleum Commc'ns., Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir. 1994) ("Where the agency has failed to provide a reasoned explanation, or where the record belies the agency's conclusion, [the court] must undo its action."); *Crowley's Yacht Yard, Inc. v. Pena*, 863 F. Supp. 18, 22 (D.D.C. 1994) (citing cases).

The Supreme Court has repeatedly described this remedy as mandatory.  *FCC v. Nextwave Pers. Commc'ns Inc.*, 537 U.S. 293, 300 (2003) ("The Administrative Procedure Act

*requires* federal courts to set aside federal agency action that is 'not in accordance with law.'"

(emphasis added)); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14

(1971) ("In all cases agency action must be set aside if the action was 'arbitrary, capricious, an

abuse of discretion, or otherwise not in accordance with law' or if the action failed to meet

statutory, procedural, or constitutional requirements."). Because Lease Sales 250 and 251 were

held, and leases issued, in the absence of a valid NEPA analysis, this Court should vacate the

sales and the issued leases. *See Alaska v. Andrus*, 580 F.2d 465, 485 (D.C. Cir. 1978)

("Government leases issued in violation of the law May [sic], in appropriate cases, be

invalidated."), *vacated in part on other grounds*, 439 U.S. 922 (1978).

### B.     The Four-Factor Test for Injunctions is Not Relevant to Evaluating the Customary Relief of Vacatur Under the APA.

Intervenors are wrong to conflate vacatur with a request for an injunction. Chev. Br. 14–

17; API Br. 12–20. Vacatur under the APA is *not* the same as an injunction, nor is it subject to

the kind of equitable balancing. In contrast to the statutory remedy of vacatur, which is the usual

remedy for a violation of the law under the APA, the Supreme Court has described injunctions as

a "drastic and extraordinary remedy, which should not be granted as a matter of course," and

may issue only after a specific showings and balancing of equities. *Monsanto Co. v. Geertson

Seed Farms*, 561 U.S. 139, 165 (2010). The *Monsanto* Court directed that where the "less

drastic remedy" of vacatur is sufficient to redress injury, "no recourse to the *additional* and

extraordinary relief of an injunction [is] warranted." *Id.* at 165–66 (emphasis added). "While

the Supreme Court made clear in *Monsanto* that there is no presumption to other injunctive

relief, both the Supreme Court and the D.C. Circuit Court have held that remand, along with

vacatur, is the presumptively appropriate remedy for a violation of the APA." *Sierra Club v. Van

Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010). As this Circuit recently explained, "[t]he

irreparable harm standard . . . is not the standard for the 'less drastic' APA remedy of vacatur

. . . . Rather it requires a substantially higher showing." *Oglala Sioux Tribe*, 896 F.3d at 535

(quoting *Monsanto*, 561 U.S. at 165–66).

The only two cases Intervenors cite for the proposition that vacatur and injunction are the

same involve different statutes.  API Br. 12; Chev. Br. 14.  First, *PGBA, LLC v. United States*

involved the government's awarding of contracts to a third party to process claim benefits under

the Administrative Dispute Resolution Act ("ADRA").  389 F.3d 1219 (Fed. Cir. 2004).  In

evaluating whether injunction was the appropriate remedy, the court specifically distinguished

the ADRA from the APA, holding that the ADRA does not incorporate the same requirement to

"set aside agency action."  *Id*. at 1225–26.  The court in fact reaffirmed that the APA requires

courts to "set aside any action it finds arbitrary or capricious without consideration of the relative

harms of such action."  *Id*. at 1225.  Second, *Virgin Islands Telephone Corp. v. FCC*, involved a

decision under the Federal Communications Act, not the APA, and did not even discuss the issue

of vacatur as distinguished from injunctions.  444 F.3d 666, 671–72 (D.C. Cir. 2006).[9]

Intervenors attempt to subject the ordinary remedy of vacatur to the multi-part test

applicable to the extraordinary remedy of injunction, but do so without the benefit of any legal

authority.  *See* Chev. Br. 14–17; API Br. 12–20.  Instead, they misrepresent Plaintiffs' requests

for relief as "requests for permanent injunctive relief."  API Br. 12.  Plaintiffs very clearly

requested only the "less drastic" remedy of vacatur in their Motion for Summary Judgment.  Pls.

