**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |
|---|---|
| GULF RESTORATION NETWORK, <u>et al.</u>, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DAVID BERNHARDT, in his official capacity | ) |
| as Secretary of the United States Department | ) |
| of the Interior, <u>et al.</u>,[1] | ) |
| | ) Civil Action No. 18-1674 (RBW) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| AMERICAN PETROLEUM INSTITUTE, | ) |
| <u>et al.</u>, | ) |
| | ) |
| Intervenor-Defendants. | ) |

_____

**<u>MEMORANDUM OPINION</u>**

The plaintiffs, Gulf Restoration Network, Sierra Club, and the Center for Biological

Diversity (collectively, the "plaintiffs"), filed this civil action for declaratory and injunctive relief

against the United States Department of the Interior (the "Department"); David Bernhardt, in his

official capacity as the Secretary of the Interior (the "Secretary"); Casey Hammond, in his

official capacity as the Acting Assistant Secretary of Land and Minerals Management; and the

Bureau of Ocean Energy Management ("BOEM") (collectively, the "federal defendants"),

"challeng[ing] the [allegedly] unlawful decisions by [federal defendants] . . . to hold Offshore

Lease Sale[] 250 [('Lease Sale 250')] and [Offshore Lease Sale] 251 [('Lease Sale 251')] in the

Gulf of Mexico in reliance on arbitrary environmental analyses" pursuant to the National

---

[1] Casey Hammond is substituted for Joseph R. Ballash as the proper party defendant pursuant to Federal Rule of Civil Procedure 25(d).

Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370m-12 (2018), and the

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706 (2018).  Complaint for

Declaratory and Injunctive Relief ("Compl." or the "Complaint") ¶ 1.  The American Petroleum

Institute ("API") and Chevron U.S.A. Inc. ("Chevron") (collectively, the "intervenor-

defendants") join the federal defendants in defending this action.  Currently pending before the

Court are (1) the Plaintiffs' Motion for Summary Judgment and Request for a Hearing ("Pls.'

Mot."), (2) the Federal Defendants' Cross-Motion for Summary Judgment and Opposition to

Plaintiffs' Motion for Summary Judgment ("Fed. Defs.' Mot."), (3) the American Petroleum

Institute's Cross-Motion for Summary Judgment ("API's Mot."), and (4) Chevron U.S.A. Inc.'s

Cross-Motion for Summary Judgment ("Chevron's Mot.").  Upon careful consideration of the

parties' submissions,[2] the Court concludes for the following reasons that it must deny the

plaintiffs' motion for summary judgment and grant the federal defendants' and the intervenor-

defendants' (collectively, the "defendants") cross-motions for summary judgment.

---

[2] In addition to the filings already identified, the Court considered the following submissions in rendering its decision: (1) the Motion of the American Petroleum Institute for Leave to Intervene as a Defendant ("API's Mot. to Intervene"); (2) the Defendants' Answer to Plaintiffs' Complaint ("Fed. Defs.' Answer"); (3) Chevron U.S.A. Inc.'s Motion to Intervene in Support of Defendants ("Chevron's Mot. to Intervene"); (4) the [Proposed] Answer, Defenses, and Affirmatives Defenses of Defendant-Intervenor American Petroleum Institute ("API's Answer"); (5) Chevron U.S.A. Inc.'s Proposed Answer, Defenses, and Affirmative Defenses to Plaintiffs' Complaint for Declaratory and Injunctive Relief ("Chevron's Answer"); (6) the Plaintiffs' Memorandum in Support of Their Motion for Summary Judgment ("Pls.' Mem."); (7) the Memorandum of the American Petroleum Institute in Opposition to Plaintiffs' Motion for Summary Judgment, and in Support of Its Cross-Motion for Summary Judgment ("API's Mem."); (8) Chevron U.S.A. Inc.'s Memorandum of Points and Authorities in Support of Cross-Motion for Summary Judgment and Opposition to Plaintiffs' Motion for Summary Judgment ("Chevron's Mem."); (9) the Plaintiffs' Opposition to Federal Defendants' and Intervenor-Defendants' Cross-Motions for Summary Judgment and Reply in Support of Plaintiffs' Motion for Summary Judgment ("Pls.' Reply"); (10) the Federal Defendants' Reply in Support of Their Cross-Motion for Summary Judgment ("Fed. Defs.' Reply"); (11) the Reply Memorandum of the American Petroleum Institute in Support of Its Cross-Motion for Summary Judgment ("API's Reply"); (12) Chevron U.S.A. Inc.'s Reply in Support of Cross-Motion for Summary Judgment ("Chevron's Reply"); and (13) the Appendix of Administrative Record Citations ("AR").

# I.     BACKGROUND

**A.     Statutory and Regulatory Background**

**1.     The NEPA**

Congress enacted the NEPA for the purpose of "promot[ing] efforts which will prevent or eliminate damage to the environment and biosphere[.]"  42 U.S.C. § 4321; see also id. § 4371. To advance these objectives, the NEPA provides that a federal agency shall include, inter alia,

> in every recommendation or report on . . . major [f]ederal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action[.]

Id. § 4332(C).  This statement is commonly referred to as an environmental impact statement ("EIS").  See Oceana v. Bureau of Ocean Energy Mgmt., 37 F. Supp. 3d 147, 151 (D.D.C. 2014). The pertinent regulations implemented pursuant to this provision of the NEPA require the agency to prepare a programmatic EIS in certain circumstances.  See 40 C.F.R. § 1508.25.  A supplement to the programmatic EIS is required when either "the agency makes substantial changes in the proposed action that are relevant to environmental concerns[,]" id. § 1502.9(c)(1)(i), or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts[,]" id. § 1502.9(c)(1)(ii).

> Where NEPA analysis is required, its role is primarily information-forcing . . . . It is now well-established that [the] NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions.  It is equally clear that [the] NEPA does not impose a duty on agencies to include in every EIS a detailed explanation of specific measures which will be employed to mitigate the adverse impacts of a proposed action.

Indian River Cty., Fla. v. U.S. Dep't of Transp., 945 F.3d 515, 522 (D.C. Cir. 2019).  Thus, "because [the] NEPA's requirements are 'essentially procedural,' the statute does 'not mandate particular substantive environmental results.'  Instead, [the] NEPA 'focus[es] Government and public attention on environmental effects of proposed agency action.'"  Id. at 522–23 (fourth alteration in original) (citation omitted) (quoting Theodore Roosevelt Conservation P'ship v. Salazar, 661 F.3d 66, 68 (D.C. Cir. 2011)).  The NEPA requirements "simply . . . ensure that the agency has adequately considered and disclosed the environmental impacts of its actions."  Id. at 523 (alteration in original) (quoting WildEarth Guardians v. Jewell, 738 F.3d 298, 308 (D.C. Cir. 2013)).

### 2. The Outer Continental Shelf Lands Act

"The Outer Continental Shelf is an area of submerged lands, subsoil, and seabed that lies between the outer seaward reaches of a state's jurisdiction and that of the United States."  Ctr. for Biological Diversity v. U.S. Dep't of the Interior, 563 F.3d 466, 472 (D.C. Cir. 2009).  The Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356b (2018), "establishes a procedural framework under which [the] [Department] may lease areas of the [Outer Continental Shelf] for purposes of exploring and developing the oil and gas deposits of the [Outer Continental Shelf's] submerged lands."  Id.  The

> OCSLA's mandate that [the] [Department] manage mineral leases in the Outer Continental Shelf encompasses four distinct stages of regulatory responsibility: (1) formulation of a five year leasing plan by the Department . . . ; (2) lease sales; (3) exploration by lessees; [and] (4) development and production.  Each stage involves separate regulatory review[,] and it is well established that [the] NEPA's requirements apply of their own force to each stage of the OCSLA regulatory process.

Ctr. for Biological Diversity v. Zinke, 260 F. Supp. 3d 11, 18 (D.D.C. 2017) (fourth and fifth alterations in original) (citation and internal quotation marks omitted).  Relevant to this case,

4

"during the lease-sale stage, [the] [Department] solicits bids and issues leases for particular

offshore leasing areas."  Ctr. for Biological Diversity, 563 F.3d at 473 (citing 43 U.S.C.