Br. 2 ("Plaintiffs . . . ask this Court to . . . vacate BOEM's decisions to hold Lease Sales 250 and

---

[9] API also incorrectly refers to *Monsanto* and *Winter* for support. API Br. 12–13. As described, *supra*, *Monsanto* distinguished between injunction and vacatur. 561 U.S. at 165. The court in *Winter* evaluated solely the issue of whether to overturn the issuance of a preliminary injunction; it did not consider the separate remedy of vacatur. *Winter*, 555 U.S. at 20.

251."); *id.* 41 ("The Court should vacate Lease Sales 250 and 251 and the leases granted thereunder, and remand the Supplemental EIS to prepare a new, legally compliant EIS.").  That Plaintiffs also included a general request for "appropriate" injunctive relief in their Complaint does not supersede the relief they are actually requesting in this motion.[10]

A request for vacatur is simply not a request for an injunction.  *See Monsanto*, 561 U.S. at 165.  More specifically, in the context of relief for the government's arbitrary decision to issue leases on public land, courts distinguish between the vacatur of a lease and an injunction that would enjoin future activity pursuant to the lease.  *See, e.g.*, *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 83–84 (D.D.C. 2019) (distinguishing between enjoining an agency from further leasing authorizations and other forms of injunction from the "standard remedy" of vacatur in APA actions); *High Country Cons. Advocates v. Forest Serv.*, 67 F. Supp. 3d 1262, 1263–64 (D. Co. 2014) (recognizing "[v]acatur is the normal remedy for an agency action that fails to comply with NEPA," including the arbitrary issuance of leases); *see also Pit River Tribe v. Forest Serv.*, 469 F.3d 768, 788 (9th Cir. 2006).[11]  For this reason, the injunction arguments made by Intervenors are inapplicable.

## C.     The Limited Exceptions to the Default APA Standard Do Not Apply Here.

The D.C. Circuit has recognized limited exceptions to the default remedy of vacatur in

---

[10] Chevron incorrectly states that Plaintiffs have somehow "conceded" that their request for vacatur is tantamount to a request for an injunction. Rather, by using the disjunctive "or," Plaintiffs pled two distinct requests for relief. Compl. 40, ECF No. 1.

[11] Even in those unusual situations denying vacatur, the courts have imposed an alternative remedy that had the same practical effect of preventing the action from continuing before completion of the required NEPA review. *See, e.g.*, *WildEarth*, 368 F. Supp. 3d at 84–85 (enjoining any drilling activity while the agency completed additional NEPA review); *Native Vill. of Point Hope v. Salazar*, No. 1:08-cv-0004-RRB, 2010 WL 2943120, at *7 (D. Alaska July 21, 2010), *as amended by* 730 F. Supp. 2d 1009, 1019 (D. Alaska 2010) (same); *Sierra Club v. U.S. Dep't of Agric., Rural Util. Serv.*, 841 F. Supp. 2d 349, 362 (D.D.C. 2012) (enjoining new approvals that would allow construction of a coal plant until after preparation of an EIS). The Court could do the same here if it determines that an interim prohibition on conducting activities on leases is preferable to vacatur during remand.

some APA cases.  In *Allied Signal, Inc. v. U.S. Nuclear Regulatory Commission*, 988 F.2d 146,

150-51 (D.C. Cir. 1993), the D.C. Circuit declined to vacate a rulemaking for two reasons.  First,

in light of the record, the court observed that there was "at least a serious possibility" that the

agency could substantiate its reasoning on remand with additional explanation.  *Id*. at 151.

Second, the court concluded that vacatur would be highly disruptive.  *Id.*  Neither applies here.

In the context of environmental cases, the most common use of remand without vacatur

occurs where vacating such a rule would leave the plaintiffs with even less protection than the

inadequate rule that they challenged.  Such a case arose in *Davis County Solid Waste*

*Management v. EPA*, where this Circuit found air pollution emissions guidelines to be legally

inadequate, but declined to vacate them during the remand process since "greater pollution

emissions would . . . occur" if the guidelines were vacated than if they were left in place. 108

F.3d 1454, 1459–60 (D.C. Cir. 1997); *see also Ctr. for Biol. Div. v. EPA*, 861 F.3d 174, 188–89

(D.C. Cir. 2017) (remanding without vacatur because it would better maintain enhanced

protection of environmental values); *Advocates for Highway and Auto Safety v. Fed. Motor*

*Carrier Safety Admin.*, 429 F.3d 1136, 1151–52 (D.C. Cir. 2005) (no vacatur where plaintiffs

challenged safety rule as not protective enough); *Anacostia Riverkeeper v. Jackson*, 713 F. Supp.