§ 1337(a)).

## B.     Factual Background

### 1.     The Parties

The plaintiffs are three environmental non-profits and networks, see Compl. ¶¶ 13–15;

cf. Fed. Defs.' Answer ¶¶ 13–15; API's Answer ¶¶ 13–15; Chevron's Answer ¶¶ 13–15, and the

federal defendants are the agencies and officials charged with administering lease sales under the

OCSLA, see Compl. ¶¶ 17–20; Fed. Defs.' Answer ¶¶ 17–20; API's Answer ¶¶ 17–20;

Chevron's Answer ¶¶ 17–20.  Specifically, (1) the Department is "the federal department with

authority, through the Secretary, under [the] OCSLA to hold lease sales for oil and gas rights on

the Outer Continental Shelf and to issue leases[,]" Compl. ¶ 19; cf. Fed. Defs.' Answer ¶ 19;

API's Answer ¶ 19; Chevron's Answer ¶ 19; (2) the Secretary "is the chief officer of the

Department . . . charged with overseeing the proper administration and implementation of the . . .

OCSLA[,]" Compl. ¶ 17; cf. Fed. Defs.' Answer ¶ 17; API's Answer ¶ 17; Chevron's Answer

¶ 17; (3) the BOEM "is the federal agency within the Department . . . to which the Secretary has

delegated authority under [the] OCSLA to hold lease sales for oil and gas rights on the Outer

Continental Shelf[,]" id. ¶ 20; cf. Fed. Defs.' Answer ¶ 20; API's Answer ¶ 20; Chevron's

Answer ¶ 20; and (4) the Assistant Secretary of Land and Minerals Management "is the official

to whom the Secretary delegated authority to sign records of decision to hold lease sales under

[the] OCSLA[,]" id. ¶ 18; cf. Fed. Defs.' Answer ¶ 18; API's Answer ¶ 18; Chevron's Answer

¶ 18.  API is a "trade association of the oil and natural gas industry[,]" whose "members are

deeply engaged in the exploration for and development of offshore oil and gas resources as

leaseholders, lease operators, and service companies, including in the Gulf of Mexico." API's

Mot. to Intervene at 2. Chevron "conducts operations in the [Outer Continental Shelf] in the

Gulf of Mexico and has participated in a number of lease sales, including the [l]ease [s]ales

challenged in the Complaint." Chevron's Mot. to Intervene at 4.

      **2.**    **Lease Sales 250 and 251**

In November 2016, the Department began developing the 2017–2022 Five Year Outer

Continental Shelf Leasing Program (the "2017–2022 program"), which proposed "a schedule of

[eleven] potential lease sales in four [Outer Continental Shelf] planning areas[,] [including] ten

sales in the [Gulf of Mexico] Program Area." AR 4269. Lease Sales 250 and 251, the subjects

of the plaintiffs' legal challenge, were included in the 2017–2022 program proposed lease sale

schedule. See AR 4269. On January 19, 2017, the Department approved the 2017–2022

program. See Record of Decision for the 2017–2022 Outer Continental Shelf Oil and Gas

Leasing Program Final Programmatic Environmental Impact Statement; MMAA104000, 82 Fed.

Reg. 6643, 6643 (Jan. 19, 2017). The BOEM prepared three EISs in connection with Lease

Sales 250 and 251: (1) the Outer Continental Shelf Oil and Gas Leasing Program: 2017–2022

Final Programmatic EIS (the "Programmatic EIS"), see AR 14,242–15,179, which was issued in

November 2016, see AR 14,242; (2) the Gulf of Mexico OCS Oil and Gas Lease Sales:

2017–2022 Gulf of Mexico Lease Sales 249, 250, 251, 252, 253, 254, 256, 257, 259, and 261

Final Multistate EIS (the "Multistate EIS"), see AR 5417–7274, which was issued in March

2017, see AR 5419; and (3) the Gulf of Mexico OCS Lease Sale Final Supplemental

Environmental Impact Statement 2018 (the "Supplemental EIS"), see AR 15,471–16,365, which

was issued in December 2017, see AR 15,473. "The Supplemental EIS tier[ed] from and

update[d] the . . . Multistate EIS[] and incorporate[d] by reference all of the relevant material in

the . . . Multistate EIS." AR 15,475.  The BOEM considered the information in the EISs and

subsequently decided to proceed with Lease Sales 250 and 251.  See AR 1635–42, 16,891–99.

The then-Assistant Secretary of Land and Minerals Management issued the record of decision

for Lease Sale 250 on February 8, 2018, see AR 1642, and the record of decision for Lease Sale

251 on June 28, 2018, see AR 16,899.  Lease Sale 250 was held on March 21, 2018, see AR

1642, and Lease Sale 251 was held on August 15, 2018, see AR 16,899.  The plaintiffs take issue

with certain aspects of the EISs that the BOEM relied upon in making its decision to hold Lease

Sales 250 and 251, namely, (1) the no action alternative, (2) the Bureau of Safety and

Environmental Enforcement ("BSEE") safety rules, and (3) the royalty rate.  See Pls.' Mem. at

23–45.  The Court will discuss each in turn.

### a.      The No Action Alternative

The Supplemental EIS "contains analyses of the potential environmental impacts that

could result from a proposed regionwide lease sale in the Gulf of Mexico as scheduled in the

2017–2022 . . . program[,]" AR 15,551, to "inform decisions for . . . [L]ease [S]ales [250 and

251] scheduled in 2018[,]" AR 15,552.  The Supplemental EIS contains an alternatives section

"outlining the alternatives that [were] considered for th[e] environmental analysis."  AR 15,553.

The alternatives section includes five alternatives: Alternatives A, B, C, D, and E.  See AR

15,553–60 (discussing Alternatives A to E).  Relevant to the plaintiffs' challenge are

Alternatives A and E.  "Alternative A [ ] allow[s] for a proposed regionwide lease sale

encompassing all three planning areas within the [United States] portion of the Gulf of Mexico

[Outer Continental Shelf][,]" AR 15,553, while Alternative E (the "no action alternative") is "the

cancellation of a single proposed [Gulf of Mexico] lease sale within the 2017–2022 [ ]

[p]rogram[,]" AR 15,559.  The no action alternative states:

The opportunity for development of the estimated oil and gas that could have resulted from a proposed action (i.e., a single proposed lease sale) or alternative to the proposed action, as described above, would be precluded or postponed to a future lease sale.  Any potential environmental impacts resulting from a proposed lease sale would not occur.  Activities related to previously issued leases and permits (as well as those that may be issued in the future under a separate decision) related to the [Outer Continental Shelf] Oil and Gas Program would continue.  If a lease sale were to be cancelled, the resulting development of oil and gas would most likely be postponed to a future lease sale; therefore, the cumulative level of [Outer Continental Shelf] oil- and gas related activity would only be reduced by a small percentage, if any.  Therefore, the cancellation of a proposed lease sale would not significantly change the environmental impacts of overall [Outer Continental Shelf] oil- and gas-related activity.

AR 15,559–60.

### b.    The BSEE Safety Rules

In 2016, the BSEE[3] implemented two offshore safety regulations: (1) the Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Blowout Preventer Systems and Well Control rule (the "Well Control Rule"), which "focuses on blowout preventer and well-control requirements," Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Blowout Preventer Systems and Well Control, 81 Fed. Reg. 25,887, 25,888 (Apr. 29, 2016), and (2) the Oil and Gas and Sulphur Operations on the Outer Continental Shelf—Oil and Gas Production Safety Systems rule (the "Production Safety Rule"), which "amend[ed] and update[ed] the regulations regarding oil and natural gas production safety on the Outer Continental Shelf[,]" Oil and Gas and Sulphur Operations on the Outer Continental Shelf—Oil and Gas Production Safety Systems, 81 Fed. Reg. 61,833, 61,834 (Sept. 7, 2016) (collectively, the "safety rules").

On December 29, 2017, the BSEE proposed to amend the Production Safety Rule "to amend, revise, or remove current regulatory provisions that create[d] unnecessary burden on stakeholders while maintaining or advancing the level of safety and environmental protection."