2d 50, 52 (D.D.C. 2010) (staying vacatur of insufficiently stringent water pollution limits

because the "public interest" would not be served by having no water pollution limits at all

during remand).  In such instances, both to further the purposes of the statute and to redress the

harm to the prevailing plaintiff, courts have been willing to leave an insufficiently protective rule

in place while the agency undertakes a remand to resolve the rule's inadequacies.  *Pollinator*

*Stewardship Council v. EPA*, 806 F.3d 520, 532 (9th Cir. 2015) (explaining that the court should

not deviate from the normal remedy of vacatur because "leaving the EPA's registration of

sulfoxaflor in place risks more potential environmental harm than vacating it"). Intervenors do

not show that vacating the leases here would result in more environmental harm than leaving

them in place.

Intervenors argue that this Court should decline to apply the normal remedy of vacatur

for unlawful agency action and urge the Court to weigh the seriousness of the agency's errors

against the disruptive consequences. Chev. Br. 12; *see also* API Br. 18-19. As discussed below,

neither of these factors warrants an exception to vacatur.

1. *Courts in this Circuit rarely apply the Allied-Signal framework to remand without vacatur in NEPA cases.*

While Intervenors urge the Court to apply the *Allied-Signal* factors, the standard APA

remedy of vacatur (or, alternatively, the more robust remedy of an injunction) is virtually always

imposed where an agency violates NEPA. This is particularly true in this Circuit, which has

declared, and consistently reaffirmed, that "[p]ursuant to the case law in this Circuit, vacating a

rule or action promulgated in violation of NEPA is the standard remedy." *Humane Soc'y v.

Johanns*, 520 F. Supp. 8, 37 (D.D.C. 2007); *Pub. Emps. for Envtl. Responsibility v. Fish and

Wildlife Serv.* (*PEER v FWS*), 189 F. Supp. 3d 1, 2 (D.D.C. 2016) ("A review of NEPA cases in

this district bears out the primacy of vacatur to remedy NEPA violations.").

In the vast majority of NEPA cases in this Circuit, *Allied-Signal* and the possibility of

remand without vacatur is not even discussed at all. Rather, vacatur is simply imposed without

additional analysis, even though disruptive consequences are likely. *E.g., Del. Riverkeeper

Network v. Fed. Energy Reg. Comm'n*, 753 F.3d 1304 (D.C. Cir. 2014) (vacating approval of

gas pipeline); *Kempthorne*, 577 F. Supp. at 210 (vacating plan allowing snowmobiles in national

park); *Nat'l Wildlife Fed'n v. Norton,* 332 F. Supp. 2d 170, 188 (D.D.C. 2004) (vacating Corps

permit for private mine); *Greater Yellowstone Coal. v. Bosworth*, 209 F. Supp. 2d 156, 163

(D.D.C. 2002) (vacating grazing leases); *Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109

F. Supp. 2d 30, 44 (D.D.C. 2000) (vacating permit for riverboat casino); *Johanns*, 520 F. Supp.

2d at 38; *Humane Soc'y v. Dep't of Commerce*, 432 F. Supp. 2d 4, 25 (D.D.C. 2006).[12]

In a handful of NEPA cases, courts discuss the *Allied Signal* factors, but ultimately

vacate the decision.  In these instances, courts generally find that vacatur is necessary to satisfy

NEPA's goals by ensuring that the agency has unfettered discretion to make a different decision

once the remand is complete.  *E.g.*, *Friends of the Capital Crescent Trail v. Fed. Transit*

*Admin.*, 200 F. Supp. 3d 248, 254 (D.D.C. 2016) (vacating permits for a rail line involving

nearly a billion dollars in federal funding and holding "it would make little sense and cause

even more disruption if defendants were to proceed with the project while the [EIS] was being

completed, only to subsequently determine that another alternative is preferable"); *Reed v.*

*Salazar*, 744 F. Supp. 2d 98, 118–20 (D.D.C. 2010) (vacating funding agreement between

agency and tribe governing management of bison, despite costs); *Van Antwerp*, 719 F. Supp. 2d

at 78–80 ("Because interveners intend on continuing development pursuant to the permit,

vacatur is appropriate in order to prevent significant harm resulting from keeping the agency's

decision in place.").  This is typically the case in courts outside this Circuit as well.  *See, e.g.,*

*High Country*, 67 F. Supp. 3d at 1262 (vacating coal leases because NEPA remand may result

in decision "to forgo granting the lease modifications altogether").