---

[3] The BSEE is a bureau within the Department, separate from the BOEM, which "is responsible for lease operations, safety, and enforcement."  AR 27,101.

Oil and Gas and Sulphur Operations on the Outer Continental Shelf—Oil and Gas Production

Safety Systems—Revisions, 82 Fed. Reg. 61,703, 61,703 (Dec. 29, 2017).  The BSEE finalized

the amendments to the Production Safety Rule on September 28, 2018, which became effective

on December 27, 2018.  <u>See</u> Oil and Gas and Sulphur Operations on the Outer Continental

Shelf—Oil and Gas Production Safety Systems, 83 Fed. Reg. 49,216, 49,216 (Sept. 28, 2018)

("Revised Production Safety Rule").  On May 11, 2018, the BSEE proposed to amend the Well

Control Rule to "revise requirements for well design, well control, casing, cementing, real-time

monitoring [ ], and subsea containment" "to ensure safety, while correcting errors and reducing

certain unnecessary regulatory burdens imposed under the existing regulations."  Oil and Gas

and Sulphur Operations in the Outer Continental Shelf—Blowout Preventer Systems and Well

Control Revisions, 83 Fed. Reg. 22,128, 22,218 (May 11, 2018).  The BSEE finalized the

amendments to the Well Control Rule on May 15, 2019, which became effective on July 15,

2019.  <u>See</u> Oil and Gas and Sulphur Operations in the Outer Continental Shelf—Blowout

Preventer Systems and Well Control Revisions, 84 Fed. Reg. 21,908, 21,908 (May 15, 2019)

("Revised Well Control Rule").  The BOEM "conducted its [ ] [EISs] with the 2016 . . .

Production Safety [ ] Rule and the 2016 Well Control Rule in place[,]" AR 4133, despite the fact

that it was "aware of the changing regulations under a new administration[,]" AR 16,347 (in

response to a public comment on the draft Supplemental EIS regarding the BSEE's proposed

amendments to the Well Control and Production Safety Rules, stating that the "BOEM [was]

aware of changing regulations under a new administration[,]" but that "the analysis conducted

for the 2018 lease sale was performed under the current 2017–2022 [ ] [p]rogram" and "[t]he

information used to conduct these analyses was the best available information at that time").

After the amendments to the Production Safety and Well Control Rules were proposed, but

before they were finalized, the "BOEM [ ] determined that the proposed changes to the 2016 . . .

Production Safety [] Rule and the 2016 Well Control . . . Rule d[id] not change the conclusions

of the . . . Supplemental EIS because the changes to the rules leave critical safety provisions

intact."  AR 4133.

Additionally, in February 2017, the United States Government Accountability Office

("GAO") issued a report evaluating "[thirty-two] high-risk areas[,]" HIGH-RISK SERIES:

Progress on Many High-Risk Areas, While Substantial Efforts Needed on Others, U.S. Gov't

Accountability Office (Feb. 2017), https://www.gao.gov/assets/690/682765.pdf (the "GAO

report"),[4] including the "management of federal oil and gas resources[,]" AR 27,101

(capitalization removed).  The GAO report stated that the BSEE "had undertaken various reform

efforts since its creation in 2011, but had not fully addressed deficiencies in its investigative,

environmental compliance, and enforcement capabilities identified by investigations after the

Deepwater Horizon incident."[5]  AR 27,102.  Specifically, the GAO report found that the

"BSEE's ongoing restructuring has made limited progress in enhancing its enforcement

capabilities" because the "BSEE has not developed procedures with criteria to guide how it uses

enforcement tools—such as warnings and fines—which are among the goals of [the] BSEE's

restructuring[.]"  AR 27,103.  "To address risk of the effectiveness of [the] BSEE's

investigations, . .  [the GAO] recommended that [the] BSEE complete policies outlining the

responsibilities of investigations, environmental compliance, and enforcement programs, and

---

[4] The Court takes judicial notice of the full GAO report, which is published on the GAO's website, as the administrative record contains only excerpted portions of the report.  See Farrell v. Tillerson, 315 F. Supp. 3d 47, 54 n.3 (D.D.C. 2018) (Walton, J.) ("[C]ourts in this jurisdiction have frequently taken judicial notice of information posted on official public websites of government agencies." (alteration in original) (quoting United States ex rel. Groat v. Boston Heart Diagnostics Corp., 255 F. Supp. 3d 13, 24 n.7 (D.D.C. 2017) (Walton, J.)).

[5] "On April 20, 2010, the Deepwater Horizon drilling rig exploded in the Gulf of Mexico, resulting in [eleven] deaths, serious injuries, and the largest marine life oil spill in [United States] history."  AR 27,101.

update and develop procedures to guide them." AR 27,104.  In response to concerns raised in a

public comment on the draft Supplemental EIS by the plaintiffs regarding the effectiveness of the

BSEE's purportedly "insufficient regulatory oversight of the offshore oil and gas industry[,]" AR

16,347, the BOEM responded that the GAO's "report concerning [the] BSEE's operations are

outside the scope of th[e] Supplemental EIS because [the] BSEE's operations are outside of the

leasing process." AR 16,346–47.

c. <strong>The Royalty Rate</strong>

In March 2008, the BOEM set the royalty rate for "[Gulf of Mexico] leases in all water

depths . . . [at] 18.75%." AR 10.  On June 27, 2017, the then-Acting Assistant Secretary of Land

and Minerals Management "set the royalty rate for [Gulf of Mexico] leases situated in less than

200 meters of water at 12.5% [ ] for [ ] lease sale[s] and maintain[ed] the royalty rate for leases

situated in 200 meters of water and deeper at 18.75[%] [ ]." AR 9.  Although "the lower royalty

rate in shallow water [was] expected to increase activity[,]" AR 10, the BOEM represented that

"given that shallow water comprises a small percentage of aggregate [Gulf of Mexico]

production, leasing activity, and revenues, the aggregate impacts of this change are expected to

be minimal[,]" AR 7.  Despite the change in the royalty rate for shallow waters, the EISs

prepared by the BOEM, including the Supplemental EIS, which was issued in December 2017

after the royalty rate change, see AR 15,473, forecasted lease sale activity using the higher

18.75% royalty rate, cf. AR 4132.  In response to a concern raised by one of the plaintiffs

regarding "the reduction of the royalty rate from 18.75% to 12.5% for leases situated in water

depths less than 200 meters[,]" AR 16,580, the BOEM thereafter "reanalyzed the forecasted oil

and gas exploration, discovery, development, and production activity expected from a proposed

sale lease following the reduction in royalty rates from 18.75% to 12.5% for leases in water 200

11

meters or less[,]" AR 4132.  The "BOEM [ ] verified the activity level in any forecasted year
resides well within the margin of error taken into account" in the Supplemental EIS and
"determined that the impact analysis conducted in the . . . Supplemental EIS, and documents
from which it tiered, remain[ed] valid[,] even assuming some leases [were] issued with a 12.5%
shallow water royalty rate."  AR 4132.  The BOEM based its conclusion on an evaluation by the
BOEM's Office of Resource Evaluation, "us[ing] a series of spreadsheet-based models to
estimate the range of anticipated oil and natural gas production volumes and associated levels of
exploration, development[,] and decommissioning activity on a per lease sale basis."  AR 16,581.
The spreadsheet-based models utilized "[h]istorical lease sale specific leasing activity and trends,
number of discoveries, discovery volumes and production volumes, drilling activity and trends,
platform installations and decommissioning activity, oil and gas prices[,] and activity costs[,]"
and "[t]he resulting forecast [was] analyzed and compared to actual historical data to [e]nsure
that historical precedent and recent trends [we]re reflected in each activity forecast."  AR 16,581.