This makes sense considering the underlying purposes of NEPA to ensure that

"important effects will not be overlooked or underestimated only to be discovered after

---

[12] The cases Intervenors cite do not involve NEPA violations. Chev. Br. 12 (citing *Sugar Cane Growers Coop. of Fla. v. Veneman*, 289 F.3d 89, 98 (D.C. Cir. 2002) (Food Security Act); *Black Oak Energy LLC v. FERC*, 725 F.3d 230, 233, 240 (D.C. Cir. 2013) (Federal Power Act); *Stand Up for California! v. U.S. Dep't of the Interior*, 879 F.3d 1177, 1190–91, (D.C. Cir. 2018) (Clean Air Act)).

resources have been committed or the die otherwise cast." *Robertson*, 490 U.S. at 349; *Alaska*, 580 F.2d at 473 ("[T]he basic thrust of an agency's responsibilities under NEPA is to predict the environmental effects of proposed action *before* the action is taken" (emphasis added)). Agencies must embark on a NEPA review with an "open mind," such that the process could yield a different outcome than originally anticipated. *Kleppe v. Sierra Club,* 427 U.S. 390, 417–18 (1976) (Marshall, J., concurring in part and dissenting in part).  As the D.C. Circuit recently observed, "[t]he idea behind NEPA is that if the agency's eyes are open to the environmental consequences of its actions and if it considers options that entail less environmental damage, it may be persuaded to alter what it proposed." *Sierra Club v. Fed. Energy Regulatory Comm'n*, 827 F.3d 36, 45 (D.C. Cir. 2016) (alteration in original) (citation omitted).

Accordingly, "the harm with which courts must be concerned in NEPA cases is not, strictly speaking, harm to the environment, but rather the failure of decision-makers to take environmental factors into account in the way that NEPA mandates." *Jones v. D.C. Redevelopment Land Agency*, 499 F.2d 502, 512 (D.C. Cir. 1974).  Remedies in NEPA cases, therefore, focus on ensuring the integrity of the decisionmaking process and preserving the full range of options. *Alaska*, 580 F.2d at 485 ("[W]here courts have enjoined ongoing projects, they have done so primarily to preserve for the relevant decisionmaker the full opportunity to choose among alternatives. . . .").  Then-Judge Breyer identified this concern: "Once large bureaucracies are committed to a course of action, it is difficult to change that course—even if new, or more thorough, NEPA statements are prepared and the agency is told to 'redecide.'" *Massachusetts v. Watt*, 716 F.2d 946, 952–53 (1st Cir. 1983).

> 2.      *The NEPA flaws here are significant and not easily corrected.*

As to the first *Allied Signal* factor, Plaintiffs have shown the deficiencies in the analysis

are significant and go to the heart of BOEM's decisions about whether, when, and where to hold

lease sales.  Vacatur here would serve NEPA's fundamental purpose of requiring agencies to

look before they leap.  *See, e.g., Ctr. for Food Safety v. Vilsack*, 734 F. Supp. 2d 948, 953 (N.D.

Cal. 2010) ("The fact that the Court has already found that [the agency] failed to fully consider

the potential consequences of [its decision] and that Plaintiffs have shown that [the decision]

may significantly affect the environment demonstrates that [the agency's] errors are not minor.").

Vacatur also advances the mandates of NEPA and OCSLA by preserving the decisionmakers'

opportunity to choose among policy alternatives, *Alaska*, 580 F.2d at 485, and ensuring "orderly"

offshore development "subject to environmental safeguards," 43 U.S.C. § 1332(3).

Chevron seeks to characterize the flaws in the EIS as trivial and easily remedied.  Chev.

Br. 12–13.  Not so.  The deficiencies in the EIS go to the heart of the decision to sell leases in the

Gulf of Mexico.  Proper analysis and disclosure about, *inter alia*, the environmental benefits of

not offering a lease sale or delaying a lease sale, the potential impacts of safety regulation repeals

on the risks for blowouts or loss of well control, and the lack of current enforcement of safety

regulations could each "have led [the Secretary] to reject altogether a lease sale" in the Gulf.