### 3.    This Litigation

On July 16, 2018, shortly after the record of decision for Lease Sale 251 was issued, see
AR 16,899 (indicating that the record of decision for Lease Sale 251 was issued on June 28,
2018), the plaintiffs initiated this civil action against the federal defendants, see Compl. at 1.
The intervenor-defendants subsequently moved to intervene in support of the federal defendants,
and the Court granted both of their motions to intervene.  See Order at 13 (Dec. 7, 2018), ECF
No. 35.  The plaintiffs thereafter filed their motion for summary judgment, see generally Pls.'
Mot., and the federal defendants and the intervenor-defendants filed their cross-motions for
summary judgment, see generally Fed. Defs.' Mot.; API's Mot.; Chevron's Mot.  These motions
are the subjects of this Memorandum Opinion.

## II.        STANDARD OF REVIEW

"A party is entitled to summary judgment "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a).

The "NEPA lack[s] a specific statutory review provision and, consequently, challenges

alleging violations of th[is] statute are brought pursuant to the APA." Am. Wild Horse

Campaign v. Bernhardt, __ F. Supp. 3d __, __, Civ. Action No. 18-1529 (BAH), 2020 WL

736772, at *6 (D.D.C. Feb. 13, 2020); see Indian River Cty., 945 F.3d at 527 (explaining that

"judicial review under . . . [the NEPA] is governed by the APA" because the NEPA does not

"suppl[y] a private right of action").   In the APA context, summary judgment is the mechanism

for deciding whether, as a matter of law, an agency action is supported by the administrative

record and is otherwise consistent with the APA standard of review.  See, e.g., Citizens to

Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 415–16 (1971), abrogated on other grounds

by Califano v. Sanders, 430 U.S. 99 (1977).  But, due to the limited role a district court plays in

reviewing the administrative record, the typical summary judgment standards set forth in Federal

Rule of Civil Procedure 56 are not applicable.  See Stuttering Found. of Am. v. Springer, 498 F.

Supp. 2d 203, 207 (D.D.C. 2007).  Rather, "[u]nder the APA, it is the role of the agency to

resolve factual issues to arrive at a decision that is supported by the administrative record,

whereas 'the function of the district court is to determine whether or not as a matter of law the

evidence in the administrative record permitted the agency to make the decision it did.'"  Id.

(quoting Occidental Eng'g Co. v. Immigration & Naturalization Serv., 753 F.2d 766, 769–70

(9th Cir. 1985)).  In other words, "when a party seeks review of agency action under the APA,

the district judge sits as an appellate tribunal[,]" and "[t]he entire case on review is a question of

law." Am. Bioscience, Inc. v. Thompson, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks omitted).

The APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness." Fed. Commc'ns Comm'n v. Fox Television Stations, Inc., 556 U.S. 502, 513 (2009).  It requires district courts to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not accordance with law[.]"  5 U.S.C. § 706(2)(A).  However, "the scope of review under the arbitrary and capricious standard is narrow and a [district] court will not substitute its judgment for that of the agency." Motor Vehicles Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983) (internal quotation marks omitted); see Citizens to Preserve Overton Park, 401 U.S. at 416 ("Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one.").  Nonetheless, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the acts found and the choice made.'" State Farm Mut. Auto. Ins. Co., 463 U.S. at 43 (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).  A district court must uphold an agency decision "so long as the agency 'engaged in reasoned decisionmaking and its decision is adequately explained and supported by the record.'" Clark Cty., Nev. v. Fed Aviation Admin., 522 F.3d 437, 441 (D.C. Cir. 2008) (quoting N.Y. Cross Harbor R.R. v. Surface Transp. Bd., 374 F.3d 1177, 1181 (D.C. Cir. 2004)).

### III.    ANALYSIS

The plaintiffs argue that summary judgment should be awarded to them because the BOEM (1) "irrationally and unlawfully assumed that the same environmental effects would occur even if it did not hold the lease sales[,]" Pls.' Mem. at 23 (capitalization removed), and

14

(2) "failed to rationally assess the effects of the lease sales on the environment[,]" id. at 32

(capitalization removed).  The federal defendants counter that summary judgment should be

awarded to the defendants because (1) the "BOEM complied with 40 C.F.R. § 1502.14 by

considering the alternative of no action[,]" Fed. Defs.' Mem. at 8 (capitalization removed), and

(2) the "BOEM took a hard look at the effects of the lease sales on the environment, as required

by [the] NEPA[,]" id. at 12.  The intervenor-defendants join the federal defendants' arguments,

see API's Mem. at 6–10; Chevron's Mem. at 3–11, and further argue that summary judgment

should be awarded to the defendants because, even if the plaintiffs prevail on their claims, they

"have failed to show the appropriate balance of equities and public interests necessary to

establish an entitlement to the vacatur or injunctive relief they seek[,]" API's Mem. at 13; see

Chevron's Mem. at 12.

The Court will first address whether the BOEM satisfied its obligations under the NEPA.

Specifically, the Court will consider (1) whether the BOEM considered a true no action

alternative and (2) whether the BOEM took a hard look at the effects of Lease Sales 250 and 251

on the environment.  Then, if the Court concludes that the BOEM did not satisfy its NEPA

obligations, the Court will address whether the plaintiffs have established that they are entitled to

the relief that they seek.

## A.      Whether the BOEM Considered a True No Action Alternative

The plaintiffs argue that the federal defendants "irrationally and unlawfully assumed that

the same environmental effects would occur even if it did not hold the lease sales[,]" Pls.' Mem.

at 23 (capitalization removed), because the "BOEM failed to evaluate a true no action alternative

by assuming the same leases and resulting development would occur in the future[,]" id. at 25

(capitalization removed), and "irrationally assumed that future leasing would result in the same

effects under the no action alternative[,]" id. at 27 (capitalization removed).  The federal

defendants respond that the "BOEM's explanation [in the no action alternative] is consistent with

its historical experience regarding reasonably foreseeable activities in the Gulf of Mexico"

because it accounts for the facts that "leases issued under prior sales will continue to have

impacts and periodic lease sales will likely occur in the foreseeable future."  Fed. Defs.' Mem. at

8–9.

     An EIS "should present the environmental impacts of the proposal and the alternatives of

comparative form [(the 'alternatives section')], thus sharply defining the issues and providing a

clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.

The alternatives section "is at the heart of the [EIS]."  Id.  The alternatives section must

"[i]nclude the alternative of no action."  Id. § 1502.14(d).

> The Council on Environmental Quality[6] has provided some guidance as to what
> the [n]o [a]ction [a]lternative discussion should include: [I]n instances involving
> federal decisions on proposals for projects[,] [n]o action . . . would mean the
> proposed activity would not take place and the resulting environmental effects from
> taking no action would be compared with the effects of permitting the proposed
> activity or an alternative activity to go forward.  Where a choice of no action by the
> agency would result in predicable actions by others, this consequence of the no
> action alternative should be included in the analysis.  For example, if denial of
> permission to build a railroad to a facility would lead to construction of a road and
> increased truck traffic, the EIS should analyze this consequence of the no action
> alternative.

Hammond v. Norton, 370 F. Supp. 2d 226, 241 (D.D.C. 2005) (fifth, sixth, and eighth alterations

in original) (internal quotation marks omitted).

     As the federal defendants correctly note, another member of this Court, when

"[p]resented with nearly identical language and explanations" in a supplemental EIS issued by

---

[6] The Council on Environmental Quality "promulgates regulations, binding on all federal agencies, to implement the
procedural provisions of the. . . []NEPA[]."  National Environmental Policy Act Regulations; Incomplete or
Unavailable Information, 51 Fed. Reg. 15,618, 15,618 (Apr. 25, 1986).

the BOEM regarding a proposed lease sale in the Gulf of Mexico, rejected the plaintiffs' exact argument. Fed. Defs.' Mem. at 10 (citing Oceana, 37 F. Supp. 3d at 172). In Oceana, the no action alternative at issue explained that "the cancellation of the proposed lease sale would not significantly change the environmental impacts of overall [Outer Continental Shelf] activity" because the resulting development of oil and gas would most likely be postponed to a future sale[,]" and "therefore, the overall level of [Outer Continental Shelf] activity in the [Central Planning Area] would only be reduced to a small percentage, if any." 37 F. Supp. 3d at 172. The court in Oceana therefore concluded that the "BOEM did consider a true no action alternative as mandated by [the] NEPA, and that its analysis was reasonable." Id. The court explained that the "NEPA requires the agency to use the 'rule of reason,'" id. (quoting Nevada v. Dep't of Energy, 457 F.3d 78, 93 (D.C. Cir. 2006)), and that the Council on Environmental Quality "encourages agencies to include in the no action alternatives analysis situations where a choice of no action by the agency would result in predictable actions by others[,]" id. (internal quotation marks omitted). The court concluded that the BOEM's "recogni[tion] that even if it cancelled th[at] lease sale, another lease sale in the same area would likely eventually go forward" was reasonable because "the Central Planning Area of the Gulf of Mexico is a hotbed for oil and gas leases generally" and the "BOEM is statutorily tasked with developing the [Outer Continental Shelf]." Id.; see id. at 172 n.24 (reasoning that "[i]t [was] [ ] very likely that even if th[at] particular lease was cancelled, another lease in the same area would likely present the same environmental risks, albeit further into the future" because the "BOEM ha[d] already implemented another [five]-year Leasing Program . . . for the Central Planning Area of the Gulf of Mexico").