*Alaska*, 580 F.2d at 485.  Vacating the leases will preserve the full opportunity for the Secretary

to choose among alternatives that is contemplated by NEPA.  *Watt*, 716 F.2d at 952  (Breyer, J.)

(stating "when a decision to which NEPA obligations attach is made without the informed

environmental consideration that NEPA requires, the harm that NEPA intends to prevent has

been suffered").  If BOEM had adequately considered the repealed safety regulations, for

example, it may have decided not to hold a lease sale or to offer a more limited sale that

eliminated higher risk areas.  As this Circuit has "recently affirmed," "'the fail[ure] to address'

an important aspect of the problem is a 'major shortcoming[].'"  *Stewart v. Azar*, 313 F. Supp. 3d

237, 273 (D.D.C. 2018) (quoting *Humane Soc'y v. Zinke*, 865 F.3d 585 (D.C. Cir. 2017)).  Here,

BOEM neglected to consider several critical factors, including repeal of the Safety Rules and

changes to royalty rates, among others.  Indeed, in closely related circumstances, this Circuit

vacated the 2007–2012 Five Year Oil and Gas Leasing Program because of Interior's failure to

do an adequate environmental review.  *See Ctr. for Biol. Div. v. U.S. Dep't of the Interior*, 563

F.3d 466, 489 (D.C. Cir. 2009).

      BOEM's failures are not shortcomings of explanation that can be corrected by providing

the missing rationale for the agency action.  *See Volpe*, 401 U.S. at 420.  Instead, BOEM must

prepare a new NEPA analysis of key issues at the heart of this dispute and make a new decision

based on a full and objective analysis.  The only way to ensure the integrity of that process, and

reduce the risks to Plaintiffs that the process is supposed to be analyzing, is by applying the

default remedy of vacatur.

           *3.*     *Any alleged inconveniences do not warrant straying from the default
remedy of vacatur.*

      As to the second factor, the "disruptive circumstances" exceptions have been applied

sparingly, and only in a handful of specific situations.  Intervenors claim potential disruptions

could occur if the leases are vacated.  Chev. Br. 13; API Br. 18–19.  While vacating the leases

may inconvenience companies who acquired the leases, the disruptions posited by Intervenors

are irrelevant and exaggerated.  In the case of Lease Sale 251, moreover, the companies only

have themselves to blame for any financial implications in light of the risks they took by bidding

on leases that they knew were challenged in this suit and under a legal cloud.

      As a threshold matter, the financial impacts and diminished profits about which

Intervenors complain carry very little if any weight in the context of a NEPA violation.  Even

under the higher bar for an injunction, "[e]nvironmental injury, by its nature, can seldom be

adequately remedied by money damages and is often . . . irreparable.  If such injury is

sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction

to protect the environment." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987).

As the court stated in *PEER v. FWS*, a case explicitly weighing economic harms in the context of

a vacatur for NEPA violations, "it is not clear that economic concerns are as relevant in an

environmental case like this one . . . the Court is reluctant to rely on economic disruption as the

basis for denying" requested relief.  189 F. Supp. 3d at 3–4 (further finding that "disruption" of

halting an activity that had been found legally flawed cannot be the basis for an exception to the

default remedy, as if it was, then "vacatur would never be appropriate"); *Reed*, 744 F. Supp. 2d

at 120 ("The fact that there may be some costs or 'field-level' effects associated with the

rescission does not mean that there should be an exception from the default rule that arbitrary

and capricious agency action be set aside."); *see also Ctr. for Native Ecosystems v. Salazar*, 795

F. Supp. 2d 1236, 1243 (D. Colo. 2011) (finding economic impacts of vacatur on transportation,

energy development, and agriculture projects to be "irrelevant"); *Diné Citizens Against Running*

*our Env't v. U.S. Office of Surface Mining Reclamation and Enf't*, No. 12-cv-01275-JLK, 2015

WL 1593995, at *2–3 (D. Colo. April 6, 2015) (vacating decision despite potential for significant

delay and expense as "prospective economic harm does not outweigh" concerns regarding a

flawed NEPA analysis).

   The disruptions that Intervenors point to are irrelevant in this context.  As another court

in this District recently found, the disruptive consequences of vacating a lease sale are not great.