Here, like the Oceana court, this Court concludes that the "BOEM did consider a true no action alternative as mandated by [the] NEPA, and that its analysis was reasonable." Id. at 172. As a preliminary matter, the Court agrees with the federal defendants' position that the no action alternatives at issue in Oceana and in this case are "nearly identical." Fed. Defs.' Mem. at 10. Compare Oceana, 37 F. Supp. 3d at 171–72 ("Alternative D is the cancellation of the proposed [Central Planning Area] lease sale. The opportunity for development of . . . gas that could have resulted from the proposed lease sale would be precluded or postponed. Any potential environmental impacts resulting from the proposed lease sale would not occur or would be postponed . . . . [T]he resulting development of oil and gas would most likely be postponed to a future sale; therefore, the overall level of [Outer Continental Shelf] activity in the [Central Planning Area] would only be reduced to a small percentage, if any. Therefore, the cancellation of the proposed lease sale would not significantly change the environmental impacts of overall [Outer Continental Shelf] activity." (internal quotation marks omitted)), with AR 15,559–60 ("Alternative E is the cancellation of a single proposed [Gulf of Mexico] lease sale within the 2017–2022 [ ] [p]rogram. The opportunity for development of the estimated oil and gas that could have resulted from a proposed action (i.e., a single proposed lease) or alternative to the proposed action[] . . . would be precluded or postponed to a future lease sale . . . . If a lease sale were to be cancelled, the resulting development of oil and gas would most likely be postponed to a future lease sale; therefore, the cumulative level of [Outer Continental Shelf] oil- and gas-related activity would only be reduced by a small percentage, if any. Therefore, the cancellation of a proposed lease sale would not significantly change the environmental impacts of overall [Outer Continental Shelf] oil- and gas-related activity.").

This Court, like the Oceana court, finds that the BOEM's conclusion that "[i]f a lease sale were to be cancelled, the resulting development of oil and gas would most likely be postponed to a future lease sale" and "the cumulative level of [Outer Continental Shelf] oil- and gas-related activity would only be reduced by a small percentage, if any[,]" AR 15,559–60, is reasonable, considering that that (1) "the Gulf of Mexico is a hotbed for oil and gas leases generally[,]" Oceana, 37 F. Supp. 3d at 172; (2) the "BOEM is statutorily tasked with developing the [Outer Continental Shelf][,]" id.; and (3) "[i]t is [ ] very likely that even if th[e] particular lease[s] [at issue] w[ere] cancelled, []other lease[s] in the same area would likely present the same environmental risks, albeit further into the future[,]" id. at 172 n.24, because "multiple future lease sales [in the Gulf of Mexico] are scheduled under the existing [ ] [2017–2022] [p]rogram developed pursuant to 43 U.S.C. § 1344[,]" Fed. Defs.' Reply at 4 n.5; see AR 4269 (2017–2022 program proposed lease sale schedule reflecting "ten [proposed lease] sales [between 2017 and 2022] in the [Gulf of Mexico] Program Area").

The plaintiffs' counterarguments are unavailing.  The plaintiffs first argue that the holding in Oceana "was based on an incorrect interpretation of [the] OCSLA that it 'mandates' [the] BOEM to 'implement lease sales[,]'" and that the "OCSLA mandates no such thing."  Pls.' Mem. at 27 (quoting Oceana, 37 F. Supp. 3d at 174).  The OCSLA "requires the Secretary . . . to maintain a comprehensive oil and gas leasing program to implement the policies of the [OCSLA]."  Energy Action Educ. Found. v. Andrus, 516 F. Supp. 90, 93 (D.D.C. 1980).  While the plaintiffs are correct that the OCSLA does not mandate the approval of every proposed lease sale, see Kerr-McGee Corp. v. Watt, 517 F. Supp. 1209, 1210 (D.D.C. 1981) ("The implementing regulations for the [OCSLA] provide that "[t]he United States reserves the right to reject any and all bids received for any tract, regardless of the amount offered." (quoting 43

C.F.R. § 3316.5(b)), it is instructive that Congress declared when it enacted the OCSLA that its policy objective was that "the [O]uter Continental Shelf . . . should be made available for expeditious and orderly development, subject to environmental safeguards[,]" 43 U.S.C. § 1332(3).  And, because "expeditious and orderly development" of the Outer Continental Shelf is a core tenet of the OCSLA, id., it was not unreasonable for the Oceana court to accept the BOEM's representations in the no action alternative at issue in that case that "even if [a] particular lease sale was cancelled, another lease in the same area would likely present the same environmental risks, albeit further into the future." Oceana, 37 F. Supp. 3d at 172 n.24. Accordingly, it is also not unreasonable for this Court to accept the BOEM's representations in the no action alternative at issue in this case that "the cancellation of [the] proposed lease sale[s] would not significantly change the environmental impacts of overall [Outer Continental Shelf] oil-and gas-related activity" because "the resulting development of oil and gas would most likely be postponed to a future lease sale[.]"  AR 15,559–60.

The plaintiffs next argue that the "BOEM did not evaluate how holding the proposed lease sales would compare with delaying the effects until later in time[] when the lease sale offerings, demand and supply, and lease bidding patterns will [be] different[,]" Pls.' Mem. at 29, and that other "[c]ourts have rejected similar environmental analyses when the agency relied on faulty assumptions about its no action alternative in the face of differing future conditions[,]" id. at 30 (citing N.C. Wildlife Fed'n v. N.C. Dep't of Transp., 677 F.3d 596 (4th Cir. 2012); Ctr. for Biological Diversity v. U.S. Dep't of the Interior, 623 F.3d 633 (9th Cir. 2010)).  In North Carolina Wildlife Federation, the Fourth Circuit concluded that the agencies "failed to take the required hard look at environmental consequences[,]" as required under the NEPA, because they relied on certain data that included underlying assumptions "without disclosing the data's

underlying assumptions" and "falsely respond[ed] to public concerns[.]"  677 F.3d at 605.  The

North Carolina Wildlife Federation court did not state that agencies could not rely upon data if it

included certain underlying assumptions, see id. (not reaching the question of "whether [the]

NEPA permit[ted] the [a]gencies to use [ ] [the] data"); it merely stated that such data could not

be relied upon if the underlying assumptions were not disclosed to the public in the EIS, see id.

at 604–05 ("When relevant information 'is not available during the [impact statement] process

and is not available to the public for comment[,] . . . the [impact statement] process cannot serve

its larger informational role, and the public is deprived of its opportunity to play a role in the

decision-making process.'" (alterations in original) (quoting N. Plains Res. Council v. Surface

Transp. Bd., 668 F.3d 1067, 1085 (9th Cir. 2011)).  In Center for Biological Diversity, the Ninth

Circuit concluded that the agency did "not conduct[] the 'hard look' that [the] NEPA requires[,]"

623 F.3d at 646, because it assumed that the environmental consequences of mining the land at

issue would be the same regardless of whether the land was publicly or privately owned, despite

a law imposing different land use requirements on publicly versus privately owned land, see id.

at 643.