*WildEarth Guardians*, 368 F. Supp. 3d at 84.  In *WildEarth*, the Bureau of Land Management

arbitrarily issued oil and gas leases on federal lands without sufficiently considering the effects

of climate change.  The court determined that vacatur would not disrupt public and private

economic interests, noting "the risk of economic harm from procedural delay and industrial inconvenience 'is the nature of doing business, especially in an area fraught with bureaucracy and litigation.'" *Id.* at 84 n.35 (quoting *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F. Supp. 3d 91, 104 (D.D.C. 2017)).[13] So too here.  Any economic disruptions are not sufficient for the Court to stray from the ordinary course of vacatur.

Intervenors also hypothesize that vacatur could disrupt the bidding process because potential bidders in a new lease sale would know the original bid amounts.  Chev. Br. 13; API Br. 19–20.  Intervenors offer no evidence to show that there was in fact any competition for the acquired leases in Lease Sales 250 or 251 nor that the companies actually benefitted from sealed bids in the first place.  Nor do Intervenors offer any reason to speculate that there would be outside competitors in any future sales.  Intervenors complain that future lease sales would not be adequately "fair and competitive," API Br. 19, while ignoring the reality that BOEM offered many more leasable parcels in Lease Sales 250 and 251 in order to significantly *reduce* competition.  And the companies benefitted from the arguably unfair advantage of obtaining the leases at rock-bottom prices.  Pls. Br. 9.  Intervenors should not be able to wield the advantages conveyed by bidding on an illegal lease sale as justification for not implementing the ordinary remedy of vacatur.

Additionally, Plaintiffs filed the current lawsuit nearly one month before Lease Sale 251 took place.  Chevron and other bidding companies were aware of the legal flaws in the EIS before participating in at least Lease Sale 251 and entered their bids with full knowledge and

---

[13] In *WildEarth*, the court did not deny vacatur "on the basis of alleged economic harm," but "the court declined to vacate the leases because the deficiencies only involved one aspect of the lease sales that could likely be easily addressed on remand." 368 F. Supp. 3d at 83–85 & n.35. In contrast here, BOEM's errors amount to serious deficiencies. *See supra* at 40-42. Further, the court ultimately concluded the agency's "lack of reasoned explanation" was still a serious enough failing to leave the court "in doubt as to whether the agency chose correctly in making its 'leasing decisions.'" 368 F. Supp. 3d at 84–85.

calculation of the risks.  In other NEPA cases, courts refuse to credit economic harm that arises from a defendant's own risk-taking, even for the more extraordinary relief of injunctions.  For example, in *Sierra Club v. U.S. Army Corps of Engineers*, the court enjoined construction of a power plant that was almost complete despite claims of significant economic harm to its owner. 645 F. 3d 978, 998 (8th Cir. 2011).  The court reasoned that the company "commenced plant construction a year before the § 404 permit was issued, repeatedly ignoring administrative and legal challenges and a warning by the Corps that construction would proceed at its own risk." *Id*. at 996*; see also Davis v. Mineta*, 302 F.3d 1104, 1116 (10th Cir. 2002) (finding that state entities "have 'jumped the gun' on the environmental issues by entering into contractual obligations that anticipated a pro forma result [and] are largely responsible for their own harm").

Remand without vacatur is an unusual remedy, limited to narrow situations that do not apply here.  Its use where an agency has violated NEPA is rare.  This Court should not allow the leases to remain in place, exposing Plaintiffs and the public to the very impacts that BOEM unlawfully failed to analyze in the first place.  Accordingly, this Court should apply the standard remedy and vacate the leases here.

## CONCLUSION

For the foregoing reasons, the Court should declare the lease sale decisions and the Supplemental EIS unlawful, in violation of NEPA and the APA, and should vacate the decisions and issued leases, and remand the Supplemental EIS to BOEM to prepare a new, legally compliant EIS.

Respectfully submitted this 14th day of June, 2019.

/s/ Stephen D. Mashuda
Stephen D. Mashuda (DC Bar No. WA0005)
Christopher D. Eaton (*pro hac vice*)
EARTHJUSTICE
705 Second Ave., Suite 203
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
smashuda@earthjustice.org
ceaton@earthjustice.org

Brettny Hardy (*pro hac vice*)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
bhardy@earthjustice.org

*Attorneys for Plaintiffs Gulf Restoration Network,
Sierra Club, and Center for Biological Diversity*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 14, 2019, I caused the foregoing to be filed and served upon counsel of record via the Court's CM/ECF filing system, which will send notice of such to all counsel of record.

/s/ Stephen D. Mashuda

Stephen D. Mashuda