 The Court finds that the plaintiffs' reliance on the North Carolina Wildlife Federation and

Center for Biological Diversity cases is misplaced and that those cases are distinguishable from

this case.  Unlike the underlying assumptions relied upon by the agencies in North Carolina

Wildlife Federation, which were not disclosed in the EIS, see 677 F.3d at 605, here, the

underlying assumption that the effects of holding the lease sales now, as opposed to sometime in

the future, are virtually the same was disclosed in the Supplemental EIS, cf. AR 15,584 (stating

that the projected effects of holding a lease sale are calculated "over the [fifty]-year analysis

period of 2017–2066").  Moreover, unlike the underlying assumptions in Center for Biological

Diversity, which were flatly at odds with controlling statutory authority, see 623 F.3d at 643,

here, the "BOEM [ ] did not make an incorrect assumption, but rather acknowledged a practical

reality of the OCSLA statutory scheme[,]" Oceana, 37 F. Supp. 3d at 174; see id. ("[T]he

OCSLA mandates that the Secretary, who delegates authority to [the] BOEM, implement lease

sales of the [Outer Continental Shelf].  As such, regardless of th[ese] particular lease[s] going

forward, in all likelihood, another one eventually will [be implemented] in . . . the Gulf of

Mexico." (citation omitted)).  Moreover, despite the BOEM's acknowledgment that projected

effects of holding a proposed lease sale "do not predict future oil and gas activities with absolute

certainty[,]" the BOEM's projections are "the best assumptions and estimates of a set of future

conditions that are considered reasonably foreseeable and suitable for presale impact analyses"

because "they were formulated using historical information and current trends in the oil and gas

industry[,]" AR 15,580.

 Accordingly, the Court concludes that the BOEM considered a true no action alternative.

**B.** **Whether the Federal Defendants Took a Hard Look at the Effects of the Lease Sales on the Environment**

 The plaintiffs next argue that the BOEM "failed to rationally assess the effects of the

lease sales on the environment[.]"  Pls.' Mem. at 32 (capitalization removed).  Specifically, they

argue that the BOEM's reliance on safety rules promulgated by the BSEE was arbitrary and

capricious because the "BOEM knew at the time that [the Department] was repealing substantial

portions of these reforms, largely erasing the safety gains[,]" Pls.' Mem. at 32, and the "BSEE's

enforcement and inspection programs are anything but rigorous[,]" id. at 40.  They further argue

that the BOEM's use of the 18.75% royalty rate was arbitrary and capricious because the "use of

the inaccurately higher royalty rate arbitrarily and capriciously skewed [the BOEM's] estimated

levels of development and production lower, impeding a full and fair discussion of the potential

effects of the lease sales[,]" id. at 42 (internal quotation marks omitted), and because the BOEM

"attempted to paper over [its] erroneous effects analysis at the last minute before Lease Sale 251

in the [r]ecord of [d]ecision[,]" id.  The federal defendants respond that the "BOEM was not

required to consider proposed amendments to rules[,]" Fed. Defs.' Mem. at 14, and that,

"[r]egardless, the proposed amendments d[id] not propose to eliminate safety and environmental

regulations[,]" id. at 16.  They further argue that the BOEM's use of the 18.75% royalty rate and

failure to supplement the EIS with that information was not arbitrary and capricious because "the

reduction was not a 'substantial change in the proposed action' or a 'significant new

circumstance' that would require supplementation of an EIS under the Council on Environmental

Quality Regulations."  Id. at 25 (quoting 40 C.F.R. § 1502.9(c)).  The Court will address each of

the plaintiffs' arguments in turn.

### 1. Whether the BOEM's Reliance on the BSEE's Safety Rules was Arbitrary and Capricious

The plaintiffs argue that the BOEM's reliance in the Supplemental EIS on the BSEE's

safety rules was arbitrary and capricious because the BOEM "knew at the time [it was preparing

the Supplemental EIS] that [the Department] was repealing large portions of these reforms,

largely erasing the safety gains[,]" Pls.' Mem. at 32, and because the GAO report purportedly

found that the "BSEE's enforcement and inspection programs [were] anything but rigorous[,]"

id. at 40, and "[w]hen commenters confronted [the] BOEM with the incongruity between its

analyses and the [GAO] report, [the] BOEM expressly declined to even consider the report[,]"

id. at 40–41.  The federal defendants respond that the "BOEM was not required to consider

proposed amendments to rules[,]" Fed. Defs.' Mem. at 14, and that, "[r]egardless, the proposed

amendments d[id] not propose to eliminate safety and environmental regulations[,]" id. at 16.

The Court first addresses whether the BOEM's reliance on the BSEE's rules was arbitrary and capricious in light of the fact that the Department was purportedly "repealing large portions of these reforms[.]"  Pls.' Mem. at 32.  As to this point, the plaintiffs argue that the "BOEM did not 'use the best available' information' when it completed the Supplemental EIS and issued the Records of Decision in Lease Sales 250 and 251" because the Department "already had proposed the Production Safety [ ] [Rule] [r]epeals in the Federal Register and had submitted proposed repeals of the Well Control Rule to the Office of Management and Budget[,]" Pls.' Reply at 19–20, and that "[o]nce the repeals were proposed, it became irrational for [the] BOEM to presume that [ ] [the Department] would not repeal at least some portions of the [ ] [Well Control and Production Safety] Rules[,]" id. at 21 (emphasis added).  However, contrary to the plaintiffs' argument, it is an

> established point of law that proposed regulations . . . have no legal effect.  By design, rulemaking—proposed rules, followed by notice and comment, leading to final rules—is a process of graduated decision-making resulting in final regulations.  It would make little sense for [ ] [a] court to short-circuit the process by giving effect to what were merely meant to be proposed regulations.

Sweet v. Sheahan, 235 F.3d 80, 87 (2d Cir. 2000) (citations omitted); see United States v. Springer, 354 F.3d 772, 776 (8th Cir. 2004) ("A major purpose of formal rulemaking is to ensure that agencies gather as much relevant information before promulgating final rules that will have the force and effect of law.  For this reason, an agency that exercises its discretion to propose a rule has no duty to promulgate its proposal as a final rule.  Thus, it is well-settled 'that proposed regulations . . . have no legal effect.'" (quoting Sweet, 235 F.3d at 87)).

> The omission of speculative information from an environmental impact statement prepared at the lease sale stage is permissible; however, an environmental impact statement which is incomplete due to the omission of ascertainable facts, or the inclusion of erroneous information, violates the disclosure requirement of 42 U.S.C. § 4332(2)(C).  The rule of reason requires that consideration be given to

practical limitations on the agency's analysis, such as the information available at the time.

Wilderness Soc'y v. Salazar, 603 F. Supp. 2d 52, 60–61 (D.D.C. 2009) (citation and internal quotation marks omitted).

Here, as the federal defendants correctly note, see Fed. Defs.' Mem. at 15 n.5, the BSEE's rules that the BOEM relied on in its Supplemental EIS were still in effect when the Supplemental EIS was issued, compare AR 15,473 (indicating that the Supplemental EIS was issued in December 2017), with Revised Production Safety Rule, 83 Fed. Reg. at 49,216 (finalized on September 28, 2018), and Revised Well Control Rule, 84 Fed. Reg. at 21,908 (finalized on May 15, 2019). Therefore, it was not arbitrary and capricious for the BOEM to issue a Supplemental EIS that did not take into account proposed amendments to the BSEE's rules because the BSEE "ha[d] no duty to promulgate its propos[ed] [rules] as [ ] final rule[s]" and the BSEE's proposed rules "ha[d] no legal effect" at the time the Supplemental EIS was issued. Springer, 354 F.3d at 776; see Nance v. Envtl. Protection Agency, 645 F.2d 701, 708 (9th Cir. 1981) ("[W]here the effect of legislation on future agency action is unclear, and the passage of the legislation is not assured until after all action preliminary to the agency rendering a final decision has been taken, and the time has passed during which the agency would normally be required to render that final decision, it was not arbitrary and capricious for the agency to approve a proposed change in air quality standards that did not take account of pending legislation.").

The Court next addresses whether the BOEM's reliance on the BSEE's rules was arbitrary and capricious in light of the GAO report purportedly finding that the "BSEE's enforcement and inspection programs [were] anything but rigorous." Pls.' Mem. at 40. As a preliminary matter, "an agency may properly base its evaluation of environmental impacts on the

assumption that other specialized agencies with jurisdiction will enforce permits and related

mitigation measures according to the law." Okanogan Highlands All. v. Williams, No. CIV. 97-

806-JE, 1999 WL 1029106, at *4 (D. Or. Jan. 12, 1999) (citing No GWEN All. of Lane Cty.,

Inc. v. Aldridge, 855 F.2d 1380, 1386–87 (9th Cir. 1988); City & Cty. of San Francisco v.

United States, 615 F.2d 498, 501 (9th Cir. 1980)); see Moapa Band of Paiutes v. U.S. Bureau of

Land Mgmt., No. 2:10-CV-02021-KJD, 2011 WL 4738120, at *7 (D. Nev. Oct. 6, 2011) ("[The

agency] also assumed in its determination that regulatory agencies charged with permit

enforcement would ensure compliance with the permit requirements.  This assumption is

reasonable." (citing Oknogan Highlands All., 1999 WL 1029106, at *4)), aff'd, 546 F. App'x

655 (9th Cir. 2013).  Moreover, to the extent that the plaintiffs argue that the GAO report casts

doubt on the "assumption that . . . [the BOEM] will enforce . . . mitigation measures according to

the law[,]" Okanogan Highlands All., 1999 WL 1029106, at *4, the Court rejects this argument.

Contrary to the plaintiffs' suggestion otherwise, the GAO report does not suggest that the BSEE

is not performing its enforcement duties at all; it merely suggests that there is room for

improvement of the BSEE's existing policies.  Cf. AR 27,102 (acknowledging that the BSEE

"had undertaken various reform efforts since its creation in 2011, but had not fully addressed

deficiencies in its investigative, environmental compliance, and enforcement capabilities

identified by investigations after the Deepwater Horizon incident" (emphasis added)).  This case

is thus distinguishable from Friends of Back Bay v. United States Army Corps of Engineers, the

case on which the plaintiffs rely, see Pls.' Mem. at 40 (citing 681 F.3d 581, 589 (4th Cir. 2012)).

In Friends of Back Bay, the agency issued a finding of no significant impact and issued a permit

authorizing channel dredging.  See 681 F.3d at 583, 586.  The agency's finding of no significant

impact[7] and issuance of the permit was "conditioned on [a]dequate funding for the enforcement of the [no-wake zone][,]" despite the fact that the agency was aware that funding for enforcement was neither available not had been allocated.  Id. at 585.  The court concluded that the agency's finding of no significant impact was arbitrary and capricious because, "[a]bsent any reasonable basis to conclude, that[] . . . the [no-wake zone] was being adequately enforced or its efficacy was otherwise assured, the concept thereof as discussed within the [environmental assessment] was a logical nullity."  Id. at 589; see id. (stating that the court was "unable to divorce the [agency's] demonstrably incorrect assumption of an effective [no-wake zone] from [the agency's] ultimate conclusion that no EIS need be prepared").  Here, simply because the GAO report identified areas for needed improvement within the BSEE does not render the BOEM's underlying assumption when it relied on the BSEE's rules that the BSEE would perform its duties to be "demonstrably incorrect[,]" id., and "even given the [BSEE']s] past [enforcement] failures, this Court will not presume that the [BSEE] would have necessarily failed to comply with [ ] [enforcement] requirements for future projects[,]" Sierra Forest Legacy v. U.S. Forest Serv., 652 F. Supp. 2d 1065, 1090 n.13 (N.D. Cal. 2009) (citing Sierra Club v. Penfold, 857 F.2d 1307, 1319 (9th Cir. 1988)); see Sierra Club, 857 F.2d at 1319 ("It would be a mistake for us to assume that because an [environmental assessment] was inadequate in the past, [the] [agency] will not comply with [the] NEPA in the future.").

---

[7] "As an integral underpinning of the . . . []NEPA[], an EIS must be devised in connection with every recommendation or report on proposals for . . . major [f]ederal actions significantly affecting the quality of the human environment." Friends of Back Bay, 681 F.3d at 584 (fourth alteration in original) (internal quotation marks omitted).  "To determine whether a particular action meets the threshold of significantly affecting environmental quality, federal agencies are required to draft an [e]nvironmental [a]ssessment [ ], which is a concise public document designed to provide sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact[.]"  Id. (fourth alteration in original) (internal quotation marks omitted).  "When an agency relies on [ ] a mitigated [finding of no significant impact], it may avoid preparing an EIS."  Id. at 587.

Accordingly, the Court concludes that the BOEM's reliance on the BSEE's safety regulations was not arbitrary and capricious.

### 2.      Whether the BOEM's Use of the 18.75% Royalty Rate was Arbitrary and Capricious

The plaintiffs next allege that the "BOEM stated that it presumed an 18.75% shallow-water royalty rate when it estimated activity levels, despite the fact that [the Department] had reduced that rate to 12.5% explicitly to increase bidding and lease activity." Pls.' Mem. at 42. They argue that the BOEM's use of the 18.75% royalty rate was arbitrary and capricious because the "use of the inaccurately higher royalty rate arbitrarily and capriciously skewed [the BOEM's] estimated levels of development and production lower, impeding a full and fair discussion of the potential effects of the lease sales[,]" id. (internal quotation marks omitted), and the BOEM "attempted to paper over [its] erroneous effects analysis at the last minute before Lease Sale 251 in the Record of Decision[,]" id. The federal defendants respond that the BOEM's use of the 18.75% royalty rate, rather than a 12.5% royalty rate, and failure to include a discussion of the 12.5% royalty rate in the Supplemental EIS was not arbitrary and capricious because "the reduction was not a 'substantial change in the proposed action' or a 'significant new circumstance' that would require supplementation of an EIS under the Council on Environmental Quality Regulations[,]" Fed. Defs.' Mem. at 25 (quoting 40 C.F.R. § 1502.9(c)), and that the "BOEM's decision not to add a discussion of the [royalty] rate change [from 18.75% to 12.5%] to the [ ] Supplemental EIS [was] well within the rule of reason[,]" id.

> The Supreme Court has explained that under the rule of reason, "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized." Rather, "a supplemental EIS must be prepared" only when a new action will affect the quality of the environment "in a significant manner or to a significant extent not already considered." Courts must also defer to the agency's "informed discretion about whether to prepare a supplemental EIS because it requires "substantial agency expertise." That said, "courts should not automatically defer

> to the agency's express reliance on an interest in finality without carefully
> reviewing the record and satisfying themselves that the agency has made a reasoned
> decision based on its evaluation of the significance—or lack of significance—of
> the new information."

Stand Up for Cal.! v. U.S. Dep't of Interior, 410 F. Supp. 3d 39, 57 (D.D.C. 2019) (citations

omitted) (quoting Marsh v. Or. Nat. Res. Council, 490 U.S. 360, 373, 374, 376–77, 378 (1989)).

"The overarching question is whether an EIS's deficiencies are significant enough to undermine

informed public comment and informed decisionmaking."  Sierra Club v. Fed. Energy Reg.

Comm'n, 867 F.3d 1357, 1368 (D.C. Cir. 2017).

> In evaluating an agency's decision not to prepare a supplemental EIS, courts
> employ a two-step inquiry.  First, the court must evaluate whether the agency took
> a hard look at the proffered new information.  Next, if the agency did take a hard
> look, the court must then determine whether the agency's decision not to prepare a
> supplemental EIS was arbitrary or capricious.

Chem. Weapons Working Grp. v. U.S. Dep't of Def., 655 F. Supp. 2d 18, 34–35 (D.D.C. 2009)

(citations and internal quotation marks omitted).

As to the first step of this inquiry, "whether the [BOEM] took a hard look at the proffered

new information[,]"

> [w]hen applying the hard look test, courts may consider whether the agency obtains
> opinions from its own experts, obtains opinions from experts outside the agency,
> gives careful scientific scrutiny, and responds to all legitimate concerns that are
> raised.  If the agency does take a hard look at new information and concludes the
> information is insignificant, the agency should provide a reasoned explanation for
> this conclusion.

Id. at 35 (citation and internal quotation marks omitted).  "The determination as to whether

information is either new or significant 'requires a high level of technical expertise'; thus, [the

Court] 'defer[s] to the informed discretion of the [agency]."  Blue Ridge Envtl. Def. League v.

Nuclear Reg. Comm'n, 716 F.3d 183, 197 (D.C. Cir. 2013) (quoting Marsh, 490 U.S. at 377).

Here, in response to a concern raised by one of the plaintiffs regarding "the reduction of the royalty rate from 18.75% to 12.5% for leases situated in water depths less than 200 meters[,]" AR 16,580, the BOEM considered the issue and concluded that

> any increase in activity would be minimal and that the range of anticipated production volumes and activity-level estimates that appear in the 2017–2022 . . . [p]rogram, . . . []EIS[][,] and supplemental EIS specific to . . . Lease Sale[s] 250 and 251 for leases to be awarded and anticipated to be awarded in water depths less than 200 meters remain current[,]

AR 16,580–81. This conclusion was based on an evaluation by the BOEM's Office of Resource Evaluation, "us[ing] a series of spreadsheet-based models to estimate the range of anticipated oil and natural gas production volumes and associated levels of exploration, development[,] and decommissioning activity on a per lease sale basis." AR 16,581. The spreadsheet-based models utilized "information regarding "[h]istorical lease sale specific leasing activity and trends, number of discoveries, discovery volumes and production volumes, drilling activity and trends, platform installations and decommissioning activity, oil and gas prices[,] and activity costs[,]" and "[t]he resulting forecast [was] analyzed and compared to actual historical data to [e]nsure that historical precedent and recent trends [we]re reflected in each activity forecast." AR 16,581.

Here, the BOEM "obtain[ed] [an] opinion[] from its own expert[]," Chem. Weapons Working Grp., 655 F. Supp. 2d at 35, the Office of Resource Evaluation, see AR 16,581, which is qualified to offer the opinion it provided, see Resource Evaluation Program, U.S. Dep't of the Interior Bureau of Ocean & Energy Mgmt., https://www.boem.gov/oil-gas-energy/resource-evaluation (last visited Apr. 21, 2020) (explaining that the "Resource Evaluation Program [ ] support[s] all BOEM program areas, both energy and non-energy, through critical technical and economic analysis" and is responsible for, inter alia, "[a]nalyzing Geological and Geophysical data in order to determine the volume and the nature of potential hydrocarbon accumulations, the

volume of reserves[,] and production characteristics of discovered [Outer Continental Shelf] oil and gas fields[]" and "[d]eveloping and updating computer models for evaluation of the economic value of [Outer Continental Shelf] hydrocarbon resources").[8]   Such reliance is permissible under the hard look test.  See Chem. Weapons Working Grp., 655 F. Supp. 2d at 35 (stating that "agencies, particularly those dealing with technical and scientific matters, are entitled to rely on the views of their own experts, 'so long as the experts are qualified and express a reasonable opinion[]'" (quoting Sabine River Auth. v. U.S. Dep't of Interior, 951 F.2d 669, 678 (5th Cir. 1992)); see also id. at 43 ("Although an agency should consider the public's concerns, provided the agency responds to legitimate concerns, it may rely upon its own experts in making procedural decisions." (citing Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 288 (4th Cir. 1999)).  The BOEM "t[ook] a hard look at [the] new information and conclude[d] the information was insignificant," id.; see AR 16,580–81 (stating that the BOEM's "analyses of the impact that reducing the royalty rate from 18.75% to 12.5% . . . in the . . . []EIS[] and Supplemental EIS specific to . . . Lease Sale[s] 250 and 251 . . . remain current"), and also "provide[d] a reasoned explanation for this conclusion[,]" Chem. Weapons Working Grp., 655 F. Supp. 2d at 35, see AR 16,581 (explaining that a reduction in the royalty rate does not affect the analysis because "[s]eventy years of exploration and production activity in the shallow water areas of the Gulf [of Mexico] has depleted much of the area reserves and the opportunity for undiscovered resources is limited to relatively small accumulations that require little activity to exploit the resource").  The Court therefore concludes that the BOEM "took a hard look at the proffered new information[,]" Chem. Weapons Working Grp., 655 F. Supp. 2d at 24, and will proceed to the second step of the inquiry.

---

[8] As the Court previously explained, see Part I.B.2.b, supra, the Court may take judicial notice of information posted on the official websites of government agencies.

As to the second step of the inquiry, "whether the [BOEM's] decision not to prepare a supplemental EIS was arbitrary or capricious[,]" id. at 35, "[a]lthough review [of the decision] must be 'searching and careful,' the [C]ourt must not substitute its own judgment for that of the agency[,]" id. (quoting Johnson, 165 F.3d at 287), and because the BOEM "is making predictions, within its area of special expertise, . . . [w]hen examining this kind of scientific determination, as opposed to simple findings of fact, a reviewing court must generally be at its most deferential[,]" Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc., 462 U.S. 87, 103 (1983).  Here, the "BOEM [ ] reanalyzed the forecasted oil and gas exploration, development, and production activity expected from [ ] [L]ease [S]ale 251 following the reduction of royalty rates from 18.75% to 12.5% in waters 200 meters or less" and concluded that "[t]he forecasted scenario [in the Supplemental EIS], based originally on 18.75% royalty rates, remain[ed] valid" because "[a]ny additional activity that could occur as a result of the change in royalty rate in shallow water [was] still expected to be within the range of foreseeable activity scenario under which the analysis was performed." AR 4132.  The Court concludes that "[g]iven this history of [ ] reassessment, [the BOEM's] actions cannot be said to have been based on a 'clear error of judgment[,]'" Chem. Weapons Working Grp., 655 F. Supp. 2d at 44 (quoting Overton Park, 401 U.S. at 416), which "follows other courts' decisions to uphold agency discretion in this area[,]" Stand Up for Cal.!, 410 F. Supp. 3d at 59; see, e.g., Nat'l Comm. for the New River v. Fed. Energy Reg. Comm'n, 373 F.3d 1323, 1330 (D.C. Cir. 2004) ("[T]he [agency's determination that the new information was not significant enough to warrant preparation of a supplement to the [draft EIS][] is entitled to deference." (citing Marsh, 490 U.S. at 375–76)).  Accordingly, the Court concludes that the Supplemental "EIS's deficiencies are [not] significant enough to undermine informed public comment and informed decisionmaking[,]" Sierra Club, 867 F.3d at

1368, and that the BOEM's failure to supplement the Supplemental EIS with the 12.5% royalty rate was not arbitrary and capricious, see City of Olmsted Falls, Ohio v. Fed. Aviation Admin., 292 F.3d 262, 274 (D.C. Cir. 2002) (explaining that "[a] supplemental EIS is only required where new information provides a seriously different picture of the environmental landscape" and concluding that the agency's decision not to supplement the EIS was not arbitrary and capricious where "there simply [was] not significant new information, and the landscape [was] unchanged" (internal quotation marks omitted)).

Because the Court has concluded that the BOEM has satisfied its obligations under the NEPA and the plaintiffs are not entitled to the relief that they seek, the Court will deny the plaintiffs' motion for summary judgment and grant the federal defendants' and the intervenor-defendants' cross-motions for summary judgment.[9]

## IV.    CONCLUSION

For the foregoing reasons, the Court concludes that the BOEM did not act arbitrarily and capriciously in preparing the no action alternative, by relying on the BSEE's safety rules, or by choosing not to supplement the Supplemental EIS with the 12.5% royalty rate.  Therefore, the Court will deny the plaintiffs' motion for summary judgment and grant the federal defendants' and the intervenor-defendants' cross-motions for summary judgment.

**SO ORDERED** this 21st day of April, 2020.[10]

REGGIE B. WALTON
United States District Judge

---

[9] Because the Court concludes that the plaintiffs are not entitled to the relief they seek, the Court need not address the parties' arguments regarding the appropriateness of the plaintiffs' requested remedies.

[10] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.